**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;<br><br>     *Movants*,<br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>     *Respondent*. | No. 1:26-mc-19 |

**BRIEF IN SUPPORT OF MOVANT STATES' MOTION TO QUASH SUBPOENA**

Kwame Raoul
 *Attorney General of Illinois*
Cara Hendrickson*
 *Executive Deputy Attorney General*
Katharine Roller*
Paul Berks*
 *Complex Litigation Counsels*
Gretchen Helfrich*
 *Deputy Chief, Special Litigation Bureau*
Molly Mauck*
 *Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
115 South LaSalle St.
Chicago, IL 60603
312-814-3000

Counsel for the State of Illinois

\* *Pro hac vice forthcoming*
*Additional counsel in signature block*

Jay Jones
 *Attorney General of Virginia*
Tillman J. Breckenridge (#85647)
 *Solicitor General*
Megan C. Keenan (#102489)
 *Deputy Solicitor General*
 Counsel of Record
Mikaela A. Phillips (#97164)
 *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia

August 13, 2026

**TABLE OF CONTENTS**

I.   Introduction ................................................................................................................. 1

II.  Background .................................................................................................................. 2

     A.  DHS and FMCSA's Coordinated Demand for CDLIS Data .............................................. 2

     B.  The States' Interest in CDLIS ............................................................................ 6

III. Jurisdiction ................................................................................................................. 9

IV.  Argument ................................................................................................................... 10

     A.  The States May Move to Quash the Subpoena. .................................................. 10

     B.  The Subpoena Exceeds DHS's Authority. ............................................................. 11

         1.  The Subpoena Falls Outside the Agency's Authority Because It Constitutes an
             Improper "John Doe" Subpoena. ................................................................. 12

         2.  The Subpoena's Stated Purposes Fall Outside DHS's Statutory Authority and
             Are Not Reasonably Related to DHS's Demand. ........................................... 14

         3.  The Circumstances Surrounding Issuance of the Subpoena Plausibly Raise an
             Inference of Bad Faith. ................................................................................ 16

         4.  The Subpoena Is Procedurally Invalid. ........................................................... 17

     C.  The Subpoena Violates the Driver's Privacy Protection Act. .............................. 17

     D.  The Subpoena Violates the Privacy Act. ............................................................. 19

     E.  The Court Should Stay Compliance with the Subpoena Pending Resolution of This
         Motion ........................................................................................................... 21

V.   Conclusion .................................................................................................................. 22

## I. INTRODUCTION

For almost forty years, a little-known database called the Commercial Driver's License Information System (CDLIS) has been making America's roads safer. Operated by a nonprofit entity, the American Association of Motor Vehicle Administrators[1] (AAMVA, the recipient of the subpoena at issue here), the database stores basic records about commercial driver's license (CDL) holders—records contributed and maintained by the States so that other States may search them to discover whether a CDL applicant has a CDL in another State or has an out-of-state driving record that disqualifies them. CDLIS exists to serve the States in their public safety mission; to keep dangerous drivers from being licensed to operate 18-wheelers, school buses, and other commercial motor vehicles. It is not and never was intended for immigration enforcement.

But this database proved too tempting a target for an administration bent on building a nationwide surveillance system with State records. After attempting to seize individual, personal identifying information from the States' food stamp data,[2] Medicaid data,[3] voter rolls,[4] and welfare data,[5] the Department of Homeland Security (DHS), in conjunction with a sub-agency of the Department of Transportation (DOT), the Federal Motor Carrier Safety Administration (FMCSA), now seeks to expropriate 17 million State-owned CDLIS records, by means of a subpoena served on AAMVA, the database's operator. If DHS succeeds in acquiring this data, it will harm the States, undermine the important public-safety function of CDLIS, and violate the law.

---

[1] AAMVA is a trade association for motor vehicle administrators, of which all 50 States and the District of Columbia are members.

[2] *See California v. USDA*, No. 25-cv-6310 (N.D. Cal).

[3] *See California v. HHS*, No. 25-cv-05536 (N.D. Cal.).

[4] *See, e.g.*, *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS (C.D. Cal.); *United States v. Evans*, No. 25-4403 (D.D.C.); *United States v. Koski*, No. 3:26CV42 (RCY) (E.D. Va.); *see also* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information,* Brennan Ctr. for Just., https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[5] *See New York v. Administration for Children & Families*, No. 26-cv-02726 (D.D.C.).

1

The Court should quash DHS's subpoena.  The subpoena is invalid on its face: it is a quintessential "John Doe subpoena" that unlawfully seeks personal information, including names, dates of birth, and social security numbers, about millions of individuals unknown to DHS; it fails to identify any legitimate statutory purpose that would plausibly require the production of this vast trove of data; and it was issued in manifest bad faith to assist the enforcement of FMCSA's parallel demand for the same data.  What is more, the subpoena violates the Driver's Privacy Protection Act—which bars the disclosure of driver records outside of carefully enumerated circumstances— and would establish a new system of records covering countless individuals in violation of the Privacy Act of 1974.

## II. BACKGROUND

### A.    DHS and FMCSA's Coordinated Demand for CDLIS Data

On June 25, 2026, FMCSA sent a letter to AAMVA making an unprecedented demand: that AAMVA turn over records containing the name, date of birth, State of record, license number, and Social Security number (SSN) of every driver in the entire CDLIS database going back five years, comprising some 17 million records.  Roller Decl. ¶ 3, Ex. 1 at 2.  These records, stored in CDLIS by the States, are called "Master Pointer Records" (MPRs), because they serve to "point" one jurisdiction to another State where the applicant has a previous driving record, so that the searching jurisdiction can request the applicant's full driving record from that other State.  Triepke Decl. ¶ 8–12.  According to AAMVA itself, FMCSA had never before demanded *any* portion of the CDLIS database, much less the entire corpus of data.  Roller Decl. ¶ 3, Ex. 1 at 3.  In addition to this demand, FMCSA demanded to know, for any pointer record that did not contain a Social Security number, the date when that number was removed.  *Id.* at 2.  This final request is not information that AAMVA stores in the ordinary course.  Moreover, CDLIS is designed to respond only to searches by Social Security number, or by the combination of an applicant's name and date

of birth.  Duesterhaus Decl. ¶ 10–12.  It cannot be queried on an indiscriminate or categorical basis—such as to pull all drivers with the last name "Smith"—much less to make a query that would return the entire corpus of records.  *Id.*

The June 25 letter initiated an exchange of correspondence between AAMVA and FMCSA about this demand.  In a response sent on June 30, AAMVA raised several concerns.  It noted that the contract between the two entities did not entitle FMCSA to pointer records.  It also noted that it would have to assess its legal obligations under both the DPPA and the privacy laws in all U.S. jurisdictions.  To assess these issues, AAMVA asked for "the specific intended use of the information," saying that it "must understand what agency or agencies will use the information and for what government function or functions."  Roller Decl. ¶ 3, Ex. 1 at 3–4.

In an undated response sent on July 7, 2026, FMCSA asserted that it would "use the CDLIS data as part of our statutory and regulatory oversight in our ongoing efforts to ensure the integrity and issuance of [CDLs]" and "to fulfill its federal safety and regulatory obligations."  *Id.* at 5.  FMCSA provided no further justification for its demand, but asserted that its demand "falls squarely within" the so-called "government use" exception to the DPPA, 18 U.S.C. § 2721(b)(1).  *Id.* at 5–6.

On July 10, 2026, AAMVA wrote reiterating its concerns about its obligations under the DPPA, and set forth its "understanding that [the government use] exception does not create a blanket authorization to disclose driver records whenever asked by a government agency."  *Id.* at 7.  On the contrary, AAMVA's view was that it "must consider whether each data element requested is necessary to the governmental purposes for which it was requested.  In other words, we must at least know what government agency will use the records for what government function."  *Id.* at 7–8.

On July 23, 2026, AAMVA officials and FMCSA officials met in-person to discuss FMCSA's demand and AAMVA's concerns. The meeting ended with FMCSA making an explicit threat to terminate all of AAMVA's federal grants and contracts and file litigation if AAMVA did not inform DOT by the following day (July 24, 2026) whether AAMVA intended to produce the 17 million pointer records. *Id.* at 11.

In its July 24 follow-up letter to AAMVA, FMCSA reiterated its view that its request was covered by the government use exception to the DPPA, because "FMCSA intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. §§ 311 and 313, including verifying CDL validity and conducting motor carrier safety assessments." *Id.* at 9. FMCSA also stated that it was authorized to make "subsequent redisclosure[s] to federal partner agencies . . . provided the data is used strictly in furtherance of legitimate government functions." *Id.*

AAMVA responded the same day, writing that it intended to disclose the records to FMCSA "on or around August 17," *id.* at 11, and asking FMCSA not to follow through on its threat to terminate AAMVA's grants and contracts, because "[d]oing so will cause significant disruption to the national commercial driver licensing program, including CDLIS. Disruption to these programs, particularly CDLIS, will have immediate negative impacts on all jurisdictions, including the inability for all 50 states and the District of Columbia to issue or renew any CDL as well as non-CDL driver licenses." *Id.* at 12. Perhaps recognizing that AAMVA faced potential legal liability for making this disclosure, AAMVA asked DOT to "confirm in writing that AAMVA's production of the pointer records will be an act carried out on behalf of, and at the specific direction of, DOT." *Id.* Neither DOT nor FMCSA ever confirmed this, for reasons that soon became clear.

4

On July 27, 2026, AAMVA sent a letter to U.S. State driver licensing agency administrators, informing them of FMCSA's data demand, which the letter described as "unique." *Id.* at 17–18.  AAMVA asked that the State agencies provide information about "any jurisdiction-specific-law or agreement-related limitations that may be relevant" to the data demand by August 3, 2026.  *Id.* at 18.  In response, many States sent letters to AAMVA opposing disclosure outright, warning AAMVA that disclosing their CDLIS records to FMCSA would violate their contracts with AAMVA or federal and State laws, or requesting additional time to assess the implications of FMCSA's extraordinary demand.  *See e.g.*, Triepke Decl. ¶ 16, Ex. A.

But during this time, the federal government began to escalate its tactics.  On July 28, the day after AAMVA sent its letter to its membership, DHS served a subpoena on AAMVA, in person (the "First Subpoena").  *See* Roller Decl. ¶ 3, Ex. 1 at 14.

The First Subpoena, entitled "Immigration Enforcement Subpoena," called for the production of exactly the same data demanded by FMCSA.  It cited as legal authority for DHS's demand 8 U.S.C. § 1225(d).  *Id.*  The First Subpoena was short-lived: a subsequent letter from AAMVA referenced an email sent by FMCSA staff in which the staff informed AAMVA that FMCSA and DHS had "coordinated their data demands" and that DHS intended to withdraw the subpoena "due to AAMVA's efforts to cooperate with FMCSA."  *Id.*  DHS then did, in fact, withdraw the First Subpoena.  *Id.* at 21.

That subsequent letter from AAMVA to FMCSA, sent on August 7, 2026, informed FMCSA that AAMVA would convene its board of directors on August 14, 2026, to consider an "opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data."  *Id.* at 14.  AAMVA noted that FMCSA had requested that production begin on a rolling basis on August 10, but stated that it could not produce any bulk data before the August 14 meeting,

5

emphasizing that "[a]t bottom, this is state data that does not belong to AAMVA, necessitating a measured approach." *Id.*

The federal government evidently disagreed. On August 11, *i.e.*, two business days after the federal government learned that AAMVA might not produce all fifty States' records on August 17 after all, FMCSA wrote to AAMVA that "DOT has no choice but to take immediate action to secure the production of the requested pointer records," by which it meant that "[t]oday, the Department of Homeland Security," *not* DOT or FMCSA, "will reissue the administrative subpoena it previously withdrew." *Id.* at 21. That same day, DHS served a second administrative subpoena on AAMVA (hereinafter, "the subpoena"). Bellows Decl. ¶ 31, Ex. 1. The subpoena is identical to the First Subpoena and the FMCSA data demand, right down to the specific requirement that records without an SSN must specify when the SSN was deleted. *Id.* The title of the subpoena, again, is "IMMIGRATION ENFORCEMENT SUBPOENA." It demands a response by 8:00 a.m. Eastern Time on August 17, 2026—less than one week after service, and the same date that AAMVA had previously planned to disclose the records at issue to FMCSA. *Id.* The stated reason for the subpoena, as identified in the cover letter, is "investigating illegal practices in commercial driver's license (CDL) schools, identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens, and conducting civil immigration enforcement." *Id.*

**B.    The States' Interest in CDLIS**

As both the federal government and AAMVA have expressly stated, the records stored in CDLIS are owned by the States. In a DOT 2022 Privacy Impact Assessment regarding CDLIS, for example, DOT affirmed that "FMCSA is not the owner of the data," and instead "relies on the [States] for the quality and integrity of the CDLIS data, as the information is collected, owned, and

6

maintained by each individual [State]."[6]  *See also* Commercial Driver's License (CDL) Standards; Incorporation by Reference of a New State Procedures Manual (SPM), 89 Fed. Reg. 50235, 50237 (June 13, 2024).  All information stored in CDLIS is contributed by the States.  Only the States—not AAMVA or the federal government—have the power to add, delete, or alter the CDLIS records they have contributed, which they update in real time and regularly amend to eliminate or correct erroneous or out-of-date entries.  *See, e.g.*, AAMVA, CDLIS State Procedures Manual d.2, at 17, 50–52 (2025); *see e.g.,* Wakumoto Decl. at 4 ¶ 13; Wint Decl. at 4 ¶ 13.  To protect these and other State-owned driver records, the legislatures of many States, including many of the Movant States here, have passed laws governing how State driver's license information may be handled, to whom it may be disclosed, and for what purpose.[7]

DHS's subpoena thus demands that AAMVA turn over *State* records—records reflecting sensitive, personal information for millions of State residents.  The real-world consequences of this unlawful transfer of custody would be significant.[8]  The data in CDLIS—including individuals' names, dates of birth, and Social Security numbers or lack thereof—is highly sensitive personal identification information that is protected by both federal and state law.  DHS now seeks

---

[6] U.S. Dep't. of Transp., Privacy Impact Assessment: Federal Motor Carrier Safety Administration (FMCSA) State Compliance Records Enterprise (SCORE) System, p. 8 (Aug. 15, 2022).

[7] For example, the California Information Practices Act (IPA), Cal. Civil Code § 1798 *et seq.*), among other state laws, strictly prohibits the disclosure of personal information by State agencies, including the California DMV, subject to limited, narrow exceptions. Cal. Civil Code § 1798.1.  Similarly, the Illinois Vehicle Code (625 Ill. Comp. Stat. 5/*et seq.*) strictly limits the disclosure of highly restricted personal information (HRPI), including Social Security numbers and personal identifying information (PII), such as names, addresses, dates of birth, and driver's license numbers. 625 Ill. Comp. Stat. 5/1-125.9, 159.2.  The District of Columbia and other states have similar laws.  *See, e.g.*, D.C. Code § 50-1401.0lb; 21 Del. C. §§ 305; 305(p); Wis. Stat. § 343.14(2j); Mich. Comp. Laws § 257.208c; 2022 Mass. Acts, ch. 81, § 7, *available at* https://perma.cc/B5A5-247V; 940 Mass. Code Regs. § 37.01 *et seq.*

[8] On August 13, 2026, in a related matter filed in this district, Movant States moved for a temporary restraining order against FMCSA and AAMVA to protect their respective CDLIS data. *See State of Illinois, et al. v. U.S. Department of Transportation, et al.*, Case No. 1:26-cv-2547 (E.D. Va.).

to coerce AAMVA into transferring that information to the federal government but has offered no assurances regarding the protections it will take with the data—if any.

Moreover, transfer of the States' CDLIS records to DHS would profoundly alter the nature of the CDLIS database and deprive the States of control over their data. It would create a brand-new database controlled by the federal government but populated in the first instance by the States' data. The States would have no access to, or control over, that data, and so would lose the ability to superintend, secure, and verify their records. That creates a significant risk that DHS (or other federal agencies to which DHS might transfer the data) would take adverse action against the States or their residents, including immigration enforcement proceedings, on the basis of out-of-date, incomplete, and erroneous data. *See* Hastings Decl., ¶25–28; Arroyo Decl. at 6 ¶ 26–32, 7 ¶ 35–36.

Disclosure of the Movant States' CDLIS data pursuant to the subpoena will also impose significant compliance burdens on the States, which have relied on the security and confidentiality of CDLIS records in designing their own driver information systems, and in making representations to applicants about the confidentiality of the information they submit to the Movant States. *See e.g.*, Bustle Decl. at 2 ¶ 4, 6 ¶¶ 26–33, 8 ¶¶ 40–42. Those representations, on application forms and other communications, may need to be revised, requiring the expenditure of significant State resources. *See e.g.*, Catalfamo Decl. at 8 ¶ 41–42; Nizer Decl. at 8 ¶ 40; Jack Decl. at 9 ¶ 44.

Most importantly, the Movant States' residents entrust them with their personal data when they apply for a commercial driver's license, and that trust would be shattered if the data is turned over to DHS, especially without controls on how DHS may use the data. One obvious consequence of this loss of trust would be that fewer people would seek CDLs from the Movant States. *See,*

8

*e.g.*, Miles Decl. at 6 ¶¶ 29–31; Benfield Decl. at 6 ¶ 29.  This would mean a loss of revenue to the Movant States from fees that CDL applicants pay.  *See, e.g.*, Duesterhaus Decl. ¶ 31.  But far more significant is the chilling effect of the transfer of data on individuals who are concerned in general about disclosing their personal information to the federal government, such as non-citizens who are legally present in the United States and lawfully qualified to obtain a CDL and who fear being subject to DHS's dragnet immigration-enforcement campaign.  *See, e.g.*, Miles Decl. at 6 ¶¶ 29–31; Benfield Decl. at 6 ¶ 29.  Moreover, residents who would otherwise become qualified operators of commercial motor vehicles and contributors to the Movant States' economies may avoid doing so, or they may attempt to drive commercial motor vehicles without a license, potentially posing a risk to public safety in the Movant States.

### III. JURISDICTION

Under Rule 45(d)(3)(A) of the Federal Rules of Civil Procedure, "the court for the district where compliance is required must quash or modify a subpoena" that requires disclosure of protected matter or subjects a person to undue burden.  Procedures under Rule 45 are applicable to the federal administrative subpoena at issue here pursuant to Rule 81(a)(5), which provides that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." This district is a proper venue for the Movant States to file this motion because the American Association of Motor Vehicle Administrators (AAMVA) is located in this district and has been demanded to transmit responsive information from this district.  *See, e.g.*, *In re Boeing Co. Aircraft Sec. Litig.*, 344 F.R.D. 281, 282 (D.D.C. 2023) (explaining that "a subpoena 'requires compliance' in the location where it directs production"); *HI.Q, Inc. v. ZeetoGroup, LLC*, No. MC 22CV1440-LL-MDD, 2022 WL 17345784, at *8 (S.D. Cal. Nov. 29, 2022) (noting that "the 'place of

9

compliance'" may also include the place "where the documents sought are located or where the nonparty subpoena recipient resides or works").

## IV. ARGUMENT

DHS's subpoena is unlawful. First, the subpoena is facially invalid: it is a "John Doe subpoena" that unlawfully seeks to conduct a fishing expedition by seizing personal information about millions of individuals unknown to DHS; it fails to identify any legitimate statutory purpose that would plausibly require the production of 17 million records; and it was issued in manifest bad faith to assist the enforcement of FMCSA's parallel demand for the same data. What is more, the subpoena violates the DPPA and would assemble a new system of records covering countless individuals in violation of the Privacy Act. For all of these reasons—each of which is independently sufficient to render the subpoena unlawful—the Court should quash the subpoena.

**A.      The States May Move to Quash the Subpoena.**

A party has standing to challenge a subpoena issued to a third party when the party "claims some personal right or privilege in the information sought by the subpoena." *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 239 (E.D. Va. 2012) (quoting *United States v. Idema*, 118 F. App'x 740, 744 (4th Cir. 2005)). Parties unquestionably have "a personal right or interest in protecting their *own* . . . information from disclosure." *Consumer Fin. Prot. Bureau v. Nexus Servs., Inc.*, No. 5:21-cv-00016, 2022 WL 1597840, at *6 (W.D. Va. 2022). And parties also "have an interest in . . . subpoenaed materials due to their concern regarding the disclosure of personal information contained in those materials." *United States v. Vo*, 78 F. Supp. 3d 171, 175 (D.D.C. 2015).

Here, the Movant States have standing on both grounds. The records subject to the subpoena belong to the Movant States: as AAMVA itself has said, the States are the "owners" of the records, and they have sole authority to alter or delete them. Roller Decl. ¶ 3, Ex. 1 at 11. In addition, the States have concerns "regarding the disclosure of personal information contained in

those materials." *United States v. Vo*, 78 F. Supp. 3d at 175 (D.D.C. 2015).  Among other harms, such disclosure would breach the States' assurances of confidentiality to CDL applicants and holders, deter individuals from applying for licenses, likely induce some individuals to take public safety risks by driving without a CDL, and require the States to undertake costly measures to update their disclosures to applicants.  *See supra* pp. 8–9.

In addition, it is appropriate for the States to file this motion now.  Numerous other courts have entertained similar pre-enforcement suits by third parties who possess the principal interest in the records.  *See, e.g.*, *In re Admin. Subpoena to Children's Hosp.*, No. 8:26-CV-01834, 2026 U.S. Dist. LEXIS 126801, WL 1660098, at *15 (D. Md. June 9, 2026); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-MC-0007-MSM-AEM, 2026 U.S. Dist. LEXIS 106783, WL 1392565, at *10 (D.R.I. May 14, 2026); *In re Summons Issued to Meta Platforms*, Inc., No. 25-MC-80325, Dkt. No. 3 (N.D. Cal. Oct. 17, 2025).  That is because, for parties like the Movant States, waiting until the government moves to enforce the subpoena against a third party may be too late: "In cases in which an administrative subpoena is directed to a party other than the holder of a privacy interest in the targeted items, the rights-holder will often not be afforded an opportunity to object" because the target of the subpoena "ha[s] no reason to resist compliance." *Hell's Angels Motorcycle Corp. v. County of Monterey*, 89 F. Supp. 2d 1144, 1151 (N.D. Cal. 2000).  That risk is particularly acute here, as AAMVA has previously stated that it would accede to the federal government's demands, and it has substantial incentives—including the threatened cutoff of all of its federal funding—to do so again.  *See* Roller Decl. ¶ 3, Ex. 1 at 11.

**B.      The Subpoena Exceeds DHS's Authority.**

An administrative agency's authority to issue subpoenas "is created solely by statute." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Sch.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (quoting *Peters v. United States,* 853 F.2d 692, 696 (9th Cir. 1988)).  As the

11

Fourth Circuit has explained, an administrative subpoena is proper only if "(1) the inquiry is within the authority of the agency and is for a proper purpose; (2) the matter requested is reasonably relevant to the inquiry; and (3) the demand is not unreasonably burdensome or broad." *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 166 (4th Cir. 1988); *see United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Further, a court may inquire into the good or bad faith of an agency in issuing an administrative subpoena if the movant "makes an adequate showing that the agency is acting in bad faith or for an improper purpose, such as harassment." *Resolution Trust Corp. v. Frates*, 61 F.3d 962, 965 (D.C. Cir. 1995) (citation modified); *see also Connor v. United States*, 434 F.3d 676, 680 (4th Cir. 2006) (noting that improper purposes include "to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation" (cleaned up)). Here, the DHS subpoena is invalid on each of these grounds.

**1.    The Subpoena Falls Outside the Agency's Authority Because It Constitutes an Improper "John Doe" Subpoena.**

It is well-established that section 1225(d) does not grant DHS authority to issue "John Doe subpoenas"—that is, subpoenas that request "information concern[ing] individuals whose identity is currently unknown to [the agency]." *Peters*, 853 F.2d at 698–99 & 695 n.3. As the Ninth Circuit explained nearly four decades ago, where Congress has wished to permit other agencies to issue such subpoenas, it "specifically authorized" them to do so and "provided unique procedural safeguards to protect the unknown parties." *Peters*, 853 F.2d at 697–98. In the tax laws, for instance, Congress enacted a provision entitled "[a]dditional requirement in the case of a *John Doe* summons," which prohibits the IRS from issuing a John Doe summons unless the IRS first persuades a court that the summons relates to an investigation of "a particular person or ascertainable group or class of persons," that "there is reasonable basis for believing that such

12

person or group or class of persons" has violated the law, and that the information "is not readily available from other sources." *Id.* at 698 (quoting 26 U.S.C. § 7609(f)); *see United States v. Bisceglia*, 420 U.S. 141, 152 (1975) (Blackmun, J., concurring) (broad subpoena language does not necessarily grant "authority to issue a 'John Doe' summons where neither a particular taxpayer nor an ascertainable group of taxpayers is under investigation"). Against this backdrop, the court explained, it was highly improbable that Congress granted DHS authority to issue John Doe subpoenas "*sua sponte*" in section 1225(d) without employing any of "the same language, authorization, safeguards, or policy underpinnings," or enacting text that "specifically authorized" them. *Peters*, 853 F.2d at 698–99; *cf. United States v. Minker*, 350 U.S. 179, 187–88 (1956) (because section 1225(d) confers a "power capable of oppressive use," courts should adopt a "restrictive reading" of its terms unless Congress speaks with "appropriate explicitness").

The subpoena at issue here is a textbook John Doe subpoena. It directs AAMVA to provide personally identifying information about millions of people unknown to the agency, including their "Name[s]," "Date of Birth," and "Social Security Number." Bellows Decl. ¶ 31, Ex. 1 at 3. The subpoena thus demands that AAMVA "surrender information concerning [individuals] whose identity is current unknown to" DHS. *Peters*, 853 F.2d at 695 n.3. DHS has followed none of the constraints or guardrails (such as limiting its request to an ascertainable group of persons suspected of violating a law within the agency's jurisdiction) that would allow a court to order enforcement of an agency-issued subpoena. *See*, *e.g.,* Nathaniel Gleicher, Note, *John Doe Subpoenas: Toward a Consistent Legal Standard*, 118 Yale L.J. 320, 338–45 (2008) (summarizing safeguards that courts generally apply before authorizing John Doe subpoenas). Section 1225(d) does not grant DHS authority to engage in this sort of unconstrained "fishing expedition," *Peters*, 853 F.2d at 697 (citation omitted), and so the subpoena is invalid for that reason alone.

13

**2.      The Subpoena's Stated Purposes Fall Outside DHS's Statutory Authority and Are Not Reasonably Related to DHS's Demand.**

An administrative subpoena's purpose must be grounded in the agency's statutory authority and must be "reasonably related" to the information that the agency demands. *Newport News*, 837 F.2d at 165; *see In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1415–18 (D.C. Cir. 1994). In a letter accompanying the subpoena, DHS cites three purposes for its demand for the records of every CDL holder: "investigating illegal practices in commercial driver's license (CDL) schools," "identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens," and "civil immigration enforcement." Bellows Decl. ¶ 31, Ex. 1. None is sufficient to show that DHS is acting within its statutory subpoena authority, and none can justify a demand for the records of millions of people.

DHS's first professed purpose—"investigating illegal practices in commercial driver's license (CDL) schools"—falls outside of the agency's authority. Authority to regulate commercial driver's licensing rests with the States and DOT, not DHS. *See, e.g.*, 49 U.S.C. § 31311. And even if DHS has authority to investigate *certain* driving schools for *certain* activity within DHS's jurisdiction—something that has not been established here—there is no "reasonable relation" between such a targeted investigation and a request for *all* records of *all* commercial drivers— irrespective of whether they attended a school under investigation, or whether they obtained their driving credentials before the suspected misconduct started.

DHS's second purpose fares no better. Though DHS may have power to investigate certain types of criminal fraud, agencies cannot use assertions of "broad investigatory powers" to claim an "unfettered authority to cast about for potential wrongdoing" through subpoenas. *In re Sealed Case*, 42 F.3d at 1418. Rather, they must articulate their investigative purposes with some specificity and "articulate a "valid statutory basis in support of [those] purposes." *Id.* DHS has

14

not specified what kind of criminal fraud it is investigating, whether such suspected fraud falls within the agency's authorities, or what those authorities may be.  And as with DHS's first purpose, demanding data on millions of people—including U.S. citizens—bears no reasonable relationship to an investigation into particular driving schools' compliance with immigration laws (assuming this purpose is again related to driving schools, and not aimed at some other class of targets entirely).

Finally, DHS's third purpose, a general interest in "civil immigration enforcement," is so broad that it could justify any number of "fishing expeditions into private papers on the possibility that they may disclose evidence" relevant to DHS's goals.  *In re Sealed Case*, 42 F.3d at 1418 (quoting *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924)).  And such "broad language . . . makes it impossible to apply the . . . *Morton Salt* test," since it leaves reviewing courts "unable to determine whether the information demanded is 'reasonably relevant' and 'not too indefinite.'" *Id*.

At bottom, the subpoena is not justified by particularized investigative purposes within DHS's authority and is needlessly overbroad and out of proportion to any legitimate interest DHS could have in the records.  Agencies may not engage in fishing expeditions by issuing subpoenas that are "unreasonably . . . broad," or that require production of a vast store of documents with only tenuous relevance to the agency's legitimate purpose.  *Newport News*, 837 F.2d at 165; *see, e.g.*, *Gen. Ins. Co. v. EEOC*, 491 F.2d 133, 135 (9th Cir. 1974) (upholding determination that subpoena was "unduly broad" where it "reached back in time nearly eight years" and demanded evidence of misconduct "not even charged or alleged").

15

### 3. The Circumstances Surrounding Issuance of the Subpoena Plausibly Raise an Inference of Bad Faith.

The subpoena is also invalid because there is strong evidence that it was issued in "bad faith." *Resolution Trust Corp.*, 61 F.3d at 965. To make this showing, a movant need only "point to specific facts or circumstances plausibly raising an inference of bad faith." *United States v. Clarke*, 573 U.S. 248, 254 (2014). Although "[n]aked allegations of improper purpose are not enough . . . neither is a fleshed out case demanded." *Id.* "Circumstantial evidence can suffice to meet [the movant's] burden," particularly given that "direct evidence of another person's bad faith . . . will rarely if ever be available." *Id.*

Here, the circumstances overwhelmingly—and, at minimum, plausibly—support the inference that DHS's stated purposes in issuing the subpoena are contrived. DHS initially issued this subpoena shortly after FMCSA issued a parallel demand that AAMVA turn over the contents of CDLIS to FMCSA. Roller Decl. ¶ 3, Ex. 1 at 13. In their requests, DHS and FMCSA sought precisely the same records: all MPRs, going back 5 years, containing the driver's name, date of birth, State of record, license number, and SSN, and if an SSN was removed from the MPR, the date of such removal. *Compare id.* at 2, *with* Bellows Decl. ¶ 31, Ex. 1 at 4. FMCSA informed AAMVA that the two agencies "coordinated" on the requests. Roller Decl. ¶ 3, Ex. 1 at 13. And DHS initially withdrew its subpoena after AAMVA indicated that it would accede to FMCSA's request—only to reissue that same subpoena two business days after AAMVA told FMCSA that it was reconsidering that decision and would not produce the records before August 14. *Id.* at 14, 21. FMCSA itself told AAMVA that the DHS-issued subpoena was a "DOT . . . action" prompted by AAMVA's "shift in position." *Id.* at 21.

Any objective observer would conclude from considering this sequence of events that DHS issued the subpoena not solely to enforce the immigration laws, as it claims, but also to assist

16

FMCSA in its own efforts to obtain the CDLIS database by strong-arming AAMVA into compliance. That conclusion is supported by the fact that DHS sought the same records, at the same time, and in open coordination with FMCSA, and that it issued, withdrew, and then reissued the subpoena based on the status of AAMVA's willingness to comply with FMCSA's request. And that inference is further reinforced by the highly atypical and otherwise inexplicable nature of DHS's subpoena: that it departs from decades of precedent by seeking the identities of millions of unknown individuals; that it fails to articulate any specific statutory purpose; and that its scope is massively discontinuous with its stated objectives. Judges are "not required to exhibit a naiveté from which ordinary citizens are free." *DOC. v. New York*, 588 U.S. 752, 785 (2019). These facts are enough to "plausibly rais[e] an inference of improper motive." *Clarke*, 573 U.S. at 256.

### 4.     The Subpoena Is Procedurally Invalid.

Finally, the subpoena is procedurally invalid for substantially the same reason. To be enforceable, subpoenas must follow all "required administrative steps." *E.g.*, *Spell v. United States*, 907 F.2d 36, 39 (4th Cir. 1990). 8 C.F.R. § 287.4, which DHS itself cites in its subpoena, protects against agency fishing expeditions by requiring DHS to identify the *specific proceeding* for which the information is sought: "*Every* subpoena issued under the provisions of this section *shall* state the title of the proceeding." *Id.* § 287.4(b)(2) (emphasis supplied). Unsurprisingly (in view of the breadth of DHS's stated purposes), the subpoena mentions no proceeding whatsoever and leaves the relevant "Title of Proceeding" section of the subpoena form (Form I-138, which DHS must use, s*ee id.* § 287.4(b)) completely blank.

### C.     The Subpoena Violates the Driver's Privacy Protection Act.

The subpoena is also contrary to the DPPA. That statute prohibits "any person" from "obtain[ing] or disclos[ing] any personal information[] from a motor vehicle record" unless one of

fourteen exceptions applies. 18 U.S.C. § 2722(a); *see id.* § 2721(a)(1), (c). "Highly restricted personal information" may be disclosed only if one of four exceptions applies. *Id.* § 2721(a)(2).

The MPRs sought by the subpoena contain "personal information" drawn directly from the States' "motor vehicle records." *See id.* § 2725(3) (defining "personal information" to mean "information that identifies an individual," including their "driver identification number" and "name"); *id.* § 2725(1) (defining "'motor vehicle record'" to include "any record that pertains to a motor vehicle operator's permit"). Moreover, the MPRs contain "highly restricted personal information," including "social security number[s]." *Id.* § 2725(4). Thus, this subpoena is prohibited unless one of the four enumerated exceptions applies.

The sole exception that could conceivably serve as basis for the subpoena is the government-use exception. Under that exception, an entity may disclose highly restricted personal information "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." *Id.* § 2721(b)(1). Because this exception pertains to the disclosure of highly restricted personal information, the Supreme Court has instructed that it must be "narrowly . . . read," and construed to permit only those disclosures that the statute authorizes in "clear and explicit language." *Maracich v. Spears*, 570 U.S. 48, 60, 64 (2013). As the *en banc* Seventh Circuit has explained, this exception permits disclosure only where the requesting agency demonstrates that "*all* of th[e] information" it obtains "actually [i]s used in effectuating" a legitimate government function. *Senne v. Village of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) (citation modified).

The subpoena does not satisfy this requirement. DHS has not demonstrated that "all of th[e] information" in the 17 million MPRs that it has demanded will "actually [be] used in

18

effectuating" any of DHS's statutory functions. Instead, DHS has vaguely asserted that it is "investigating illegal practices," Bellows Decl. ¶ 31, Ex. 1, and that the requested records are "required in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws," *id*. But DHS has not claimed that it will "actually" use "all" 17 million names, SSNs, dates of birth, and driver's license numbers currently held by AAMVA in carrying out any statutory function—nor is it plausible that the agency has any present intention of using every "particular piece of disclosed information" in that vast database. *Senne*, 695 F.3d at 606; *see Weber*, 816 F. Supp. 3d 1168, 1195 & n.35 (C.D. Cal. 2026) (federal government's attempted collection of "millions of Californians' drivers license numbers" unlawful because the federal government "ha[d] not identified" how all of that information would be used).

Further, DHS has not sufficiently identified any statutory function it believes this information will help it carry out. As noted above, DHS has stated that it will use the information for several undefined purposes, including "conducting civil immigration enforcement." *See supra* pp. 14–15. That, however, describes essentially the entire universe of activities that DHS may invoke section 1225 to aid. *See* 8 U.S.C. § 1225(d)(4). DHS's request thus does nothing to narrow or specify the functions for which DHS will ostensibly use the information.

**D.    The Subpoena Violates the Privacy Act.**

The subpoena also violates a host of core privacy protections in the Privacy Act.

First, the Privacy Act imposes several notice requirements for creating or modifying "systems of records." The subpoena here will effectively create a new database of CDLIS information, "searchable by the name of the individual or by some identifying number," and it consequently will create a "system of records" subject to the Privacy Act's requirements. 5 U.S.C. § 552a(a)(5). But DHS has taken none of the steps the Privacy Act requires. The agency has not published the notice required by 5 U.S.C. § 552a(e)(4) explaining why DHS is collecting States'

19

driver data and how it will access, use, store, and share that data. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026). Nor has DHS afforded the public an opportunity to comment on the proposed uses of the data. *See* 5 U.S.C. § 552a(e)(11); *Weber*, 816 F. Supp. 3d at 1193. DHS has also failed to provide "advance notice of" the new (or significantly changed) database to Congress, which the Privacy Act mandates "in order to permit an evaluation of the probable or potential effect of [the agency's] proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r).

Second, the Privacy Act requires an agency to maintain "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order." *Id.* § 552a(e)(1). As noted above, the vast trove of information DHS is collecting is not plausibly "relevant" or "necessary" to carry out any of DHS's statutory authority, much less a purpose that DHS is "required to . . . accomplish[]" by law.

Third, the subpoena, which DHS has plainly issued in part for the purpose of obtaining information on behalf of FMCSA, violates the Privacy Act's basic prohibition against disclosing personal information without consent. *See* 5 U.S.C. § 552a(b)(1); *Am. Fed'n of Gov't Emps. v. OPM*, 777 F. Supp. 3d 253, 274 (S.D.N.Y. 2025). Though agencies may share personal information externally if one of eleven narrowly defined exceptions applies, none does here: A plan to share drivers' personal information with FMCSA to carry out its own statutory functions cannot satisfy narrow exceptions for FOIA disclosures (*id.* § 552a(b)(2)), census and statistical research (*id.* §§ 552a(b)(4), (b)(5)), individual health and safety (*id.* § 552a(b)(6)), congressional or Government Accountability Office oversight (*id.* §§ 552a(b)(9), (b)(10)), compliance with court orders (*id.* § 552a(b)(11)), or the Debt Collection Act (*id.* § 552a(b)(12)). The Privacy Act's exception for sharing of records for "civil or criminal law enforcement" requires a written request

20

for the "*particular portion*" of an individual record and cannot authorize bulk data transfers. *Id.* § 552a(b)(7) (emphasis added). And DHS cannot take advantage of the Act's "routine use" exception to the consent rule (*id.* § 552a(b)(3)) because that exception requires agencies to publish a detailed notice explaining the "routine uses" that will require disclosure and the purposes behind each use. *See, e.g.*, *Cooper v. FAA*, 816 F. Supp. 2d 778, 787–90 (N.D. Cal. 2008). DHS has not published *any* public notice about how it will use CDLIS data.

The fact that DHS seeks to obtain this information through subpoena does not somehow exempt it from all of these statutory mandates. The D.C. Circuit has explained that agencies may not use "subpoenas" to "circumvent" the limits of the Privacy Act. *Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988). On the contrary, it has noted that "[o]ne of Congress' explicit goals in enacting the Privacy Act was to preclude overzealous investigators from running roughshod over an individual's privacy, and the grand jury subpoena simply does not safeguard against that danger." *Doe v. DiGenova*, 779 F.2d 74, 84 (D.D.C. 1985). The court noted that at least the same concern was posed by "any subpoena—whether it issues from the prosecutor, a criminal defendant, or civil litigant." *Id.* at 84–85. DHS therefore may not disregard the critical privacy safeguards in the Privacy Act through the simple expedient of collecting information through subpoena.

**E.     The Court Should Stay Compliance with the Subpoena Pending Resolution of This Motion**

Courts have "inherent authority and discretion" to stay compliance with administrative subpoenas pending resolution of a motion to quash. *In re Summons Issued to Meta Platforms*, No. 25-MC-80325, Dkt. No. 3 at 2 (N.D. Cal. Oct. 17, 2025). The return date on the subpoena is this coming Monday, August 17, 2026, at 8:00 a.m., a mere six days after it issued. The Movant States respectfully request that this Court enter an interim stay order to maintain the status quo by requiring that (a) AAMVA refrain from complying with the subpoena pending a ruling on the

21

Movant States' motion to quash; (b) DHS must immediately inform AAMVA that AAMVA should not produce the subpoenas documents until further notice; and (c) if AAMVA produces any documents in response to the subpoena, DHS must not inspect any such documents until the Court rules on this motion.  Such interim relief is consistent with the approach that other courts have taken when faced with emergency motions to quash, *see, e.g.*, *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 252 (S.D. Ohio 2011) (issuing "interim order forestalling compliance with the subpoenas until the motion to quash could be finally resolved"); *accord, e.g.*, *Ocean Garden Prods. Inc. v. Blessings Inc.*, No. 18-cv-322-TUC-RM, Dkt. No. 401 (D. Ariz. May 20, 2020); *Liles v. United States*, No. 3:19CV494/RV/EMT, 2020 WL 10965921, at *1–2 (N.D. Fla. Mar. 25, 2020); *Grewal & Assocs., P.C. v. Hartford Cas. Ins. Co.*, No. 1:10-cv-214, Dkt. No. 23 (W.D. Mich. Aug. 18, 2010); *United States v. Menominee Tribal Enters.*, No. 07-C-316, 2008 WL 2273285, at *3 (E.D. Wis. June 2, 2008); *Barrington v. Mortgage IT, Inc.*, No. 07-cv-61304, Dkt. No. 17 (S.D. Fla. Dec. 10, 2007), and is necessary here, where the disclosure and misuse of the Movant States' data will inflict significant and lasting harm.

## V. CONCLUSION

For the foregoing reasons, the Movant States respectfully request that the Court quash the subpoena, and that the Court stay compliance with the subpoena pending resolution of the motion to quash.

Date: August 13, 2026                                   Respectfully submitted,


**KWAME RAOUL**                                      **JAY JONES**
Attorney General of Illinois                              Attorney General of Virginia

*/s/ Katharine Roller*                                   */s/ Megan C. Keenan*
CARA HENDRICKSON*                                TILLMAN J. BRECKENRIDGE (#85647)
*Executive Deputy Attorney General*                   *Solicitor General*


22

KATHARINE ROLLER*
PAUL BERKS*
*Complex Litigation Counsel*
GRETCHEN HELFRICH*
*Deputy Chief, Special Litigation Bureau*
MOLLY MAUCK*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.,
Chicago, IL 60603
312-814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
Paul.Berks@ilag.gov
Gretchen.Helfrich@ilag.gov
Molly.Mauck@ilag.gov
*Counsel for Movant State of Illinois*

MEGAN C. KEENAN (#102489)
*Deputy Solicitor General*
*Counsel of Record*
MIKAELA A. PHILLIPS (#97164)
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us
mphillips@oag.state.va.us
*Counsel for Movant Commonwealth of Virginia*


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Mitchell P. Reich*
MITCHELL P. REICH*
*Senior Counsel to the Attorney General*
KARTHIK REDDY*
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov
*Counsel for Movant District of Columbia*

**ROB BONTA**
Attorney General of California

*/s/ David Green*
THOMAS S. PATTERSON*
MICHAEL L. NEWMAN*
*Senior Assistant Attorneys General*
SETH E. GOLDSTEIN*
ROBIN L. GOLDFADEN*
*Supervising Deputy Attorneys General*
DAVID GREEN*
MARIA BUXTON*
CHASE GOLDSTEIN*
EZRA KAUTZ*
EMILIA P. E. MORRIS*
*Deputy Attorneys General*
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov
*Counsel for Movant State of California*


**KRISTIN MAYES**
Attorney General of Arizona

*/s/ Mary M. Curtin*
MARY M. CURTIN*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov
ACL@azag.gov
*Counsel for Movant State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

*/s/ Gabe Podesta*
GABE PODESTA*
SARAH H. WEISS*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
Gabe.Podesta@coag.gov
Sarah.Weiss@coag.gov
*Counsel for Movant State of Colorado*

23

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Vianca Malick*
VIANCA MALICK*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Vianca.Malick@ct.gov
*Counsel for Movant State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

/s/ *Ian R. Liston*
IAN R. LISTON*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
ANURADHA SIVARAM*
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Counsel for Movant State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
KALIKOʻONĀLANI D. FERNANDES*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for Movant State of Hawaiʻi*

**AARON M. FREY**
Attorney General of Maine

*/s/ Halliday Moncure*
HALLIDAY MONCURE*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
207-626-8800
Halliday.Moncure@maine.gov
*Counsel for Movant State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ Yasmin Dagne*
YASMIN DAGNE*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Gerard J. Cedrone*
GERARD J. CEDRONE*
*Deputy State Solicitor*
MICHELLE PASCUCCI*
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2282
Gerard.Cedrone@mass.gov
*Counsel for Movant Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
*Assistant Attorney General*
P.O. Box 30212

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
*Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600

24

Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov
*Counsel for the State of Michigan*

St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us
*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Amanda McElfresh*
AMANDA MCELFRESH*
*Deputy Attorney General*
New Jersey Office of the Attorney General
124 Halsey Street
Newark, NJ 07101
609-696-5363
Amanda.McElfresh@law.njoag.gov
*Counsel for Movant State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Counsel for Movant State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
*Chief Counsel for Federal Initiatives*
ZOE LEVINE*
*Special Counsel for Immigrant Justice*
MATTHEW CONRAD*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
212-416-8333
Rabia.Muqaddam@ag.ny.gov
Zoe.Levine@ag.ny.gov
Matthew.Conrad@ag.ny.gov
*Counsel for Movant State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
*Counsel for Movant State of Oregon*

**JOSH SHAPIRO**
Governor for Commonwealth of Pennsylvania

*/s/ Jacob B. Boyer*
JENNIFER C. SELBER*
JACOB B. BOYER*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Ryan Patrick Kane*
RYAN PATRICK KANE*

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS*

25

*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov
*Counsel for Movant State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Brian Keenan*
BRIAN KEENAN*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov
*Counsel for Movant State of Wisconsin*

*Assistant Attorney General*
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov
*Counsel for Movant State of Washington*

26