**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | No. 1:26-mc-19 |
| *Movants*, | |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | |
| *Respondent*. | |

**DECLARATION OF SAUNDRA M. JACK**

I, Saundra M. Jack, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a resident of the Commonwealth of Virginia. I am over the age of 18, competent to testify as to the facts herein, and I testify based on personal knowledge, records kept in the ordinary course of business at the Virginia Department of Motor Vehicles ("Virginia DMV"), and information I learned from DMV personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.  I am currently employed by the Virginia DMV as Commissioner since April 25, 2026. I have also served as a legal services analyst with DMV for a year and a half, the Director of Data Management Services for DMV for six years, and the Assistant Commissioner for Data Management for two years.

3.  In my current role at the Virginia DMV, I am responsible for oversight of the agency at an enterprise level. As the Commissioner of the Virginia DMV, I am responsible for ensuring the agency serves the citizens of the Commonwealth in providing licensing and vehicle transactions. This includes oversight of the driver services team, which is responsible for ensuring compliance with all federal and state laws and regulations relating to the issuance of commercial driver's licenses.

4.  In Virginia, the DMV is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial driver's licenses (CDLs) and non-commercial driver's licenses. See, for example, Va. Code §§ 46.2-200, 46.2-341.15, 46.2-484. Among other things, the Virginia DMV is responsible for verifying each driver's license applicant's legal eligibility and medical fitness, identifying and disciplining problem drivers, and protecting the privacy of drivers' personal information.

**<u>Virginia's Management of Driver Licensing</u>**

5.  The Virginia DMV is responsible for issuing and renewing commercial driver's licenses (CDLs) and personal driver's licenses (PDLs) to residents of Virginia.

6.  As part of Virginia's commitment to traffic safety, the Virginia DMV follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, the Virginia DMV administers driving tests, assesses applicants' medical fitness, checks

DECLARATION OF SAUNDRA M. JACK

to ensure that each applicant is not the holder of a driver's license from any other state, and checks each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs, the Virginia DMV also verifies the applicant's immigration status.

7.    The Virginia DMV is also responsible for maintaining commercial driver records and transmitting and receiving conviction, withdrawal, and other driver record information in accordance with federal and state recordkeeping requirements.

8.    To comply with our legal obligations and ensure that each driver has a clean record, it is necessary for the Virginia DMV to have a means of checking each driver's history, not only in Virginia, but in other states where the applicant may have held a license.

9.    For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS).

**The Commercial Driver's License Information System (CDLIS)**

10.    CDLIS is a database that contains driver records owned and maintained by the states. It operates as a clearinghouse where states can assist one another in verifying the identity and history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members.

11.    CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's: state of record, driver license number, name, date of birth, social security number (SSN), sex, the date and time the driver was added to CDLIS, the date and time the record was last updated, and indicators showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

12.    If the Virginia DMV queries CDLIS and finds that an applicant has a Master Pointer Record, the Virginia DMV would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR) which the state of record would provide directly to the requesting state. Similarly, if another state queries CDLIS and

DECLARATION OF SAUNDRA M. JACK

finds a Master Pointer Record for a driver licensed in Virginia, the Virginia DMV would send that driver's record to the requesting state.

13. To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

14. As stated above, the data in CDLIS is owned and maintained by the states. The Virginia DMV has the power to add, delete, or change its own records maintained in CDLIS—and regularly does so, to ensure that our data remains accurate and up-to-date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any power to make additions, deletions, or changes to Virginia's CDLIS data.

15. Before issuing a CDL, Virginia, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, whether his or her license has been disqualified, and whether the applicant is disqualified from operating a motor vehicle. 49 CFR 383.73(b)(ii). The Virginia DMV queries CDLIS every time we issue, renew, or replace a CDL, which is often multiple times per day. The Virginia DMV also uses CDLIS to check the Drug and Alcohol Clearinghouse ("DACH") as part of all CDL issuances, as well as to electronically verify and post CDL holders' medical examiner certificates when applicable.

16. The Virginia DMV has participated in and relied on CDLIS to operate its CDL program since 1989. Even if we were not legally required to use CDLIS, we would need CDLIS or some other system like it in order to serve our public safety mission: the Virginia DMV needs to know whether an applicant has a history of dangerous or unlawful driving in order to fulfill its public safety mission. If CDLIS were to become unavailable, particularly without advance notice, it would have an immediate and substantial impact on Virginia's commercial driver licensing program. CDLIS is foundational to the administration of CDLs, and the loss of the system would effectively prevent the Commonwealth from issuing, renewing, transferring, or otherwise administering commercial driver licenses in accordance with federal requirements. Without access to CDLIS, Virginia would be unable to carry out the core functions necessary to operate its CDL program.

DECLARATION OF SAUNDRA M. JACK

17. The Virginia DMV participates in CDLIS pursuant to a contract with AAMVA. Attached as Exhibits A and B are true and correct copies of Virginia's CDLIS contracts with AAMVA that were executed in 1989 and 2006, respectively.

18. In addition to CDLIS, AAMVA also operates other critical programs that the Virginia DMV uses. For example, AAMVA operates the Problem Driver Pointer System ("PDPS"). PDPS allows states to search the National Driver Registry ("NDR"), which contains information on problem drivers. By carrying out a PDPS search, the Virginia DMV obtains information that directs them to the jurisdiction that has a full record of a driver's history. Based on this information, the Virginia DMV can determine whether an applicant for a driver's license is eligible.

19. Like CDLIS, PDPS was created by statute and is a function of the National Highway Transportation Safety Administration ("NHTSA").

20. AAMVA also operates the State-to-State ("S2S") Verification Service, which is a means for a state to electronically check with all other participating states to determine if the applicant currently holds a driver's license or identification card in another state. The Virginia DMV queries S2S before issuing personal driver's licenses.

21. The Virginia DMV queries at least one AAMVA system every time an individual applies for an original driver's license.

**FMCSA's Demand for CDLIS Data**

22. On Monday, July 27, 2026, the Virginia DMV learned that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Virginia's records.

23. I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

24. I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, the Virginia DMV already carries out those functions, as is typical for state agencies, in accordance with federal and state statutes and regulations.

25. I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am

4

not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

### Irreparable Harms to Virginia of Disclosure to FMCSA

26. FMCSA's demand seeks Virginia's proprietary and confidential records and data.

27. Once Virginia's data is in FMCSA's hands, Virginia would lose control and oversight of its confidential records. To my knowledge, FMCSA has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency. And even if FMCSA made promises to AAMVA regarding the security and/or privacy of this data, Virginia would not be in a position to enforce those promises, and these new records, which would be federal and not state records, could be used for purposes that violate our state law and regulations regarding the confidentiality of information.

28. In particular, the Virginia DMV understands itself to be bound by Virginia laws requiring that the DMV may not disseminate privileged information to any federal, state, or local government entity, law-enforcement officer, or law-enforcement agency for purposes related to civil immigration enforcement unless (i) the individual who is the subject of the information provides consent or (ii) the requesting agency presents a lawful judicial order, judicial subpoena, or judicial warrant. As part of the Virginia DMV's normal process for responding to requests from government agencies, including FMCSA, requesting agencies are generally required to certify that the information requested will be used only for an authorized purpose and in a manner consistent with Virginia law. Had FMSCA directly requested records from the Virginia DMV, FMCSA would have been required to provide such a certification before the records could be released. Handing over Virginia's proprietary and confidential information to FMCSA absent such a certification is incompatible with those obligations.

29. The Virginia DMV's concerns about compliance with Virginia law have been exacerbated by FMCSA's coordination with the Department of Homeland Security in its data demand, including via the Department of Homeland Security's service of an administrative immigration enforcement subpoena upon AAMVA on Tuesday, July 28, seeking production of the same information that FMSCA demanded from AAMVA. The Virginia DMV understands that the federal government's

DECLARATION OF SAUNDRA M. JACK

effort to collect the data in service of civil immigration enforcement absent any judicial order, subpoena, or warrant would run afoul of Virginia's privacy and confidentiality laws.

30. Moreover, if the data were turned over to FMCSA, Virginia would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to Virginia could form the basis or justification for federal action.

31. Finally, residents of Virginia entrust the state with their personal data when they apply for a commercial driver's license. That trust would be destroyed if the data is turned over to FMCSA without controls and without a clear statement of FMCSA's purpose in seeking it.

32. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs from Virginia. This means Virginia will lose revenue, as each applicant for a standard CDL with no endorsements must pay a $64 fee, and endorsements cost an additional $1 per year.

33. There is also an acute risk that some individuals who are concerned about broadly disclosing their personal information to the federal government—such as individuals who are lawfully qualified to obtain a CDL but are part of mixed-status immigration families—may avoid the CDL process entirely and attempt to drive commercial motor vehicles without a license. If that occurs in even a small number of cases, it would pose grave public-safety risks, as states would not be able to identify the drivers of those motor vehicles or ensure that they are properly qualified to drive commercial motor vehicles.

**Irreparable Harms to Virginia if AAMVA's Programs Are Impaired**

34. I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

35. Virginia would be seriously harmed if FMCSA carried out those threats.

36. As stated above, the Virginia DMV heavily relies on CDLIS and other resources and services operated by AAMVA, including the PDPS and S2S.

37. Without an effective, functioning, and up-to-date CDLIS, the Virginia DMV would not be able to issue new CDLs or renew existing ones in compliance with federal law and regulations. The Virginia DMV would also not be able to replace existing credentials that are lost or stolen, as the

DECLARATION OF SAUNDRA M. JACK

Virginia DMV would be unable to run a CDLIS/DACH inquiry, which is required under federal regulations. The Virginia DMV would be completely shut down from any CDL issuance.

38.     And even if those laws and regulations did not apply, Virginia would be harmed by losing access to an important public safety resource that keeps unsafe drivers off of Virginia's roads. CDLIS serves as the national repository that ensures each commercial driver has only one driver record and that convictions, withdrawals, and disqualifications are exchanged among jurisdictions. If CDLIS were no longer available due to federal action, the Virginia DMV would face significant operational challenges and data integrity issues, and the nationwide exchange of commercial driver information would be disrupted, increasing the risk that unsafe commercial drivers could avoid enforcement actions by moving between jurisdictions. Without a national system for exchanging commercial driver information, individuals could obtain credentials for which they are not eligible, driver histories may not be accurately maintained, and Virginia could be unable to identify or take appropriate licensing actions based on convictions, withdrawals, disqualifications, or other information received from other jurisdictions.

39.     If CDLIS were unavailable, Virginia's customers would also be impacted. New applicants would likely be unable to obtain a Virginia CDL. Existing CDL holders may be unable to renew, replace, upgrade, or transfer their credentials. Individuals relocating into or out of Virginia could experience significant delays or be unable to transfer their commercial driving privileges. And commercial drivers could experience employment interruptions or loss of income.

40.     In turn, Virginia would suffer economic impacts. Disruptions to the CDL program would affect industries dependent upon commercial drivers, including freight transportation, passenger transportation, construction, utilities, agriculture, and emergency response. Virginia would also experience a loss of CDL-related licensing revenue.

### Security and Confidentiality of Virginia's Records

41.     I understand that Virginia's participation in the CDLIS system is a condition to receive certain federal highway funds.

DECLARATION OF SAUNDRA M. JACK

42.    It has never been Virginia's understanding that FMCSA or any other federal agency has lawful authority to obtain the contents of CDLIS, nor that granting FMCSA the right to obtain and redisclose Virginia's records was a condition of participation in CDLIS.

43.    Virginia has relied on the security and confidentiality of CDLIS records in designing its own information systems, in establishing practices relating to the maintenance of such records, and in notifying applicants for CDLs about how their information would be used and shared. For example, Virginia has strict consumer data protection laws that provide strong privacy protections with limited exceptions, and one of those exceptions is the release of certain records to AAMVA. See Va. Code § 46.2-208(B)(29). The Virginia DMV also makes public representations to applicants that, under state law, personal information, as well as vehicle information and driver information, is considered privileged, and may not be released without the requester meeting the criteria identified in Va. Code § 46.2-208. See, for example, https://www.dmv.virginia.gov/records/release.

44.    If FMCSA is able to obtain and redisclose Virginia's records whenever it wishes, Virginia will need to alter its practices. Among other things, Virginia will need to revise the assurances of confidentiality it provides to CDL applicants, which will require the expenditure of substantial state resources.


I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 11, 2026, in Richmond, Virginia.


*Saundra M. Jack*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Saundra M. Jack
Commissioner
Virginia Department of Motor Vehicles

8
DECLARATION OF SAUNDRA M. JACK

# EXHIBIT A



ASSIGNMENT OF AAMVAnet, INC. SUBSCRIPTION AGREEMENT

BETWEEN

STATE OF NEBRASKA DEPARTMENT OF MOTOR VEHICLES

AND

AAMVAnet, INC.

AND

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MOTOR VEHICLES

For value received, the State of Nebraska, Department of Motor Vehicles, assigns, transfers, and sets over to AAMVAnet, Inc., a Virginia nonstock corporation, the assignee herein, all rights, titles, interests, and obligations in the AAMVAnet, Inc. Subscription Agreement between the State of Nebraska Department of Motor Vehicles, AAMVAnet, Inc., and the Commonwealth of Virginia, Department of Motor Vehicles, made on the 19th day of December, 1990.

The effective date of this Assignment Of AAMVAnet, Inc. Subscription Agreement shall be November 1, 1990.

In witness whereof, the undersigned has executed this assignment as a fully authorized official on _____ October 18 _____, 19 90.

Margaret J. Higgins
Director, Department of Motor Vehicles

ACCEPTANCE OF ASSIGNMENT

AAMVAnet, Inc., a Virginia nonstock corporation, hereby accepts the foregoing instrument, subject to all the terms and conditions thereof, and in addition indemnifies and holds harmless the State of Nebraska, Department of Motor Vehicles, for any cause of action, loss, claim, and expenses (including reasonable attorney's fees), that arises directly or indirectly under the assigned AAMVAnet, Inc. Subscription Agreement after the date of this assignment.

AAMVAnet, Inc.

Dated _____ Oct. 19 _____, 19 90.

AAMVAnet, INC.

SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT is made this _/9th_ day of _December_, 19_89_, by and among AAMVAnet, INC., a Virginia nonstock corporation ("the Operator"), the STATE OF NEBRASKA, DEPARTMENT OF MOTOR VEHICLES (the "Nebraska DMV") and the undersigned subscriber, the COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MOTOR VEHICLES (the "Subscriber").

RECITALS

A.    Section 12007 of the Commercial Motor Vehicle Safety Act of 1986, 49 U.S.C. app. 2701 et seq. (the "Act") mandated the establishment of an information system which will serve as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial vehicles (hereinafter, the "Commercial Drivers License Information System" or "CDLIS").

B.    The operator is working in cooperation with the Nebraska DMV, representatives of the States (as such term is used in the Act) and the Federal Highway Administration with respect to the creation of a nationwide telecommunications network ("AAMVAnet") to support the operation of CDLIS.

RECEIVED

DEC 2 0 1989

NE DEPT MOTOR VEHICLES

1

C.  The Federal Highway Administration, Acting for the U.S. Secretary of Transportation, pursuant to the Act, has designated the Operator as the operator of CDLIS.

D.  The Nebraska DMV has entered into certain third party contractual obligations relating to the development and operation of AAMVAnet.

E.  The Nebraska DMV therefore desires to enter into this contract between AAMVAnet and the Subscriber to clarify its right to recover subscription fees directly from the Subscriber for services rendered by the Operator and the third party contractor (the "Third Party Obligations") until such time as Nebraska DMV assigns its rights and obligations under this Agreement.

F.  The Subscriber desires to contract for the use of AAMVAnet for the purpose of obtaining access to CDLIS and other telecommunication services which may be available over AAMVAnet and which it may desire to utilize from time to time (the "Services"), all as set forth herein.

**AGREEMENTS**

NOW THEREFORE, the parties hereby agrees as follows:

1.  Use of AAMVAnet.  Operator and Nebraska DMV hereby grant to Subscriber the right to utilize AAMVAnet for the purpose of

2

obtaining access to CDLIS and such other Services as Subscriber shall elect from time to time.

2. Fees. Subscriber agrees to pay for use of AAMVAnet and the Services on the basis of Subscriber's actual utilization of network services and/or applications in accordance with the charges set forth in Attachment A. All fees, less credits approved, are exclusive of any applicable state or local sales, use or other taxes of a similar nature and are subject to change upon at least thirty (30) days written notice from Operator to Subscriber.

3. Billing and Payment. Following the end of each calendar month, Nebraska DMV will cause to be sent to Subscriber an invoice setting forth charges incurred during such month by the Subscriber. Payment shall be due upon receipt of the invoice by the Subscriber. Amounts remaining due for more than sixty (60) days shall accrue interest at the rate per annum of fourteen percent (14%). Amounts remaining due for more than ninety (90) days shall result in termination of services to the Subscriber as provided in Paragraph 8 of the Agreements. Remittances shall be made payable to "Nebraska Department of Motor Vehicles" and shall be mailed to Nebraska Department of Motor Vehicles, CDL Division, P.O. Box 94789, Lincoln, Nebraska 68509 or such other payee and/or address as shall be designated by the Nebraska DMV.

4.    Equipment.  The Subscriber will be connected to AAMVAnet through equipment provided by the Subscriber as delineated in Attachment B of this Agreement.  The Operator, the Nebraska DMV or their designee shall have the right to inspect and test such equipment to confirm the compatibility of such equipment with AAMVAnet.

5.    Compliance with Certain Policies and procedures.  The Subscriber agrees and it will, unless prohibited by state law, comply fully with the Operator's policies and procedures, set forth in Attachment C, regarding the disclosure to and access of State agencies and other third parties of information transmitted over AAMVAnet, including, policies with regard to the structure and coding of transactions and billing policies and procedures.

6.    Compliance with Nebraska DMV Billing and Payment Procedures.  The Subscriber agrees that payment is due upon receipt of invoice. The Subscriber further agrees and acknowledges the authority of the Nebraska DMV to seek recovery of any financial obligations incurred by the Subscriber for services provided under this agreement.

7.    Term.  This Subscription Agreement is effective as of the date set forth above and shall continue in force until terminated by the Subscriber, Operator or Nebraska DMV, except as stated in Agreements paragraphs number three (3) or number nine (9), upon at least thirty (30) days written notice.

4

8.  Termination; Suspension of Services; Other Remedies.  If Subscriber fails to fulfill any obligations under this Subscription Agreement, then in addition to any other remedies which Operator and/or the Nebraska DMV may seek, the Operator and/or Nebraska DMV may suspend access to AAMVAnet on ten (10) days written notice.  In addition to the foregoing, if the subscriber fails to fulfill any obligations under this Subscription Agreement, the Operator and the Nebraska DMV may take whatever action at law or in equity which may appear necessary or desirable to enforce such obligations.  No remedy set forth herein is intended to be exclusive of any other remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Subscription Agreement or now or hereafter existing at law or in equity.

The Subscriber shall not be relieved of its liability to Nebraska DMV for any damages sustained by the Nebraska DMv as a result of any breach of this subscription Agreement unless Nebraska DMV so releases the Subscriber and has determined for the purpose of set-off the exact amount of damage due the Nebraska DMV.

9.  Limitation on Liability of Nebraska DMV.  The Nebraska DMV enters into this Agreement to provide specified network services based upon the Federal Highway Administration Supplemental Grant CDLIS-FY 88-002 dated August 23, 1988, and as amended on March 17, 1989, to provide the amount of $2,600,000 as the funding source for this project.  If at any time the funding source fails to appropriate monies to the Nebraska DMV, the obligation of the Nebraska DMV shall cease immediately and performance of work under the Subscription Agreement by Nebraska DMV shall terminate effective as of the date specified in the notice without penalty.

In addition, when the funding from Federal Grants has been expended, then the Nebraska DMV shall not commit to the expenditure of State funds.  At no time shall the Nebraska DMV commit to the expenditure of State funds.

Prior to the expenditure of all federal grants funds the Director of the Nebraska DMV at any time may assign the Nebraska DMV's rights and obligations under this Agreement to:  a federal government agency, another state participating in AAMVAnet, or another agency of the State of Nebraska.  Upon expenditure of all federal grants funds, Nebraska DMV may assign this Subscription Agreement to the Operator.

10. Force Majeure.  Neither the Operator, nor the Nebraska DMV, nor the Subscriber shall have any liability to any party by reason of any delay or failure to perform any obligation or event occasioned by any act of God, force majeure, storm, fire, casualty, work stoppage, strike, lockout, labor dispute, civil disturbance, equipment failure, riot, national emergency, act of government, act of public enemy, mechanical or technical failure or other causes of similar or dissimilar nature beyond its or their control.

11. Choice of Law.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Nebraska, except that, in the event that the State of Nebraska assigns its rights and obligations under this Subscription Agreement to any other party, this Subscription Agreement shall be construed and interpreted in accordance with the laws of the State of Virginia.

12. The Subscriber may not reassign any rights or obligations under this Agreement without the express written approval of the Operator and Nebraska DMV.  Upon the expenditure of all federal grant funds the Nebraska DMV may assign its rights hereunder to the Operator without the further consent of the Subscriber.

13. Notices.  All notices required or permitted to be given under the terms of this Subscription Agreement, except as stated in Agreements paragraph number nine (9), shall be deemed given when delivered in person or on the third business day after being deposited in the United States mail, first class postage prepaid, addresses as follows:

7

If to the Operator:                Richard G. Juve, Manager

                                   AAMVAnet, Inc.

                                   4200 Wilson Blvd., Ste. 600

                                   Arlington, VA   22203


If to the Nebraska DMV:            Paul N. Potadle, Attorney-

                                       Deputy Director

                                   CDL Coordinator

                                   P.O. Box 94789

                                   Lincoln, NE   68509

If to the Subscriber:              Asbury W. Quillian, IV

                                   Deputy Commissioner

                                   Department of Motor Vehicles

                                   P. O. Box 27412

                                   Richmond, VA   23269

or to such other person or address which any party shall furnish to the others in writing.

14.  Headings.  The headings in this Subscription Agreement are for convenience and reference purposes only and do not constitute part of the Agreement.

15.  Entire Agreement and Modifications.  This Subscription Agreement constitutes the entire agreement among the parties and merges any and all prior agreements and representations respecting the matters contemplated in this Subscription Agreement, whether oral or written, by and among the parties hereto.  No alteration, amendment or

8

modification of the provisions of this Subscription Agreement shall be effective unless it is reduced to writing, signed by the parties and attached hereto.

16. Counterparts.  This Subscription Agreement may be executed in two or more fully executed counterparts, each of which shall be deemed an original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same instrument.

17. Severability; Nonwaiver.  Should any provisions of the Subscription Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected thereby.  Failure of any part to enforce any provision of this Subscription Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

9

IN WITNESS WHEREOF, the undersigned have caused the Agreement to be executed by their fully authorized officials as of the date first written above.

**Subscriber**

Commonwealth of Virginia, Department of Motor Vehicles

By: _____

Asbury W. Quillian, IV

Deputy Commissioner

**AAMVAnet, Inc.**

By: _____

W. T. Joyce

Manager - AAMVAnet, Inc.

**Nebraska Department of Motor Vehicles**

By: _____

Margaret L. Higgins

Director - Department of Motor Vehicles

10

**ATTACHMENT A**

**AAMVAnet, Inc. Fee Schedule**
**June 29, 1989**

**CDLIS Fee Schedule**

This fee schedule covers the equipment and services required for the CDLIS application.

| | |
|---|---|
| Enrollment Fee for each new CDL Holder to CDLIS | $4.00 |

Traffic Usage Charges (per 1000 Characters)

| | |
|---|---|
| Prime Time | .015 |
| Non-Prime Time | .008 |

| | |
|---|---|
| Monthly Fee per Invoiced Account | 40.00 |

CDLIS Transaction Charges

| | | |
|---|---|---|
| Adds and Changes | 1989 | .05883 |
| | 1990 | .05425 |
| | 1991 | .05046 |
| | 1992 | .04692 |
| Inquiries | 1989 | .04445 |
| | 1990 | .04099 |
| | 1991 | .03812 |
| | 1992 | .03534 |

The above fees cover all fees and charges to the extent required for CDLIS operations. Only one "PROFS" user ID is included in the above fees.

Federal grant funds and CDLIS enrollment fees will cover the cost of monthly host connectivity and common carrier charges for a 90 day period prior to CDLIS implementation. Any additional costs will be at the rates covered on page 2 of Attachment A.

The fees listed on the next page apply when the service does not relate to the CDLIS application. These rates can be used to determine the cost to connect additional host computers; to have additional capacity; or to use other network services.

Attachment A
Page 2

Current AAMVAnet Rates
Effective June 29, 1989

|  | Current AAMVAnet |
|---|---|
| INSTALLATION: | |
| Host administration (per host) | $1,328 |
| Enhanced Connectivity Service* | |
| - 9.6    Kbps line (per line) | 900 |
| - 14.4    Kbps line (per line) | 1,125 |
| - 56.6    Kbps line (per line) | 1,175 |
| Protocol conversion (non-LU6.2 States) | 4,000 |
| | |
| HOST CONNECTIVITY (Monthly) | |
| Host Administration (per host) | 340 |
| Enhanced Connectivity Service* | |
| - 9.6    Kbps line (per line) | 778 |
| - 14.4    Kbps line (per line) | 1,237 |
| - 56.6    Kbps line (per line) | 3,111 |

\*    IBM will provide the modems, IBM Information Network
communications port and management of the line

Common Carrier charges are charged as received from the Common Carrier.
They are not included in the above charges.  Prime time is from 8:00 a.m.
to 8:00 p.m. (Eastern time)  Monday-Friday.

| TRAFFIC USAGE CHARGES | |
|---|---|
| Prime time per 1,000 Characters | .015 |
| Non-Prime time per 1,000 Characters | .008 |

| LOCAL DIAL ACCESS CHARGES (Per hour) | |
|---|---|
| Class A city Prime time | 4.34 |
| Class A city Non-Prime time | 2.16 |
| Class B city Prime time | 6.37 |
| Class B city Non-Prime time | 3.18 |
| 800 Number surcharge to local class A city: | 15.90 |

| INFORMATION EXCHANGE (IE) USAGE | |
|---|---|
| Information Exchange message Prime time | .255 |
| Information Exchange message Non-Prime time | .128 |
| IE Traffic, per 1,000 Characters Prime time | .060 |
| IE Traffic, per 1,000 Characters Non-Prime time | .030 |
| Storage, per Million Characters per day | 3.79 |

| GENERAL CHARGES | | |
|---|---|---|
| Enrollment Charge per invoiced account (One item) | | 150 |
| Attached network resources registration (per device) | | 35 |
| PROFS USER ID (w/1 MB of Storage) per month | Variable | 100 |
| Monthly fee per Invoiced Account | | 40 |

**ATTACHMENT B**

**AAMAnet Equipment**

**June 29, 1989**

One pair of modems, one for each end of a leased line, are included in the AAMVAnet fee structure for CDLIS operations.  The modems are the property of the Network.

The modems provided will be sufficient to process CDLIS Transactions and related management requirements such as E-Mail.  If the subscriber requires modems with a greater capacity due to other network traffic, the subscriber will be charged for the difference in cost.

A protocol converter is included in the current AAMVAnet fee structure if required by the subscriber.  If the subscriber desires a backup Protocol Converter it can be provided at additional cost.

All equipment required for telecommunications, to the point of the subscriber's side of the modem or protocol converter, is the subscriber's responsibility and cost.

<u>Attachment C</u>

**AAMVAnet Policies and Procedures**

**June 12, 1989**

## <u>Network Management and Support</u>

1. The subscriber agrees to allow network and application vendors to provide statistics, management information and financial information to AAMVAnet, Inc.

2. An IBM software package "NOTIFY", which is available to all network users, will be used to manage and track Network and application problems. The subscriber agrees to allow the network provider to provide AAMVAnet related network and application problem information to AAMVAnet, Inc.

3. The subscriber agrees to have one AAMVAnet "PROFS" User ID for Electronic Mail and Bulletin Board purposes.

## <u>CDLIS Management and Support</u>

1. The subscriber is responsible for required changes and/or updates to pointer information relative to the subscriber.

## Billing Services

1. The subscriber agrees that network charges for management control messages sent from the CDLIS control site and from Network Control Software (NCS) and for NDR Traffic responding to CDL inquiries will be prorated back to the subscriber based on the percentage of CDLIS Traffic generated by the subscriber. The rate for such charges will be calculated according to the rate schedules listed in Attachment A.

2. The rebilling process utilized by AAMVAnet, Inc. will supply detailed network and CDLIS charges to the state as a part of the billing process. In those cases where charges are being paid by federal grant funds, the rebilling system will first provide the detailed charges and then credit the item back to the subscriber. This process will allow states to review the usage of the network and CDLIS in detail on an ongoing basis.

## Privacy and Disclosure

1. The subscriber is responsible for any record keeping or tracking of data that may be required due to state or federal disclosure laws.

2. The subscriber agrees that it will not provide data from another subscriber to a commercial user. The exception to this policy is, when a driver has moved from one jurisdiction to the Subscriber's jurisdiction and the Driver History Data was moved related to this driver.

## Confidentiality

1.  AAMVAnet, Inc. is also establishing and maintaining information which is utilized to assist Motor Vehicle Agencies perform their official business.

    In order to protect the rights of the citizens in the use of this information, it is understood and agreed by the subscriber that is requesting and/or receiving:

        information from another subscriber; or
        information maintained by AAMVAnet, Inc.; or
        information maintained by contractors on behalf of AAMVAnet and/or the subscriber;
    that such information will be for the sole purpose of:
        controlling the issuance of a motor vehicle drivers license or permit; or
        official subscriber business related to the transfer of a vehicle's registration or title; or
        official law enforcement business; or
        other official business of the subscriber's motor vehicle department or division.

# EXHIBIT B

## CONTRACT VA-060312-AAMV
## BETWEEN
## THE COMMONWEALTH OF VIRGINIA
## AND
## AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS

### SCOPE OF CONTRACT

The following paragraphs contain the Contractual terms and conditions by which the Commonwealth of Virginia, hereinafter referred to as "Commonwealth" or "State", or "VITA" (Virginia Information Technologies Agency), will acquire Services as identified in Attachment "A" for the use by State Agencies, Institutions and other Public Bodies, as defined in Section 2.2-4301 *Definitions* of the Virginia Public Procurement Act (VPPA), as amended from American Association of Motor Vehicle Administrators, hereinafter referred to as "the Contractor".

### VENDORS MANUAL

This Contract is subject to the following provision of the Commonwealth of Virginia Vendors Manual and any revisions thereto: 7.12 Contract Renewal or Extension. This provision is hereby incorporated into this Contract in its entirety. A copy of the manual is normally available for review at the purchasing office and in addition, a copy can be obtained by calling the Division of Purchases and Supply (804) 786-3842, or by accessing the Department of General Services (DGS), Division of Purchases and Supply (DPS) Internet site (http://159.169.222.200/dps/).

### APPLICABLE LAWS AND COURTS

This Contract shall be governed in all respects by the laws of the Commonwealth of Virginia and any litigation with respect thereto shall be brought in the courts of the Commonwealth. The Contractor shall comply with all applicable federal, state and local laws, rules and regulations.

### ANTI-DISCRIMINATION

The Contractor certifies to the Commonwealth that it will conform to the provisions of the Federal Civil Rights Act of 1964, as amended, as well as the Virginia Fair Employment Contracting Act of 1975, as amended, where applicable, the Virginians With Disabilities Act, the Americans With Disabilities Act and §2.2-4311 of the Virginia Public Procurement Act. If the award is made to a faith-based organization, the organization shall not discriminate against any recipient of goods, Services, or disbursements made pursuant to the Contract on the basis of the recipient's religion, religious belief, refusal to participate in a religious practice, or on the basis of race, age, color, gender or national origin and shall be subject to the same rules as other organizations that Contract with public bodies to account for the use of the funds provided; however, if the faith-based organization segregates public funds into separate accounts, only the accounts and programs funded with public funds shall be subject to audit by the public body. (Code of Virginia, § 2.2-4343.1E).

Page 1 of 17 Pages

In every Contract over $10,000 the provisions in a. and b. below apply:

During the performance of this Contract, the Contractor agrees as follows:

The Contractor will not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, age, disability, or any other basis prohibited by state law relating to discrimination in employment, except there is a bona fide occupational qualification reasonably necessary to the normal operation of the Contractor. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

The Contractor, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, will state that such Contractor is an equal opportunity employer.

Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for meeting these requirements.

The Contractor will include the provisions of 1) above in every subcontract or purchase order over $10,000, so that the provisions will be binding upon each subcontractor or vendor.

## ETHICS IN PUBLIC CONTRACTING

The Contractor certifies that this Contract is made without collusion or fraud and that it has not offered or received any kickbacks or inducements from any other supplier, manufacturer or subcontractor in connection with this Contract, and that it has not conferred on any public employee having official responsibility for this procurement transaction any payment, loan, subscription, advance, deposit of money, Services or anything of more than nominal value, present or promised, unless consideration of substantially equal or greater value was exchanged.

## IMMIGRATION REFORM AND CONTROL ACT OF 1986

The Contractor certifies that it does not and will not during the performance of this Contract employ illegal alien workers or otherwise violate the provisions of the federal Immigration Reform and Control Act of 1986.

## DEBARMENT STATUS

The Contractor certifies that it is not currently debarred by the Commonwealth of Virginia from entering into Contracts for the type of goods Services covered by this Contract, nor are they an agent of any person or entity that is currently so debarred.

## ANTITRUST

By entering into a Contract, the Contractor conveys, sells, assigns, and transfers to the Commonwealth of Virginia all rights, title and interest in and to all causes of action it may now have or hereafter acquire under the antitrust laws of the United States and the Commonwealth of Virginia, relating to the particular goods or Services purchased or acquired by the Commonwealth of Virginia under said Contract.

## PAYMENT

To Prime Contractor:

Invoices for Services ordered, delivered and accepted shall be submitted by the Contractor directly to the payment address shown on the order/Contract. All invoices shall show the state Contract number and/or order number; social security number (for individual Contractors) or the federal employer identification number (for proprietorships, partnerships, and corporations).

Any payment terms requiring payment in less than 30 days will be regarded as requiring payment 30 days after invoice or delivery, whichever occurs last. This shall not affect offers of discounts for payment in less than 30 days, however.

All Services provided under this Contract or order, that are to be paid for with public funds, shall be billed by the Contractor at the Contract price, regardless of which public agency is being billed.

The following shall be deemed to be the date of payment: the date of postmark in all cases where payment is made by mail, or the date of offset when offset proceedings have been instituted as authorized under the Virginia Debt Collection Act.

**Unreasonable Charges.** Under certain emergency procurements and for most time and material purchases, final job costs cannot be accurately determined at the time orders are placed. In such cases, Contractors should be put on notice that final payment in full is contingent on a determination of reasonableness with respect to all invoiced charges. Charges that appear to be unreasonable will be researched and challenged, and that portion of the invoice held in abeyance until a settlement can be reached. Upon determining that invoiced charges are not reasonable, the Commonwealth shall promptly notify the Contractor, in writing, as to those charges which it considers unreasonable and the basis for the determination. A Contractor may not institute legal action unless a settlement cannot be reached within thirty (30) days of notification. The provisions of this section do not relieve an agency of its prompt payment obligations with respect to those charges that are not in dispute (Code of Virginia, § 2.2-4363).

To Subcontractors:

A Contractor awarded a Contract under this solicitation is hereby obligated:

To pay the subcontractor(s) within seven (7) days of the Contractor's receipt of payment from the Commonwealth for the proportionate share of the payment received for work performed by the subcontractor(s) under the Contract; or

To notify the agency and the subcontractor(s), in writing, of the Contractor's intention to withhold payment and the reason.

The Contractor is obligated to pay the subcontractor(s) interest at the rate of one percent per month (unless otherwise provided under the terms of the Contract) on all amounts owed by the Contractor that remain unpaid seven (7) days following receipt of payment from the Commonwealth, except for amounts withheld as stated in (2) above. The date of mailing of any payment by U. S. Mail is deemed to be payment to the addressee. These provisions apply to each sub-tier contractor performing under the primary Contract. A Contractor's obligation to pay an interest charge to a subcontractor may not be construed to be an obligation of the Commonwealth.

## TESTING AND INSPECTION

The Commonwealth reserves the right to conduct any test/inspection it may deem advisable to assure goods and Services conform to the specifications.

## ASSIGNMENT OF CONTRACT

To the fullest extent permitted by law, the parties agree that Contractor's rights under this Contract shall not be assignable, in whole or in part, to any other party without the Commonwealth's written consent, and that any purported assignment or transfer without such consent shall be null and void. If any law limits the right of the parties to prohibit assignment or nonconsensual assignments, the effective date of the assignment shall be as follows. The Contractor shall give the VITA Supply Chain Management office prompt written notice of the assignment, signed by authorized representatives of both the Contractor and the assignee. This written notice shall be on VITA's "Assignment Notice / Payment Instruction" form and shall provide all information requested on that form. Copies of the form may be obtained from Supply Chain Management, VITA. Upon VITA's acknowledgment of receipt of the properly executed form, the Assignee shall notify the Controller, VITA of the assignment and shall supply the Controller with a copy of the properly executed form. Any payments made prior to receipt of such notification and form shall not be covered by this assignment.

In the event the Commonwealth receives any notice from a third party claiming to be an assignee of any rights of the Contractor under this Contract, Contractor agrees that payment or other

Page 4 of 17 Pages

performance in respect of those rights shall not be due until at least thirty days after VITA's receipt of the notice required by the above paragraph or receipt of a similarly executed notice confirming the absence or revocation of the purported assignment. The VITA Supply Chain Management office shall promptly notify the Contractor of any assignment notice it receives.

VITA may assign this Contract to any entity, so long as the assignee agrees in writing to be bound by the all the terms and conditions of this Contract.

## DEFAULT

In case of failure to deliver Services in accordance with the Contract terms and conditions, the Commonwealth, after due oral or written notice, may procure them from other sources and hold the Contractor responsible for any resulting additional purchase and administrative costs. This remedy shall be in addition to any other remedies that the Commonwealth may have.

## DRUG-FREE WORKPLACE

During the performance of this Contract, the Contractor agrees to (i) provide a drug-free workplace for the Contractor's employees; (ii) post in conspicuous places, available to employees and applicants for employment, a statement notifying employees that the unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition; (iii) state in all solicitations or advertisements for employees placed by or on behalf of the Contractor that the Contractor maintains a drug-free workplace; and (iv) include the provisions of the foregoing clauses in every subcontract or purchase order of over $10,000, so that the provisions will be binding upon each subcontractor or vendor.

For the purposes of this section, "drug-free workplace" means a site for the performance of work done in connection with a specific Contract awarded to a Contractor, the employees of whom are prohibited from engaging in the unlawful manufacture, sale, distribution, dispensation, possession or use of any controlled substance or marijuana during the performance of the Contract.

## NONDISCRIMINATION OF CONTRACTORS

A Contractor shall not be discriminated against in the award of this Contract because of race, religion, color, sex, national origin, age, or disability or against faith-based organizations. If the award of this Contract is made to a faith-based organization and an individual, who applies for or receives goods, Services, or disbursements provided pursuant to this Contract objects to the religious character of the faith-based organization from which the individual receives or would receive the goods, Services, or disbursements, the public body shall offer the individual, within a reasonable period of time after the date of his objection, access to equivalent goods, Services, or disbursements from an alternative provider.

## BREACH

The Contractor shall be deemed in breach of this Contract if the Contractor (a) fails to make any Service ready for acceptance testing by the specified delivery date; (b) repeatedly fails to respond to requests for maintenance or other required service within the time limits set forth in this Contract; (c) fails to comply with any other term of this Contract and fails to cure such noncompliance within ten days (or such greater period as is acceptable to the Commonwealth) following Contractor's receipt of a Show Cause Notice identifying such noncompliance; or (d) fails to provide a written response to the Commonwealth's Show Cause Notice within ten days after receiving same.

The Contractor shall not be in breach of this Contract if its default was due to causes beyond the reasonable control of, and occurred without any fault or negligence on the part of, both the Contractor and its subcontractors. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Commonwealth in either its sovereign or Contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather.

In the event of breach, in addition to any other remedies provided by law, the Commonwealth may cancel its obligations with respect to any or all unaccepted Services. In no event shall any failure by the Commonwealth to exercise any remedy available to it be construed as a waiver of or consent to any breach.

## CONTRACTOR COMMITMENTS, WARRANTIES AND REPRESENTATIONS

Any commitment made by the Contractor within the scope of this Contract shall be binding upon Contractor. For the purposes of this Contract, a commitment by the Contractor includes:

Prices and options committed to remain in force over a specified period(s) of time;

Any written warranty or representation made by the Contractor in this Contract as to Services performance, or other physical design or functional characteristics of that which is offered.

## INSURANCE

The Contractor certifies that it will have the following insurance coverages at the time the Contract is awarded. For construction Contracts, if any subcontractors are involved, the subcontractor will have workers' compensation insurance in accordance with §§ 2.2-4332 and 65.2-800 et seq. of the Code of Virginia. The Contractor further certifies that the Contractor and any subcontractors will maintain these insurance coverages during the entire term of the Contract and that all insurance coverages will be provided by insurance companies authorized to sell insurance in Virginia by the Virginia State Corporation Commission.

### INSURANCE COVERAGES AND LIMITS REQUIRED:

Worker's Compensation - Statutory requirements and benefits. Coverage is compulsory for employers of three or more employees, to include the employer. Contractors who fail to notify the Commonwealth of increases in the number of employees that change their workers'

compensation requirements under the Code of Virginia during the course of the Contract shall be in noncompliance with the Contract.

Employers Liability - $100,000.

Commercial General Liability - $1,000,000 per occurance. Commercial General Liability is to include bodily injury and property damage, personal injury and advertising injury, products and completed operations coverage. The Commonwealth of Virginia must be named as an additional insured and so endorsed on the policy.

Automobile liability - $1,000,000 per occurrence. (only used if motor vehicle is to be used in the Contract)

## SERVICES

During the term of this Contract, the vendor is not authorized to substitute any Service identified herein without the written permission of the Director, Supply Chain Management Division, VITA. Violation of this condition shall be considered grounds for termination of the Contract.

## SERVICE COMMENCEMENT DATES

Contractor shall deliver and install the Services identified in any Telecommunications Service Order (TSO) in accordance with quoted lead times for the {respective} order(s).

Any amendment by the State to this Contract, or any part thereof, may require the establishment of a new mutually agreed to required delivery date. The State may delay the installation date by notifying the Contractor at least ten (10) days before the required service commencement date.

Neither the Contractor nor the State shall be responsible for delays resulting from acts beyond the control of each party. These include, but are not limited to, acts of God, riots, acts of war, fire, earthquakes, epidemics, or disasters.

## PATENT/COPYRIGHT PROTECTION

Contractor, at its own expense, shall defend and hold harmless the Commonwealth from and against any and all third party claims, demands, proceedings, suits, and actions (collectively, "claims") of infringement of patents, copyrights or trade secrets enforceable in the United States if the claim of infringement is alleged to relate to, or arise out of, or result from the Contractor's or Commonwealth's use of any equipment, software, materials or information prepared, developed or delivered in connection with performance of this Contract. In such suit, Contractor shall indemnify the Commonwealth, its agents, officers and employees for any loss, liability or expense incurred as a result of such suit.

The purchasing agency shall notify the Contractor of such suit within a reasonable time after learning of it and shall give the Contractor the full right and opportunity to conduct the defense of the suit, subject however to the requirements of Section 2.2-510 and Section 2.2-514 of the Code of Virginia or any successor statute. If principles of governmental or public law are involved, the Commonwealth may, at its option and expense, participate in the defense of the suit.

The Contractor shall not be required to indemnify the Commonwealth for liability arising solely out of the Commonwealth's own specifications or design or solely from the combination of equipment or software furnished hereunder with any equipment or software not supplied by the Contractor.

If, any Service becomes, or in the Contractor's opinion, is likely to become, the subject of a claim of infringement, Contractor may, at its option, provide noninfringing substitutes that are satisfactory to the Commonwealth, or at Contractor's option and expense, may obtain the right for the Commonwealth to continue the use of such Service.

If the use of such equipment or software by the Commonwealth is prevented by permanent injunction or by Contractor's failure to procure the right for the Commonwealth to continue using the software, the Contractor agrees to take back the infringing equipment, software, materials or information and refund the total amount the Commonwealth has paid Contractor under this Contract, less one half (1/2%) percent of the total paid for each month of use by the Commonwealth. This obligation is in addition to the obligations cited in the first four subparagraphs above.

## NON-APPROPRIATION

All funds for payment of Services ordered under this Contract are subject to the availability of legislative appropriation for this purpose. In the event of non-appropriation of funds by the Legislature for the items under this Contract, the Commonwealth will terminate this Contract for those Services for which funds have not been appropriated. Written notice will be provided to the Contractor as soon as possible after legislative action is completed.

If any purchases are to be supported by federal funding, and such funding is not made available, the Commonwealth may terminate this Contract for Services dependent on such federal funds without further obligation.

## HEADINGS NOT CONTROLLING

Headings used in this Contract are for reference purposes only and shall not be considered to be a substantive part of this Contract.

## ENTIRE CONTRACT

This Contract, all Services specifically listed in Attachment "A", and the notes in Attachment "A" constitute the entire Contract between the parties with respect to the subject matter of this Contract. All prior Contracts, representations, statements, negotiations and undertakings are hereby superseded

with respect to equipment and/or software acquired by the State under the terms and conditions of this Contract.

No other written documents regardless of form or content shall be executed by any agency or institution for equipment acquired under this Contract unless signed by the VITA authorized representative.

## PRICE PROTECTION/ADJUSTMENTS

The State will not pay any additional costs above those costs provided for herein. In no event may the amount of any Contract, without adequate consideration, be increased for any purpose.

Any price decrease effectuated during the Contract period by reason of market change shall be passed on to the Commonwealth of Virginia. This decrease will be effective on the date the price decrease is announced to the general public.

## TERM

The term of this Contract shall be effective for a period of one year beginning March 12, 2006. At the mutual agreement of the Commonwealth and the Contractor, the Contract may be extended for three (3) additional one-year periods; pricing is also subject to mutual agreement. The Commonwealth will issue written documentation of its intent to extend the Contract to the Contractor a minimum of thirty (30) days prior to the end of each renewal period for any extension thereafter.

## INVENTIONS AND COPYRIGHTS

The Contractor is prohibited from copyrighting any papers, reports, forms or other materials, and from obtaining any patent on any invention or other discovery resulting solely from its performance under the terms and conditions of this Contract. Any inventions, combinations, machines, methods, formulas, techniques, processes, improvements, software designs, computer programs, strategies, specific computer-related know-how, data and original works of authorship discovered, created, or developed pursuant to this Contract shall be the property of the Commonwealth.

## CONTRACTUAL RECORDS

All Contractual books, records and other documents related to matters under this Contract shall be made available by Contractor to the State and its designated agents for a period of five (5) years after final payment for purposes of audit and examination.

Contractual records are hereby further defined as this Contract and all delivery/purchase orders, invoices or correspondence directly relating to this Contract.

## LIMITATION OF LIABILITY

To the maximum extent permitted by applicable law, the Contractor will not be liable under this Contract for any indirect, incidental, special or consequential damages, or damages from loss of profits, revenue, data or use of the Services delivered under this Contract, except when such damages are caused by the gross negligence or willful misconduct of the Contractor, its employees, agents, or subcontractors. In no event shall AAMVA, Inc. be liable for any damages caused by the Commonwealth's failure to carry out its obligations, including but not limited to compliance with rules and regulations relating to the contractor as in effect from time to time. This limitation of liability will not apply, however, to liability arising from: (a) property damage, personal injury or death, or infringement; (b) defect or deficiency caused by willful misconduct or negligence on the part of the Contractor; or (c) circumstances where the Contract expressly provides a right to damages, indemnification or reimbursement.

The Contractor's liability under this Contract for direct damages shall not exceed the greater of $40,000.00 or one year the amount of money paid to the Contractor under this Contract during the twelve month period preceding the event or circumstance giving rise to such liability.

## ORDERING OFFICERS

VITA's authorized Ordering Officers are responsible for the issuance of written Telecommunications Service Order(s) (TSOs) for Services provided under this Contract. An Ordering Officer's authority is limited to issuing written TSOs to deliver, activate or deactivate the specific Services available under this Contract. Under no circumstances shall any Ordering Officer have the authority to modify this Contract.

VITA appoints the Ordering Officers named below. The Contractor is hereby notified that the Commonwealth will only make payment only against valid TSOs executed by an authorized Ordering Officer and confirmed by the Contractor. The Contractor shall be advised in writing by the VITA authorized representative or designee of any change in the identity of Ordering Officers.

Ordering Officers are Mr. Phil Johnson, Ms. Linda Brown, and Ms. Margaret Moran.

## TELECOMMUNICATIONS SERVICE ORDER (TSO)

During the term of this Contract, the Commonwealth may deliver written Telecommunications Services Orders (TSOs) to the Contractor. To be valid, the TSO must be signed by an Ordering Officer authorized to bind the Commonwealth contractually for telecommunications Services acquired under this Contract. The TSO must identify the Service(s) to be acquired, the price for each Service, and the required Commencement Date for each Service. The Contractor shall provide a FAX number to receive all TSOs, and telephone numbers of both primary and backup ordering contacts.

Upon receipt of a TSO via regular mail, facsimile or email, the Contractor shall provide acknowledgement of receipt of the TSO within 24 hours. The Contractor shall provide a written confirmation of each Order to VITA no less than 72 hours prior to VITA's requested due date. This written confirmation shall include but not be limited to the following:

A verification of service to be provided, including phone or circuit numbers, and verification that the TSO is technically correct, and
The date the Services will begin, and
The Contractor's service order number, and
Name and telephone number for the Contractor contact for the TSO, and
A verification of the charge for each item (Service) to be provided

## ACCEPTANCE, TESTING AND COMPLIANCE WITH SPECIFICATIONS

All Services are subject to inspection and testing by the State, as delineated herein under TESTING AND INSPECTION, and any Service that does not meet or exceed the specifications or other requirements of the Contract may be rejected. The State shall be given three business days from the completion of installation by the Contractor to test, evaluate and accept the Services delivered under this Contract (provided that the using agency, in its sole discretion, may accept the same prior to expiration of the seventy-two (72) hour period). If the Contractor's Services fail to meet the Contract specifications or other requirements or those required by the Contractor's own technical documentation, then the same may be rejected and returned to the vendor. Upon such rejection, VITA may terminate this Contract and exempt the State from all costs incurred by the Contractor.

Acceptance shall be effective for the purpose of determining title to that which is delivered and for making payment, however, acceptance by the State following testing and evaluation during the seventy-two (72) hour period shall not be conclusive that the Services conform in all respects to the Contract specifications and other requirements. In the event that nonconformance therewith is discovered by the State after acceptance, whether due to a latent defect or otherwise, the Contractor shall take whatever action is necessary to conform the Services to the Contract specifications and other requirements, including but not limited to modification or replacement of the same. The Contractor's failure to do so shall constitute breach of Contract for which the State may exercise the remedies provided in the section herein entitled "Termination and Cancellation," in addition to and not in lieu of any other remedies available under Virginia law.

## SERVICES WARRANTY

All Services purchased under this Contract remain under warranty for the time period commencing after acceptance by the Commonwealth and continuing to expiration of the Contract, or discontinuance of the Services at the discretion of the Commonwealth.

Contractor shall deliver and maintain the Services as described herein. In addition, the Contractor shall provide a single point of contact for the reporting of Service problems encountered by the Commonwealth. The Contractor shall provide an "800" telephone number twenty-four (24) hours per day, seven (7) days per week, including weekends and holidays for the reporting of Service problems.

## MODIFICATIONS

This Contract maybe modified in accordance with §2.2-4309 of the Code of Virginia. Such modifications may only be made by the representatives authorized to do so. No modifications to this Contract shall be effective unless it is in writing and signed by the duly authorized representative of both parties. No term or provision hereof shall be deemed waived and no breach excused unless such waiver or consent to breach is in writing.

Any Contract issued on a firm fixed price basis may not be increased more than twenty five percent (25%) or $50,000.00 whichever is greater, without the approval of the Governor of the Commonwealth of Virginia or authorized designee.

## INVOICES

All invoices shall be rendered monthly after all Services covered by the invoice have been accepted. No invoice may include any costs other than those identified herein. Invoices shall provide at a minimum:

Type and description of the Service;

Serial number, if any;

Charge for each item (Service);

This Contract Number, and;

Contractor's Federal Employer Identification Number (EIN).

## TERMINATION AND CANCELLATION

The Commonwealth shall have the unilateral right to terminate this Contract for Default, in the event that any one or more of the following events of default occur or continue during the term of this Contract, (a) the vendor shall fail to deliver the Services required by this Contract or (b) the vendor shall repeatedly fail to respond to requests for other Services within the time limits set forth in the Contract or (c) the vendor shall breach any of the other terms set forth within this Contract or (d) the vendor shall fail to cure any breach after receiving a "Show Cause Notice" identifying the failure, and providing the vendor ten (10) days to cure the failure/nonperformance. If the vendor fails to answer the cure notice, or does not correct the deficiencies noted, the State may immediately terminate the Contract for Default.

In such event, the Commonwealth will only be liable for cost incurred to the date of termination

The Commonwealth's failure to exercise its right to terminate for default under this provision shall not be construed as a waiver of its right to terminate, rescind or revoke this Contract in the event of any subsequent breach of any provisions of this Contract.

## TERMINATION FOR CONVENIENCE

This Contract may be terminated, in whole or in part, upon thirty (30) days advance written notice by the Commonwealth of Virginia. There are no additional costs or financial obligations to the Commonwealth upon termination for convenience.

## ALTERNATIVE DISPUTE RESOLUTION

In accordance with Section 2.2-4363 of the Code of Virginia, Contractual claims, whether for money or other relief, shall be submitted in writing to the VITA no later than sixty (60) days after final payment; however, written notice of the Contractor's intention to file such claim must be given to VITA at the time of the occurrence or beginning of the work upon which the claim is based. Pendency of claims shall not delay payment of amounts agreed due in the final payment. VITA shall render a final decision in writing within thirty (30) days after its receipt of the Contractor's written claim.

The Contractor may not invoke any available administrative procedure under Section 2.2-4365 of the Code of Virginia nor institute legal action prior to receipt of the purchasing agency's decision on the claim, unless that agency fails to render its decision within thirty (30) days. The decision of the purchasing agency shall be final and conclusive unless the Contractor, within six (6) months of the date of the final decision on the claim, invokes appropriate action under Section 2.2-4364, Code of Virginia or the administrative procedure authorized by Section 2.2-4365, Code of Virginia.

Contractor agrees to submit any and all Contractual disputes arising from this Contract to VITA's alternative dispute resolution procedures. Contractor may invoke VITA's alternative dispute resolution procedures at any time and concurrently with any other statutory remedies prescribed by the Code of Virginia.

In the event of any breach by the Commonwealth, Contractor's remedies shall be limited to claims for damages and Prompt Payment Act interest and, if available and warranted, equitable relief, all such claims to be processed pursuant to this Section. In no event shall Contractor's remedies include the right to terminate any license or support Services hereunder.

## SMALL, WOMEN, AND MINORITY-OWNED BUSINESSES

Where it is practicable for any portion of the awarded Contract to be subcontracted to other suppliers, the Contractor shall give full and fair consideration to small, women-owned and minority-owned businesses. When such business has been subcontracted to these firms, the Contractor agrees to furnish the VITA Contracts Manager with quarterly reports that includes the following information: name of SWAM-owned subcontracted firm, contact name and phone number, total dollar amount subcontracted and type of product or service provided by the subcontracted firm.

## DOWNTIME CREDITS

The Commonwealth shall be rebated, or credited, a prorated hourly portion of the applicable monthly service charges for each occurrence during which the Commonwealth is denied use of the Service for eight (8) hours or more during any consecutive thirty (30) day period. The rebate shall apply to the

initial eight (8) hours and all additional hours, or portions thereof, during which the Commonwealth is denied access to the Service.  Contractor provided rebates or credits shall never exceed the cost of the Services.  Any credits due the State under the terms of this Contract may be applied against Contractor's invoices with appropriate information attached.

## CONTRACTOR ACCESS TO COMMONWEALTH LOCATION/S

Commonwealth shall grant to Contractor personnel such access to the Commonwealth location(s) as may be necessary or appropriate for Contractor to perform its obligations under this Contract, subject to all security issues.  For any individual Commonwealth location, the Contractor may be required to undergo additional security procedures that may include but not be limited to: records verification, submission of photos and/or fingerprints.  The Contractor may at any time, for any Commonwealth location, be required to undertake the execution and completion for each individual employee the submission of additional forms that the Commonwealth would consider reasonable for security measures.  These forms may include the individual employee's agreement that all Commonwealth information that is garnered while at the Commonwealth site is confidential and proprietary.  Any unauthorized release of proprietary information by the Contractor or Contractor's employees shall constitute a breach of this Contract.

## NONVISUAL ACCESS TO TECHNOLOGY:

All information technology which, pursuant to this Agreement, is purchased or upgraded by or for the use of any State agency or institution or political subdivision of the Commonwealth (the "Technology") shall comply with the following nonvisual access standards from the date of purchase or upgrade until the expiration of this Agreement:

(i) Effective, interactive control and use of the Technology shall be readily achievable by nonvisual means;

(ii) The Technology equipped for nonvisual access shall be compatible with information technology used by other individuals with whom any blind or visually impaired user of the Technology interacts;

(iii) Nonvisual access technology shall be integrated into any networks used to share communications among employees, program participants or the public; and

(iv) The technology for nonvisual access shall have the capability of providing equivalent access by nonvisual means to telecommunications or other interconnected network services used by persons who are not blind or visually impaired.

Compliance with the foregoing nonvisual access standards shall not be required if the head of the using agency, institution or political subdivision determines that (i) the Technology is not available with nonvisual access because the essential elements of the Technology are visual and (ii) nonvisual equivalence is not available.

Installation of hardware, software, or peripheral devices used for nonvisual access is not required when the Technology is being used exclusively by individuals who are not blind or visually impaired, but applications programs and underlying operating systems (including the format of the data) used for the manipulation and presentation of information shall permit the installation and effective use of nonvisual access software and peripheral devices.

If requested, the Contractor must provide a detailed explanation of how compliance with the foregoing nonvisual access standards is achieved and a validation of concept demonstration.

The requirements of this Paragraph shall be construed to achieve full compliance with the Information Technology Access Act, 2.2-3500 through 2.2-3504 of the Code of Virginia.

**PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT.**

AAMVA, INC.

BY: _____

NAME: _Jeffrey Cheatham_

TITLE: _Contracts Administrator_

DATE: _03-14-2006_

COMMONWEALTH OF VIRGINIA

BY: _____

NAME: _Joe A. Parr_

TITLE: _Supervisor, Acquisition Services_

DATE: _3/29/06_

## ATTACHMENT "A"
## TO
## CONTRACT VA-060312-AAMV

Attachment "A" is hereby incorporated into and made an integral part of Contract VA-060312-AAMV between AAMVA, Inc. and Virginia Information Technologies Agency. In the event of any inconsistency between the provisions of this Attachment "A" and Contract VA-060312-AAMV, the provisions of Contract VA-060312-AAMV shall prevail.

### 1.    SERVICE DESCRIPTION

A fully Managed Private IP solution over a MPLS network that includes the following:
- CPE package (Cisco router and out of band access modem
- Telco circuit(2)
- AES-256 encryption of AAMVA application traffic (e.g., CDLIS, PDPS, NMVTIS, SSOLV, etc)
- AES-256 encryption provided for additional business upon request

Equipment will be purchased through AAMVA for this fully managed service. All equipment maintenance will be provided by AAMVA. When the purchased equipment reaches its "End of Life" cycle, which is designated by the manufacturer, the purchase model will no longer be supported. It will be the customer's responsibility to purchase new equipment from AAMVA.

### 2.    PRICING

| Item Description | Unit | Rate |
|---|---|---|
| Dual 256K PIP Circuits** | Per Month | $3,141.94 |
| Single 1841 Cisco Router** | One-Time | $4,292.07 |
| PIP Access Loop Installation Charge | One-Time | Waived |
| 1 Rack Mount Kit | One-Time | Waived |
| Backup Shadow Circuit 256Kbps – Single Router | Per Month | $1,289.96 |

**Once Verizon's full managed solution is implemented, AAMVA will reimburse VITA through CDLIS revenues for:

Two Private IP solutions (up to $1,570.97 per line – Total $3,141.94)
Cisco Router at $4,292.07

VITA will be responsible for all other one-time and monthly costs.

Page 16 of 17 Pages

3. **BILL TO ADDRESS**

Virginia Information Technology Agency
Attn: Accounts Payable
11751 Meadowville Lane
Chester, VA 23836

4. **CUSTOMER POINT OF CONTACT**

Ron Giddings
Virginia Department of Motor Vehicles
(804) 367-6518
Ron.giddings@dmv.virginia.gov

5. **CONTRACTOR POINTS OF CONTACT**

Billing and Contract:
Zeina Fawaz
Senior Customer Service and Billing Representative
(703) 908-2883
zfawaz@aamva.org

Network Support:
Henry Majowicz
Network Account Manager
(813) 996-0180
hmajowicz@aamva.org

Customer Service:
Susan Guttke
Customer Service Manager
(813) 231-2511
sguttke@aamva.org

Page 17 of 17 Pages

**MODIFICATION #5**
**TO**
**CONTRACT NUMBER VA-060312-AAMV**
**BETWEEN**
**THE VIRGINIA INFORMATION TECHNOLOGIES AGENCY**
**AND**
**AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMV)**

This MODIFICATION #5 is an agreement between the Virginia Information Technologies Agency (VITA), hereinafter referred to as "State" or "Commonwealth" or "VITA", and American Association of Motor Vehicle Administrators hereinafter referred to as "Contractor" or "AAMV" relating to the modification of the above Contract. This Modification #5 is hereby incorporated into and made part of Contract VA-060312-AAMV, as revised.

The purpose of this Modification #5 is to extend the term of this Agreement.

The parties agree to the following:

1. Contract VA-030612-AAMV will automatically renew annually, unless cancelled by either party by written notice 30 days in advance of the annual renewal date of September 11.

2. The term of contract VA-030612-AAMV is hereby extended to 9/11/2011.

The term of this modification #5 shall begin upon execution of the parties.

The foregoing is the complete and final expression of the parties' agreement to modify Contract VA-060312-AAMV and cannot be modified, except by a writing signed by duly authorized representatives of both parties.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED. PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT. ELECTRONIC SIGNATURES WILL BE CONSIDERED AS ORIGINAL SIGNATURES.

| AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS | VIRGINIA INFORMATION TECHNOLOGIES AGENCY |
|---|---|
| BY: | BY: |
| NAME: PATRICE L. AASMO | NAME: Samuel A. Nixon, Jr. |
| TITLE: VP | TITLE: Chief Information Officer |
| DATE: Sep 2, 2010 | DATE: 9/5/10 |

**MODIFICATION #4**
**TO**
**CONTRACT NUMBER VA-060312-AAMV**
**BETWEEN**
**THE VIRGINIA INFORMATION TECHNOLOGIES AGENCY**
**AND**
**AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMV)**

This MODIFICATION #4 is an agreement between the **Virginia Information Technologies Agency** (VITA), hereinafter referred to as "State" or "Commonwealth" or "VITA", and **AAMV** hereinafter referred to as "Contractor" relating to the modification of the above Contract. This Modification #4 is hereby incorporated into and made part of Contract VA-060312-AAMV, as revised.

The purpose of this Modification #4 is to extend the term of this Agreement.

The parties agree to the following:

1. The term of contract VA-030612-AAMV is hereby extended to 9/11/2010

The term of this modification #4 shall begin upon execution of the parties and shall continue until the end of this extended term of the Contract.

The foregoing is the complete and final expression of the parties' agreement to modify Contract VA-060312-AAMV and cannot be modified, except by a writing signed by duly authorized representatives of both parties.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED. PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT. ELECTRONIC SIGNATURES WILL BE CONSIDERED AS ORIGINAL SIGNATURES.

AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS

BY: _(signature)_

NAME: PATRICE L. AASMO

TITLE: VICE PRESIDENT

DATE: Feb. 4, 2010

VIRGINIA INFORMATION TECHNOLOGIES AGENCY

BY: _____

NAME: _____

TITLE: _____

DATE: _____

Digitally signed by John Tackley
DN: cn=John Tackley, c=US, o=Supply Chain Management, ou=Virginia Information Technologies Agency, email=John.Tackley@vita.virginia.gov
Reason: On behalf of the Commonwealth of Virginia
Location: Chester VA 23836
Date: 2010.02.03 16:25:08 -05'00'

## ATTACHMENT "A"
## TO
## CONTRACT VA-020131–AAMV
## FOR THE
## VIRGINIA INFORMATION TECHNOLOGIES AGENCY

Attachment "A" is hereby incorporated into and made an integral part of Contract Number VA-020131-AAMV between AAMVA, Inc. and the Virginia Information Technologies Agency. In the event of any inconsistency between the provisions of this Attachment "A" and Contract Number VA-060312-AAMV, the provisions of Contract Number VA-060312-AAMV shall control.

### 1.  SERVICE DESCRIPTION

- Frame Relay 256Kb MAC with a 96K CIR
- One 96K PVCs to each of the two Intermediate Routers
- Dial Back-up Gateway (DBG) – ISDN Backup which includes one 56/64K PVC to each of the two (AAMVnet) Intermediate Catcher Routers.
- Disaster Recovery Service – includes a line and CSU/DSU plus the router and router configuration

### 2.  PRICING

| Item Description | Unit | Rate |
|---|---|---|
| 256 Standard throughput – frame connection | Per month | $2,250.00 |
| DBG (Dial backup) 56/64 Kbps connection | Per month | $175.50 |
| Enhanced Router | Per month | $180.00 |
| S/W Mall Monthly Subscription Fee  (4 units) | Per month | $100.00 |
| User ID's on File (12 units @ $2.85 ea) | Per month | $34.20 |
| Disaster Recovery Service (256K bps connection) | Per month | $612.00 |
| MONTHLY TOTAL | | $3,351.70 |
| ANNUAL TOTAL | | $40,220.40 |

### 3.  BILL TO ADDRESS

Virginia Information Technologies Agency
Attn:  Accounts Payable
110 South 7th Street, Third Floor
Richmond, VA 23219

### 4.  COMMENCEMENT OF SERVICES

As indicated in individual TSO

**5.    AGENCY POINTS OF CONTACT**

Doug Wilson
Telecommunications Division
(804) 371-5592
doug.wilson@vita.virginia.gov

**6.    CONTRACTOR POINTS OF CONTACT**

Billing and Contracts:
Jeffrey Cheatham
Billing & Contract Representative
(703) 908-5863
jcheatham@aamva.org

Network Support:
Henry Majowicz
Network Account Manager
(813) 996-0180
Hmajowicz@aamva.org

Customer Service:
Susan Guttke
Customer Service Manager
(813) 231-2511
Sguttke@aamva.org

## MODIFICATION #3
## TO
## CONTRACT NUMBER VA-060312-AAMV
## BETWEEN THE
## COMMONWEALTH OF VIRGINIA
## AND
## AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMVA)

This MODIFICATION #3 is an agreement between the Commonwealth of Virginia, hereinafter referred to as "State" or "Commonwealth" or "VITA" (Virginia Information Technologies Agency), and **AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMVA)** hereinafter referred to as "Contractor" relating to the modification of the above contract. This Modification #3 is hereby incorporated into and made an integral part of Contract VA-060312-AAMV, as modified.

**Reference: Page 9 of 17, Paragraph entitled "Term":**

Both of the above referenced parties agree to the following:

1.    The term of Contract VA-060312-AAMV shall be extended from March 12, 2009 through March 11, 2010.

2.    Remove Attachment "A" Pages 16 & 17 of contract and replace with new Attachment "A" pages.

The foregoing is the complete and final expression of the parties' agreement to modify Contract VA-060312-AAMV and cannot be modified, except by a writing signed by duly authorized representatives of both parties.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.**

**PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT.**

AAMVA                                    COMMONWEALTH OF VIRGINIA

BY                                       BY:

NAME: PATRICE L. AASMO                   NAME: Douglas Crenshaw

TITLE: VP Prods + Svcs                   TITLE: Strategic Sourcing Manager

DATE: 2-10-2009                          DATE: 2-12-09

MODIFICATION #2
TO
CONTRACT NUMBER VA-060312-AAMV
BETWEEN THE
COMMONWEALTH OF VIRGINIA
AND
AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMVA)

This MODIFICATION #2 is an agreement between the Commonwealth of Virginia, hereinafter referred to as "State" or "Commonwealth" or "VITA" (Virginia Information Technologies Agency), and **AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS (AAMVA)** hereinafter referred to as "Contractor" relating to the modification of the above contract. This Modification #2 is hereby incorporated into and made an integral part of Contract VA-060312-AAMV, as modified.

**Reference:  Page 9 of 17, Paragraph entitled "Term":**

Both of the above referenced parties agree to the following:

The term of Contract VA-060312-AAMV shall be extended from March 12, 2008 through March 11, 2009.

The foregoing is the complete and final expression of the parties' agreement to modify Contract VA-060312-AAMV and cannot be modified, except by a writing signed by duly authorized representatives of both parties.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.**

**PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT.**

AAMVA

BY: _____

NAME: PATRICE L. AASMC

TITLE: SENIOR VP

DATE: 1-27-08

COMMONWEALTH OF VIRGINIA

BY: _____

NAME: Douglas Crenshaw

TITLE: Strategic Sourcing Manager

DATE: _____

## MODIFICATION #1

## CONTRACT NUMBER VA-060312-AAMV

## BETWEEN

## THE COMMONWEALTH OF VIRGINIA,
## VIRGINIA INFORMATION TECHNOLOGIES AGENCY

## AND

## American Association of Motor Vehicle Administrators (AAMVA)

The purpose of Modification #1 is to document the agreement between the Commonwealth of Virginia, Virginia Information Technologies Agency (VITA) and American Association of Motor Vehicle Administrators (AAMVA) concerning Contract Renewal.

Both parties agree to extend the term of the contract, from March 12, 2007 through March 11, 2008, with two remaining additional one-year renewal periods, to provide Frame Relay Services to the Commonwealth of Virginia.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**PERSONS SIGNING THIS CONTRACT ARE AUTHORIZED REPRESENTATIVES OF EACH PARTY TO THIS CONTRACT AND ACKNOWLEDGE THAT EACH PARTY AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THE CONTRACT.**

AAMVA                                          COMMONWEALTH OF VIRGINIA

BY: _____                    BY: _____

NAME: Jeffrey Cheatham                          NAME: George S. Goodman Jr.

TITLE: Senior Contracts Representitive          TITLE: IT Sourcing Consultant

DATE: 03-16-2007                                DATE: 2-27-07