**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;<br><br>　　　　　*Movants*,<br>　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>　　　　　*Respondent*. | No. 1:26-mc-19 |

**DECLARATION OF TOBY WAKUMOTO**

I, Toby Wakumoto, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a resident of the State of Hawaiʻi. I am over the age of 18, competent to testify as to the facts herein, and I testify based on personal knowledge, records kept in the ordinary course of business at the Hawaiʻi Department of Transportation (HDOT), and information I learned from HDOT personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.  I am currently employed by HDOT as the Highway Safety Manager, a position I have held since June 2022. Prior to this role, I served as a Highway Safety Specialist in this same section, which includes the oversight of driver licensing, since February 2020.

3.  In my current role at HDOT, I am responsible for the management and oversight of the state's driver licensing, civil identification, periodic motor vehicle inspection, motor vehicle registration, and related programs. Further, as the Highway Safety Manager of HDOT, I am responsible for policy implementation and program management of the aforementioned programs, budget review and consideration for the four counties' divisions of motor vehicles (together, the "County DMVs") or equivalent partners, procurement of goods and services pursuant to the proper management and implementation of aforementioned programs, and other related duties. This includes acting as the coordinator of the commercial driver licensing program with the County DMVs' staff, adopting and implementing other processing and testing procedures, and performing other program duties as required by federal law, including the commercial driver licensing requirements of Title 49 of the Code of Federal Regulations, Chapter III, Parts 382, 383, 384.

4. In Hawaiʻi, HDOT is the state driver licensing agency (SDLA), and it oversees and manages the State's commercial drivers' licenses (CDLs) and non-commercial drivers' licenses. *See* Haw. Rev. Stat. § 286-16 (directing HDOT to "prescribe uniform standards and procedures" for "driver licensing"); *id.* § 286-246 (authorizing HDOT to adopt rules to carry out state CDL laws). The State delegates the day-to-day processing of CDL applications to the State's four counties. *See id.* § 286-17 (authorizing HDOT to "delegate the enforcement" to the counties); *id.* § 286-101 (designating county officials as "examiner[s] of drivers"). The County DMVs, pursuant to state law

DECLARATION OF TOBY WAKUMOTO

and HDOT regulations, issue and renew CDLs and non-commercial drivers' licenses. *E.g.*, *id.* § 286-239 (outlining process for issuing CDLs). The County DMVs, with HDOT oversight and guidance, verify each driver's license applicant's legal eligibility and medical fitness, identify and discipline problem drivers, and protect the privacy of drivers' personal information.

### Hawaii's Management of Driver Licensing

5. HDOT is responsible for issuing and renewing CDLs and non-commercial driver's licenses to residents of Hawai'i, which it does in partnership with the four County DMVs.

6. As part of Hawaii's commitment to traffic safety and the integrity of the State's licensing and identification credentials, HDOT follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, HDOT coordinates with the County DMVs to administer driving tests, assess applicants' medical fitness, check to ensure that each applicant is not the holder of a driver's license from any other state, and check each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs, the County DMVs, with HDOT oversight and guidance, also verify the applicant's immigration status.

7. To comply with our legal obligations and ensure that each driver has a clean record, it is necessary for HDOT to have a means of checking each driver's history, not only in Hawai'i, but in other states where the applicant may have held a license.

8. For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS).

### The Commercial Driver's License Information System (CDLIS)

9. CDLIS is a database that contains driver records owned and maintained by the states. It operates as a clearinghouse where states can assist one another in verifying the identity and history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members.

DECLARATION OF TOBY WAKUMOTO

10. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's: state of record, driver license number, name, date of birth, social security number (SSN), sex, the date and time the driver was added to CDLIS, the date and time the record was last updated, and indicators showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

11. If HDOT or the County DMVs query CDLIS and find that an applicant has a Master Pointer Record, we would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR), which the state of record would provide directly to the requesting state. Similarly, if another state queries CDLIS and finds a Master Pointer Record for a driver licensed in Hawai'i, HDOT would send that driver's record to the requesting state via our information system. Typically, the County DMVs will receive an application for a CDL and run a CDLIS inquiry. If CDLIS flags that an applicant has a Master Pointer Record, County DMVs will perform a change state of record of that relevant pointer from the other state to Hawai'i. If there are any issues or concerns with the individual's record or credential, the County DMV staff will work with HDOT to determine the proper course of action.

12. To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

13. As stated above, the data in CDLIS is owned and maintained by the states. HDOT and the County DMVs have the power to add, delete, or change Hawaii's own records maintained in CDLIS—and regularly does so, to ensure that State of Hawai'i driver record data remains accurate and up-to-date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any power to make additions, deletions, or changes to Hawaii's CDLIS data.

14. Before issuing a CDL, Hawai'i, like all states, is required to use CDLIS to determine whether an applicant for a CDL is already licensed in Hawai'i or one of the other states in the United States, whether his or her license has been disqualified, and whether the applicant is disqualified from operating a motor vehicle. *See* 49 C.F.R. 383.73(b)(3)(ii).

DECLARATION OF TOBY WAKUMOTO

15.     HDOT has participated in and relied on CDLIS to operate its CDL program since the early 1990s. Even if the State of Hawai'i was not legally required to use CDLIS, the State would need CDLIS or some other system like it in order to serve our public safety mission and verify the driving qualifications of CDL holders: HDOT needs to know whether an applicant has a history of dangerous or unlawful driving in order to fulfill its public safety mission, both as a State Driver Licensing Agency and for Commercial Motor Vehicle enforcement. If CDLIS were to shut down, particularly on short notice, it would be a major impediment to the operation of our CDL program.

16.     Before issuing a non-commercial driver's license, the County DMVs will also review a driver's record, which includes a check via the State Pointer Exchange Services (SPEXS), another service provided by AAMVA. SPEXS is a shared inquiry system that includes both CDLIS and non-CDLIS pointers. In other words, SPEXS tells a user whether an applicant has a Master Pointer Record, and if so, whether that record is in CDLIS or a non-CDLIS service. SPEXS provides additional useful information on applicants for driver's licenses. Just as with CDL applications, the County DMVs rely on HDOT to address any issues or concerns with applicants for non-commercial licenses. We query CDLIS for non-CDL applicants for an important reason: a non-commercial driver license holder may have convictions committed involving a Commercial Motor Vehicle or Hazardous Materials, and such violations are required to be reported to CDLIS pursuant to FMCSA regulations. To fulfill HDOT's public safety mandate, the State must be aware of such convictions when deciding whether to issue any driver's license, even a non-commercial one. Because of this, the State's non-commercial driver's license program would also be impaired by the loss of CDLIS.

17.     HDOT participates in CDLIS pursuant to a contract with AAMVA. Attached as Exhibit A is a true and correct copy of Hawaii's CDLIS contract with AAMVA.

18.     In addition to CDLIS and SPEXS, AAMVA also operates the Problem Driver Pointer System (PDPS), which Hawai'i is required to use. PDPS allows states to search the National Driver Registry (NDR), which contains information on problem drivers. By carrying out a PDPS search, HDOT and the County DMVs obtain information that directs them to the jurisdiction that has a full record of a driver's history. Based on this information, HDOT and the County DMVs can determine

DECLARATION OF TOBY WAKUMOTO

whether an applicant for a driver's license is eligible. Hawaiʻi checks CDL applicants with both CDLIS *and* the PDPS.

19. Like CDLIS, PDPS was created by statute and is a function of the National Highway Traffic Safety Administration (NHTSA).

20. Hawaiʻi also uses AAMVA's State-to-State Verification Service (S2S), which is included in SPEXS. S2S allows states to determine if an applicant for a non-commercial driver's license holds a credential in another jurisdiction.

21. In sum, Hawaiʻi queries multiple AAMVA systems every time an individual applies for a driver's license.

### FMCSA's Demand for CDLIS Data

22. On August 5, 2026, through communications with our counsel, HDOT learned that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Hawaii's records.

23. I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

24. I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, HDOT and the County DMVs already carry out those functions, in accordance with federal and state statutes and regulations.

25. I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

### Irreparable Harm of Disclosure to FMCSA

26. FMCSA's demand seeks Hawaii's proprietary and confidential records and data.

27. Once Hawaii's data is in FMCSA's hands, Hawaiʻi would lose control and oversight of its confidential records. To my knowledge, FMCSA has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency. And even if FMCSA made promises to

DECLARATION OF TOBY WAKUMOTO

AAMVA regarding the security and/or privacy of this data, Hawai'i would not be in a position to enforce those promises, and these new records, which would be federal and not state records, could be used for purposes that violate our state law and regulations regarding the confidentiality of information.

28. In particular, HDOT understands itself to be bound by Hawai'i laws, which require us to protect the confidentiality of drivers' private information, outside of a few narrow circumstances in which state or federal law authorize disclosure. Handing over all of Hawaii's proprietary and confidential information that is contained in CDLIS to FMCSA is incompatible with those obligations.

29. Moreover, if the data were turned over to FMCSA, Hawai'i would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to Hawai'i could form the basis or justification for federal action.

30. Finally, residents of Hawai'i entrust the State with their personal data when they apply for a CDL. That trust would be destroyed if the data is turned over to FMCSA without controls and without a clear statement of FMCSA's purpose in seeking it.

31. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs from Hawai'i. This means Hawai'i will lose revenue, as each applicant for a CDL must pay $40 for an eight-year license, which the counties remit to HDOT on a monthly basis. That revenue is critical to operating the State's CDL program. In addition, this means fewer and fewer individuals will be capable of operating the necessary vehicles for various labor sector needs, such as for city buses, school buses, tankers, and more.

### Hawai'i would be harmed if AAMVA's programs were impaired

32. I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

33. Hawai'i would be seriously harmed if FMCSA carried out those threats.

34. As stated above, HDOT and the County DMVs heavily rely on CDLIS, the PDPS, and other resources and services operated by AAMVA. These services are critical to our state licensing

6

DECLARATION OF TOBY WAKUMOTO

system, as we query AAMVA-operated services every time HDOT and the County DMVs review an application for any driver's license.

35. In particular, without an effective, functioning, and up-to-date CDLIS, HDOT and the County DMVs would not be able to issue new CDLs or renew existing ones in compliance with federal law and regulations. If HDOT falls out of compliance with these federal requirements, millions of dollars in annual federal highway grant money could be withheld. Additionally, HDOT would face substantial operational challenges. We would have to consider an alternative for CDLIS, which would likely be more costly and require raising fees for CDLs, and perhaps even fees for all driver's licenses. And even if laws and regulations requiring CDLIS usage did not apply, Hawai'i would be harmed by losing access to an important public safety resource that keeps unsafe drivers off of Hawaii's roads.

**Hawai'i participated in CDLIS on the understanding that its records would be kept secure**

36. I understand that Hawaii's participation in the CDLIS system is a condition to receiving certain federal highway funds.

37. It has never been Hawaii's understanding that FMCSA or any other federal agency has lawful authority to obtain the contents of CDLIS, nor that granting FMCSA the right to obtain and redisclose Hawaii's records was a condition of participation in CDLIS.

38. Hawai'i has relied on the security and confidentiality of CDLIS records in designing its own information systems. CDLIS established best practice benchmarks for the recording and sharing of drivers' data. Hawai'i has strived to emulate those protections in its own state record information system.

39. If FMCSA is able to obtain and redisclose Hawaii's records whenever it wishes, the trusting relationship between HDOT and FMCSA would be undermined. I am unaware of any cybersecurity or privacy plan by FMCSA to steward and protect this information. As a result, HDOT would be concerned about potential data breaches, which could expose our residents' confidential, identifying information. Hawai'i would also likely need to alter its practices, including by considering additional safeguards and warnings to CDL applicants, which would require the use of substantial state resources.

DECLARATION OF TOBY WAKUMOTO

40.    If HDOT had been aware that those funds were conditioned on having to hand over driver data en masse as FMCSA is currently asking it to do, HDOT would have reconsidered the terms of its agreement to participate in CDLIS and the overall parameters of the CDL program, given the conflict with state and federal privacy laws, cybersecurity requirements, and the like.

* * *

DECLARATION OF TOBY WAKUMOTO

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 7, 2026, in Honolulu, Hawaiʻi.


_____
Toby Wakumoto
Highway Safety Manager
Hawaiʻi Department of Transportation

DECLARATION OF TOBY WAKUMOTO

# Exhibit A

## JURISDICTION SERVICES AGREEMENT

THIS JURISDICTION SERVICES AGREEMENT (Agreement) is made as of the _3_ day of November   , 2023 (Effective Date) by and between the American Association of Motor Vehicle Administrators, a District of Columbia nonprofit corporation (AAMVA), and the State of _Hawaii_____, (Jurisdiction) (each, a "Party," and together, the "Parties").

### Preliminary Statement

A.  AAMVA provides certain information technology programs established pursuant to federal law and for which participation by AAMVA member jurisdictions is legally required. Currently, these programs include, without limitation, the Commercial Driver License Information System (CDLIS), the State-to-State Verification Service (S2S), the Problem Driver Pointer System (PDPS), and the National Motor Vehicle Title Information Service (NMVTIS).

B.  In addition, AAMVA, working in collaboration with its member jurisdictions, has developed and administers certain information technology programs that promote the efficient administration of the governmental functions carried out by those jurisdictions.

C.  Jurisdiction, in accordance with the terms and conditions of this Agreement, desires to utilize those information technology programs and other products and services offered by AAMVA that are specified in this Agreement.

THE PARTIES AGREE AS FOLLOWS:

1.  **Right to Use Services**.  Subject to the terms and conditions of this Agreement, AAMVA agrees to provide to Jurisdiction the right to use those services, including Equipment and Software associated with such services that are furnished by AAMVA (collectively, the "Services"), that are from time to time identified in the Schedule of Services in Exhibit A to this Agreement, as that Schedule of Services may be amended from time to time by mutual agreement of the Parties.

2.  **Definitions**.

    a.  "Authorized Personnel" means, with reference to a Party, those employees, contractors, representatives, agents, and auditors serving on behalf and under the direction of that Party who (i) have a need to know or otherwise access Confidential Information or Protected Data to enable that Party to perform its obligations or exercise its rights under this Agreement, and (ii) are bound in writing by confidentiality obligations sufficient to protect that Confidential Information or Protected Data in accordance with the terms and conditions of this Agreement.

b. "Confidential Information" means all non-public, confidential, or proprietary information disclosed by one Party (Disclosing Party) to the other Party (Receiving Party), whether disclosed orally or disclosed or accessed in written, electronic, or other form or media and whether or not marked, designated or otherwise identified as "confidential." Confidential Information shall not include information that: (i) was previously known by the Receiving Party; (ii) is publicly available; or (iii) is lawfully obtained by the Receiving Party independently of its relationship with the Disclosing Party under this Agreement.

c. "Equipment" means, without limitation, a modem, router, and/or other equipment provided to or ordered by Jurisdiction pursuant to this Agreement for use in conjunction with one or more Services.

d. "Protected Data" means information provided to a Party by or on behalf of the other Party that identifies or can be used to identify an individual (including, without limitation, names, signatures, addresses, telephone numbers, e-mail addresses, and other unique identifiers) or can be used to authenticate an individual, including, without limitation, all Sensitive Protected Data.

e. "Security Incident" means any act or omission that (i) compromises either the security, confidentiality, or integrity of Protected Data or the physical, technical, administrative, or organizational safeguards put in place by a Party that relates to the protection of the security, confidentiality, or integrity of Protected Data or (ii) breaches the requirements of this Agreement relating to such safeguards. For the avoidance of doubt, a Security Incident under this Agreement includes, without limitation, a Security Incident that occurs in a data system of the Jurisdiction that is connected to an AAMVA data system.

f. "Sensitive Protected Data" means an individual's (i) government-issued identification number (including social security number, driver's license number or state-issued identified number); (ii) financial account number, credit card number, debit card number, credit report information, with or without any required security code, access code, personal identification number or password, that would permit access to an individual's financial account; (iii) photograph or image; or (iv) biometric, medical or disability information.

g. "Software" means computer programs (and related documentation) that AAMVA provides or requires to be used in conjunction with the Services.

3. **Fees and Invoicing**.

a. Fees. The Jurisdiction agrees to pay for Services in accordance with the fees specified in AAMVA's Government Rate Catalog for the applicable billing period. All fees, less credits approved, are exclusive of any applicable state or local sales, use or other taxes of a similar nature.  AAMVA's current Government Rate Catalog can be found at https://www.aamva.org/technology/network-services . AAMVA reserves the right to change these fees and charges upon 30 days' prior written notice to Jurisdiction. Charges for Services shall be based on the records maintained by or

2

under the direction of AAMVA.

b. <u>Invoicing</u>. Invoices for Services are payable within 60 days from the date indicated on the invoice. AAMVA reserves the right to assess late charges on Services fees not paid when due at the lesser of (i) 1.5% per month or (ii) the highest rate permitted by law until such charges are paid in full.

4. **Term and Termination**.

a. <u>Term</u>. The Jurisdiction's right to use the Services will become effective on the Effective Date and shall continue for five years from the Effective Date unless sooner terminated in accordance with the provisions of this Agreement.

b. <u>Termination without Cause</u>. Either Party may terminate this Agreement without cause by providing 60 days prior written notice to the other Party. If Jurisdiction terminates this Agreement without cause, it agrees to promptly reimburse AAMVA for resulting third-party fees, charges, and penalties AAMVA incurs.

c. <u>Termination for Material Breach</u>. Either Party may terminate this Agreement effective upon written notice to the other Party (the "Defaulting Party"), if the Defaulting Party materially breaches this Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the Defaulting Party does not cure the breach within 30 days after receipt of written notice of such breach. For the avoidance of doubt, the failure of either Party to comply with its obligations concerning the use and security of Protected Data shall constitute a material breach of this Agreement.

d. <u>Effect of Termination</u>. Neither termination of this Agreement nor suspension of Services shall relieve either Party of its respective obligations under this Agreement that arose prior to the termination or suspension date.

e. <u>Suspension of Services</u>. AAMVA may immediately suspend a Jurisdiction's access to Services if AAMVA, in its sole discretion, determines either that suspension is required to comply with any applicable legal requirement or if any act or omission by Jurisdiction or any other person reasonably appears to jeopardize the security or integrity of Services or the network(s) or facilities used to provide Services. In the event of any such suspension, AAMVA and the Jurisdiction agree to cooperate to investigate, identify, and correct the issues making the suspension necessary. Jurisdiction acknowledges that AAMVA shall not be liable for losses or damage resulting from the unavailability of the Services as the result of the suspension of Services authorized in this Agreement.

5. **Use and Return or Destruction of Confidential Information and Protected Data**.

a. <u>Access to Confidential Information and Protected Data</u>. Each Party acknowledges and agrees that during the term of this Agreement, it may receive or have access to Confidential Information and Protected Data provided by the other Party. Each Party shall comply with the terms and conditions set forth in this Agreement concerning the use, collection, receipt, transmission, storage, disposal, and disclosure of such

3

Confidential Information and Protected Data.

b. <u>Restrictions on Use and Disclosure</u>. A Party that receives Confidential Information or Protected Data (Receiving Party) from the other Party (Disclosing Party) agrees to:

    i. keep and maintain all Confidential Information or Protected Data in strict confidence, using the same degree of care (but in no event less than reasonable care) to avoid unauthorized disclosure or use of such Confidential Information or Protected Data as it normally uses to protect its own Confidential Information or Protected Data; and

    ii. use and disclose Confidential Information or Protected Data solely to Authorized Personnel to carry out each Party's obligations under this Agreement, and not use, sell, rent, transfer, distribute, or otherwise disclose or make available such Confidential Information or Protected Data to any person or for any purpose or object except as authorized by this Agreement.

c. <u>Return or Destruction of Confidential Information and Protected Data</u>. At any time during the term of this Agreement at a Disclosing Party's written request or upon the termination or expiration of this Agreement for any reason, the Receiving Party shall, and shall promptly return to the Disclosing Party all copies, whether in written, electronic or other form or media, of Confidential Information or Protected Data that was provided by the Disclosing Party in the Receiving Party's possession, or under its control, or securely dispose of all such copies, and certify in writing to the Disclosing Party that such Confidential Information or Protected Data has been returned to the Disclosing Party or disposed of securely. Receiving Party shall comply with all directions provided by the Disclosing Party with respect to the return or disposal of Confidential Information or Protected Data.

6. **Responsibilities of AAMVA**.

a. <u>Services</u>. Services provided under this Agreement will conform to the applicable documentation, although AAMVA does not warrant that any Services will be free of interruption or be error-free. AAMVA will attempt to correct deficiencies in Services within a reasonable time. Jurisdiction agrees to permit AAMVA and its suppliers and service providers to take all reasonable measures to restore service deficiencies. Jurisdiction acknowledges that Services will be unavailable during such hours as are established from time to time by AAMVA or AAMVA's suppliers and service providers and as required for system maintenance. AAMVA agrees to make commercially reasonable efforts to minimize inconvenience to Jurisdiction.

b. <u>Software</u>. AAMVA may provide Software to enable Jurisdiction to connect to one or more Services. Except as otherwise provided in writing, AAMVA grants the Jurisdiction a nontransferable, nonexclusive license to use the Software solely in conjunction with the Services and in compliance with the provisions of this Agreement.

c. <u>Resolution of Equipment or Software Problems</u>. AAMVA's sole obligation in the

event of a malfunction in Equipment or Software is to provide reasonable assistance to Jurisdiction in resolving problems or replacing defective or damaged Equipment or Software. AAMVA shall have no obligation with respect to Equipment or Software that is purchased by the Jurisdiction from a third-party vendor, even if AAMVA requires the use of that Equipment or Software or arranges for such purchase.

7.    **Responsibilities of Jurisdiction: Use of Services**.

    a.   Use of Services. The Jurisdiction agrees to use Services in accordance with this Agreement and policies established by AAMVA from time to time. The Jurisdiction is responsible for ensuring that the Jurisdiction's use of Services will not:

        i.   breach any laws, regulations or conventions related to, but not limited to, data privacy, international communications, and exportation of technical or personal data; or

        ii.   place any unusually heavy processing loads on the network or applications without prior coordination with AAMVA.

    b.   Selection of Services. The Jurisdiction is solely responsible for the selection of, use of, and interpretation of results obtained from Services. The Jurisdiction accepts all responsibility for programs, data, information, or equipment provided by the Jurisdiction or which the Jurisdiction accesses through the use of Services.

    c.   Data Access. If the Jurisdiction provides access to data, programs or other material, for use with Services, the Jurisdiction warrants that:

        i.   such use will not cause AAMVA to violate the rights of any third parties; and

        ii.   the disclosure or use of such material using Services will not involve a breach of any Confidential Information or any other contractual obligation.

    d.   Jurisdiction Responsible for the Use of Services. Except as otherwise expressly provided in this Agreement, Jurisdiction:

        i.   assumes sole responsibility and the entire risk of use and operation of its connection to the Services;

        ii.   acknowledges that it is responsible for any contractual obligations, including charges, relating to unauthorized access to the Services; and

        iii.   is responsible for ensuring that all of its computers and associated equipment and software used in conjunction with Services comply with AAMVA requirements or specifications as established from time to time.

    e.   No Unauthorized Use, Copying. The Jurisdiction agrees that it shall not:

        i.   modify, add to, translate, reverse assemble, reverse compile, decompile or

5

otherwise attempt to derive the source code from any Software;

    ii.  copy, sublicense or transfer the Software for any reason except that the Software may be copied for backup, testing or archival purposes; or

    iii.  remove any copyright or trademark notices contained in the Software.

    iv.  use AAMVA's logo, name, or any facsimile on any material without AAMVA's prior written permission.

f.  <u>Testing, Training, and Approval to Enter Production Mode</u>. Prior to accessing Services, Jurisdiction must participate in all AAMVA-required testing and training. AAMVA's written approval is required before the Jurisdiction may use any Services in production mode.

g.  <u>Sharing and Sub-licensing</u>. Jurisdiction must obtain AAMVA's approval before Jurisdiction shares the use of Services with any other entity or sublicenses use of the Services, Equipment or Software to any third party.

h.  <u>Return of Equipment and Software</u>. Upon the expiration or termination of this Agreement, Jurisdiction promptly shall return, destroy or delete, as specified by AAMVA, all Equipment or Software used in conjunction with the Services.

i.  <u>Management of Connection for Services</u>. Jurisdiction shall manage its connection to permit AAMVA and other Jurisdictions to send data to the Jurisdiction and to permit the Jurisdiction to receive data from AAMVA and other Jurisdictions, on a timely basis throughout the day. AAMVA is not responsible for any delay in sending data (or for notifying any Party of such a delay) if the delay results from the Jurisdiction's failure to so manage its connection(s), or from any cause other than AAMVA's failure to exercise ordinary care or to act in good faith. AAMVA's records shall be determinative of when data has been received by AAMVA or when AAMVA sends data to or makes it retrievable by the Jurisdiction.

8.  **Safeguarding Data Privacy and Security**.

a.  <u>Compliance with Legal Obligations</u>.  Each Party represents and warrants that its collection, access, use, storage, disposal and disclosure of Protected Data does and will comply with pertinent provisions of the Driver Privacy Protection Act (DPPA), the Federal Information Processing Standards and, to the extent required of a Party under this Agreement, by all other applicable laws, regulations, and governmental directives.

b.  <u>Information Security Program</u>.  Each Party agrees to implement, maintain and monitor a comprehensive written information security program that complies with all applicable data privacy and security laws and regulations ("Information Security Policy"), which shall be available promptly on request of the other Party.  The Information Security Policy maintained by each Party shall include appropriate administrative, technical, physical, organizational, and operational safeguards and other security measures designed to (i) ensure the security and confidentiality of

Protected Data; (ii) protect against any anticipated threats or hazards to the security and integrity of Protected Data (such as unauthorized processing, access, collection, use, copying, modification, disposal or disclosure, unauthorized, unlawful, or accidental loss, destruction, acquisition, or damage); and (iii) protect against any actual or suspected unauthorized loss, use, disclosure or acquisition of or access to any Protected Data.

c. <u>Administrative and Technical Safeguards</u>.  Without limiting each Party's obligations under Section 8(b), each Party agrees to implement such administrative, physical, and technical safeguards to protect Protected Data from unauthorized access, acquisition, or disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than accepted industry practices including the International Organization for Standardization's standards: ISO/IEC 27001 – Information Security Management Systems – Requirements and ISO/IEC 27002 – Code of Practice for International Security Management, the Control Objectives for Information and related Technology (COBIT) standards, the National Institute of Standards and Technology (NIST) Cybersecurity Framework, or other applicable industry standards for information security, and shall ensure that all such safeguards, including the manner in which Protected Data is created, collected, accessed, received, used, stored, processed, disposed of, and disclosed, comply with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement.

d. <u>Minimum Safeguards</u>.  At a minimum, each Party's safeguards for the protection of Protected Data shall include: (i) limiting access of Protected Data to Authorized Personnel; (ii) securing business facilities, data centers, paper files, servers, backup systems, and computing equipment, including, but not limited to, all mobile devices and other equipment with information storage capability; (iii) implementing network, application, database, and platform security; (iv) securing information transmission, storage, and disposal; (v) implementing authentication and access controls within media, applications, operating systems, and equipment; (vi) encrypting Sensitive Protected Data stored on any mobile media; (vii) encrypting Sensitive Protected Data transmitted over public or wireless networks; (viii) strictly segregating Protected Data from other information so that Protected Data is not commingled with any other types of information; (ix) conducting risk assessments, penetration testing, and vulnerability scans and promptly implementing, at each Party's sole cost and expense, a corrective action plan to correct any issues that are reported as a result of the testing; and (x) providing appropriate privacy and information security training to the Party's employees.

e. <u>Personnel Practices</u>. Each Party shall implement appropriate personnel security and integrity procedures and practices with respect to all employees, including but not limited to, conducting pre-employment screening processes prior to their commencement of work for the Party that includes verification of the highest educational degree held by such employees and criminal history screening that includes all localized law enforcement records for the past seven (7) years (exclusive of any incarceration time). Neither Party shall permit an individual to serve within the Authorized Personnel if that person has: (i) been convicted of a crime in connection with a dishonest act, breach of trust, or has agreed to enter into a pretrial

7

diversion or similar program in connection with a prosecution for such offense, or (ii) been convicted of a felony.

f.  <u>Prevention of Unauthorized Use or Access</u>.  Each Party shall require its employees who are Authorized Personnel to abide strictly by the Party's obligations under this Agreement. Each Party agrees that it shall maintain a disciplinary process to address any unauthorized access, use or disclosure of Protected Data by any of that Party's Authorized Personnel.

9.  **Security Incidents**.

a.  <u>Provision of Contact Information</u>.  Each Party shall provide the other with (i) the name and contact information for an employee or other representative who shall serve as the Party's primary data security contact on matters relating to data security and privacy, and (ii) contact information to reach an employee or other representative who shall be available to provide assistance twenty-four (24) hours per day, seven (7) days per week as a contact in resolving obligations associated with a Security Incident. The Parties provide the following contact information for these individuals. Each Party shall provide prompt written notice to the other of any changes in this information.

For AAMVA:

Data Security Contact:

Pierre Y. Boyer, CSISQ
(703) 839-0646
pboyer@aamva.org

24 x 7 Security Incident Contact:

security@aamva.org
(888) AAMVA80, opt.1

For Jurisdiction:

Data Security Contact:

_Toby Wakumoto_____

_(808) 692-7656_____

toby.r.wakumoto@hawaii.gov

_____

24 x 7 Security Incident Contact:

 (808) 342-1991

_____

_____

_____

b.  Notification Concerning Security Incidents.  A Party (Breached Party) shall notify the other Party within 48 (forty-eight) hours of confirming the occurrence of a Security Incident affecting Protected Data in a Service or data system operated by the Breached Party that is included in this Agreement.

c.  Investigation and Remediation Obligations.  Promptly following the Breached Party's notification of a Security Incident, the Breached Party agrees to take prompt action immediately, at its own expense, to investigate the Security Incident, to take commercially reasonable actions to identify, prevent, and mitigate the effects of any such Security Incident, and to carry out any actions required by applicable law, including but not limited to notifications to affected persons. The Parties shall cooperate and coordinate with each other to investigate the Security Incident in accordance with the Breached Party's standard policies and procedures. The other Party shall provide the Breached Party with reasonable assistance to carry out the investigation, prevention, and mitigation efforts and to comply with applicable legal requirements. If data furnished by the other Party is affected by the Security Incident, the Breached Party shall reasonably incorporate the directions of the other Party concerning the investigation, prevention, and mitigation efforts.

d.  Continuing Obligation of Information. The Breached Party shall keep the other Party informed of the status of the Security Incident, all assessments and plans of actions taken by it in response to the Security Incident, and all other related matters.  Unless required by law, the Breached Party will not notify any individual or any third party other than law enforcement of any potential Security Incident without first consulting with and obtaining written permission of the other Party.

10.  **Verification of Information Security Safeguards**.

a.  Security Questionnaire.  No more than once in any period of twelve consecutive months, and after each instance of a Security Incident each Party (Requesting Party) shall have the right to assess compliance with this Agreement by requesting the other Party (Responding Party) to promptly and accurately complete a written information security questionnaire provided by the Requesting Party (or a third-party on behalf of the Requesting Party) regarding the Responding Party's business practices and information technology environment in relation to all Protected Data being handled or transmitted by the Responding Party pursuant to this Agreement. The Responding Party shall promptly and fully cooperate with such inquiries.

b.  On-Site Security Audit.  No more than once in any period of twelve consecutive months, and after each instance of a Security Incident, each Party (Requesting Party) on at least fourteen (14) calendar days' prior written notice, and in compliance with

9

the Responding Party's data privacy and security policies, shall have the right to audit and assess the other Party's compliance with this Agreement by performing (through the Requesting Party's employees or third-party personnel) an on-site assessment of all controls in the Responding Party's physical and/or technical environment in relation to all Protected Data being handled pursuant to this Agreement.  Such assessment may include a review of a Party's current assessment reports, such as SOC 2 Type II, SSAE16, NIST 800-53 Assessment Report or equivalent reports produced by a third-party organization that performs security inspections of a Party's facilities and information processing systems. Each Party agrees to conduct data security assessments in accordance with the frequency specified in the assessment standards established by the applicable third-party organization.

11.    **Limitation of Liability**.

    a.  <u>No Consequential or Indirect Damages</u>. IN NO EVENT SHALL AAMVA BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT AAMVA WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

    b.  <u>Maximum Liability</u>. IN NO EVENT SHALL AAMVA's AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, LIABILITY FOR INDEMNIFICATION CLAIMS), WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO AAMVA PURSUANT TO THIS AGREEMENT IN THE SIX MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

    c.  <u>Exceptions</u>. THE LIMITATIONS SET FORTH IN THIS SECTION SHALL NOT APPLY TO PERSONAL INJURY OR DEATH, OR DAMAGE TO ANY REAL OR TANGIBLE PERSONAL PROPERTY CAUSED BY AAMVA'S GROSSLY NEGLIGENT ACTS OR OMISSIONS OR WILLFUL MISCONDUCT, OR TO AAMVA'S FRAUDULENT ACTS.

12. **Indemnification**.   Each party (as "Indemnifying Party") shall indemnify, hold harmless, and defend the other party and its officers, directors, employees, representatives, and agents (collectively, "Indemnified Party") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including professional fees and reasonable attorneys' fees, that are incurred by Indemnified Party (collectively, "Losses"), arising out of any third-party claim alleging (i) the Indemnifying Party's material breach or non-fulfillment of any material representation, warranty, or covenant under this Agreement; or (ii) any negligent or grossly negligent or more culpable act or omission of Indemnifying Party in connection with the performance of its obligations under this Agreement.

13. **Disclaimer of Warranties**. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SERVICES, EQUIPMENT, AND SOFTWARE ARE PROVIDED "AS IS." NEITHER AAMVA NOR ANY OF AAMVA'S SUPPLIERS OR SERVICE PROVIDERS MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY ARISING BY STATUTE OR FROM A COURSE OF DEALING OR USAGE OF TRADE. WITHOUT LIMITING THE FOREGOING, AAMVA MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES (INCLUDING ANY SOFTWARE OR EQUIPMENT) WILL MEET JURISDICTION'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY OTHER GOODS, SERVICES, OR TECHNOLOGIES, (INCLUDING ANY SOFTWARE, EQUIPMENT, HARDWARE, FIRMWARE, SYSTEM OR NETWORK), OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE. USE OF ANY INFORMATION OBTAINED BY OR THROUGH THE SERVICES IS AT JURISDICTION'S OWN RISK. AAMVA SPECIFICALLY DISCLAIMS ANY LIABILITY OR RESPONSIBILITY FOR THE ACCURACY OR QUALITY OF INFORMATION OBTAINED THROUGH SERVICES OR FOR LOSS OF DATA RESULTING FROM DELAYS, NONDELIVERIES, MISDELIVERIES, OR SERVICE INTERRUPTIONS, HOWEVER CAUSED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY AAMVA SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF AAMVA'S OBLIGATIONS UNDER THIS AGREEMENT.

14. **Miscellaneous**.

    a. <u>Compliance with Applicable Laws and Regulations</u>. Each Party agrees to comply with all applicable federal, state, and local laws, and the regulations and guidelines promulgated thereunder, applicable to the provision or use of any Service, Equipment or Software provided under this Agreement including, without limitation, the Driver's Privacy Protection Act (18 USC 2721).

    b. <u>Amendment and Modification</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party hereto.

    c. <u>Use of Name</u>.  The Jurisdiction agrees not to use AAMVA's name, logos, trademarks, or other marks without AAMVA's prior written consent.

d. <u>Headings and Captions</u>. Headings and captions are inserted for reference and convenience only and are not a part of and shall not affect the meaning or interpretation of this Agreement.

e. <u>Force Majeure</u>. No Party shall be liable or responsible to the other Party, or be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond the impacted Party's ("Impacted Party") control, including, without limitation, the following force majeure events ("Force Majeure Event"): (a) acts of God; (b) flood, fire, earthquake, epidemics, pandemics, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (d) government order, law, or actions; (e) embargoes or blockades in effect on or after the date of this Agreement; and (f) national or regional emergency; (g) other similar events beyond the control of the Impacted Party.

f. <u>Notices</u>. All notices under this Agreement must be in writing and sent to the address below unless a Party designates in writing a different address.

| Jurisdiction | AAMVA |
|---|---|
| Toby Wakumoto<br>State of Hawaii DOT<br>Highway Division, MV Safety Office<br>(808) 692-7656<br>toby.r.wakumoto@hawaii.gov | Contracts Administration<br>AAMVA<br>4401 Wilson Boulevard, Suite 700<br>Arlington, VA 22203<br>(703) 908-8286<br>contracts@aamva.org |

g. <u>Assignment</u>. Neither Party may assign, transfer, or delegate any or all of its rights or obligations under this Agreement, without the prior written consent of the other Party

h. <u>Severability</u>. A determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or enforceability of any other part of this Agreement.

i. <u>Relationship of the Parties</u>. Each Party is an independent contractor. This Agreement shall not be construed as creating any agency, partnership, joint venture, or any other form of legal association between the Parties.

j. <u>Third-Party Beneficiaries</u>. The Parties do not intend to confer any rights or remedies upon any person other than the Parties to this Agreement and their respective successors and permitted assigns.

k. <u>Survival</u>. The provisions of Section 5 (Use and Return of Confidential Information and Protected Data, Section 9 (Security Incidents), Section 10 (Verification of Information Security Safeguards, Section 11 (Limitation of Liability), Section 12 (Indemnification), Section 13 (Disclaimer of Warranties, as well as any other

provision that, in order to give proper effect to its intent, should survive such expiration or termination, shall survive the expiration or earlier termination of this Agreement.

l.  Governing Law. This Agreement shall be governed by the substantive laws of the Jurisdiction, without regard to its choice of law principles.

m.  Entire Agreement.

   i.  This Agreement shall not amend or supersede (i) the Report Out-of-State Test Results (ROOSTR) Agreement dated January 16, 2019 and last modified on October 1, 2020 (see Enclosure 1), (ii) the Digital Image Access and Exchange Participation Agreement dated January 28, 2009 (see Enclosure 2), (iii) the Driver License Data Verification System Jurisdiction Service Agreement dated May 2, 2019 and last modified on July 1, 2023 (see Enclosure 3), or (iv) the State-to-State Verification Service Agreement dated April 10, 2020 (see Enclosure 4) (collectively, the "Continuing Agreements"), including any amendments to any of the Continuing Agreements during the Term of this Agreement.

   ii.  With the exception of the Continuing Agreements, this Agreement, together with all related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, including, without limitation, the AAMVAnet, Inc. Subscription Agreement Inc. dated May 11, 1990 and any and all other contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

mi.  Order of Precedence. In the event of any inconsistency between the provisions in the body of this Agreement and any related attachments, exhibits or schedules to this Agreement, the provisions contained in such attachment, exhibit or schedule shall take precedence.

mii.  Due Authorization. Each of the Parties represents and warrants that the execution and delivery of this Agreement by the person signing this Agreement below has been duly authorized by all necessary action within their respective organization.

miii.  Counterparts. This Agreement may be executed in any number of counterparts, none of which need contain the signatures of all of the Parties so long as identical counterparts are executed by all Parties.

IN WITNESS WHEREOF, the undersigned have caused the Agreement to be executed by their authorized officials as of the Effective Date.

13

**JURISDICTION**:

**AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS**

By: *Toby Wakumoto*

___Highway Safety Manager___ [print title]

___Toby Wakumoto___ [print name]

By: _____

Wendy Sibley
Chief Financial Officer

14

## Lists of Exhibits

<u>Exhibit</u>              <u>Description</u>
A                         Schedule of Services

15

**Exhibit A**

Schedule of Services

Jurisdiction Services Agreement Exhibit A (Hawaii)

# Schedule of Services *

## AAMVA General Services

 Administrative Services

 AAMVA Program Services

 AAMVA Technology Services

## AAMVA Data Exchange Applications

 Driver Services

 Commercial Driver License Information System (CDLIS)

 State-to-State (S2S)

 Digital Image Access and Exchange Program (DIAEP)

 Report Out Of State Test Results (CSTIMS/ROOSTR)

 Verification Services

 Social Security Number Online Verification (SSOLV) System

 Driver License Data Verification (DLDV) System

 Help America Vote Verification (HAVV) System

 Verification of Lawful Status (VLS)

 US Passport Verification Services (USPVS)

## Interface Software

 Unified Network Interface (UNI)

## Network Connectivity Services

 Network Connection Services

## OpenText Interchange Services for e-business

 Information Exchange (IE) Services

 Expedite

* For a description of services listed above see AAMVA's current Government Rate Catalog which can be found at http://www.aamva.org/Network-Services.