**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | No. 1:26-mc-19 |

*Movants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Respondent*.

**DECLARATION OF STEVEN VASQUEZI**

I, Steven Vasquezi, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.   I am a resident of the Commonwealth of Massachusetts. I am over the age of 18, competent to testify as to the facts herein, and I testify based on personal knowledge, records kept in the ordinary course of business at the Massachusetts Department of Transportation, Registry of Motor Vehicles Division (RMV), and information I learned from RMV personnel, whose work I rely upon and who have assisted me in gathering this information from our institution.

2.   I am currently employed by the RMV as the Assistant Registrar of Credentialing. I have been in this role since November 2023. In my eight years with the RMV, I have also served as the Manager of the Contact Center, Acting Enforcement Services Manager, and Service Center Manager. In my current role at the RMV, I am responsible for leading and managing all aspects of the agency's personal, commercial, and most professional credentialing functions. This includes oversight and responsibility for Massachusetts' Commercial Driver's License (CDL) program, and non-commercial driver's license program.  I am also responsible for ensuring proper licensure and driver history reporting of drivers with credentials to operate commercial motor vehicles under the laws and regulations of FMCSA and of the Commonwealth of Massachusetts.  This includes serving as the RMV's leading authority on license and identification policy, including implementation and compliance with federal CDL and REAL ID requirements for identity, permit testing, medical standards, proper licensure and driver history reporting. I coordinate with RMV Service Centers and other relevant departments to ensure knowledgeable RMV staff and consistent procedures in licensing. I oversee the FMCSA's annual performance review at the RMV in coordination with the RMV's Out of State Unit, Driver Control Unit, and the Merit Rating Board to ensure that convictions and related sanctions are properly applied to CDL driver records in a timely manner and in accordance with federal and state requirements.

3.   In Massachusetts, the RMV is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial drivers' licenses (CDLs) and non-commercial drivers' licenses. (See, for example, M.G.L. Chapter 90, Section 8; M.G.L. Chapter 90F, Section 6). Among other things, the RMV is responsible for verifying each driver's license applicant's

DECLARATION OF STEVEN VASQUEZI

identity, legal eligibility, medical fitness, as well as identifying and disciplining problem drivers, and protecting the privacy of Massachusetts drivers' personal information.

### Massachusetts' Management of Driver Licensing

4. The RMV is responsible for issuing and renewing commercial driver's licenses (CDLs) and personal driver's licenses also known as Class D (passenger) and Class M (motorcycle) licenses, to residents of Massachusetts.

5. As part of Massachusetts' commitment to traffic safety, the RMV follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, the RMV administers driving tests, assesses applicants' medical fitness, checks to ensure that each applicant is not the holder of a driver's license from any other state, and checks each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs and Real ID credentials, the RMV also verifies the applicant's lawful presence in the United States in accordance with federal and state law.

6. To comply with our legal obligations under federal law, it is necessary for the RMV to have a means of checking each driver's history, not only in Massachusetts, but in other states where the applicant may have held a license.

7. For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS).

### The Commercial Driver's License Information System (CDLIS)

8. CDLIS is a database that contains driver records owned and maintained by the states. It operates as a clearinghouse where states can assist one another in verifying the identity and history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members.

9. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's: state of record, driver license number, name, date of birth, social security number (SSN), sex, the date

DECLARATION OF STEVEN VASQUEZI

and time the driver was added to CDLIS, the date and time the record was last updated, and indicators showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

10. If the RMV queries CDLIS and finds that an applicant has a Master Pointer Record, the RMV would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR) which the state of record would provide directly to Massachusetts. Similarly, if another state queries CDLIS and finds a Master Pointer Record for a driver licensed in Massachusetts, the RMV would send that driver's record to the requesting state.

11. To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

12. As stated above, the data in CDLIS is owned and maintained by the states. The RMV has the power to add, delete, or change its own records maintained in CDLIS—and regularly does so, to ensure that our data remains accurate and up-to-date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, have any power to make additions, deletions, or changes to Massachusetts' CDLIS data.

13. Before issuing a CDL, Massachusetts, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, whether their license has been disqualified, and whether the applicant is disqualified from operating a motor vehicle. The RMV usually queries CDLIS anywhere from hundreds to thousands of times each day.

14. The RMV has participated in and relied on CDLIS to operate its CDL program since around November 1, 1990. Even if we were not legally required to use CDLIS, we would need CDLIS, or some other system like it, in order to serve our public safety mission: the RMV needs to know whether an applicant has a history of dangerous or unlawful driving before licensing them in Massachusetts. If CDLIS were to shut down, it would be a major impediment to the operation of our CDL program.

DECLARATION OF STEVEN VASQUEZI

15.     Because CDLIS is incorporated into the RMV's operating systems, the RMV also queries CDLIS before issuing a personal driver's license, also known as a Class D (passenger) and/or Class M (motorcycle) license. Thus, our operation of our Class D and Class M license programs would also be impaired by the loss of CDLIS.

16.     The RMV participates in CDLIS pursuant to a contract with AAMVA. Attached as Exhibit A is a copy of the agreement between AAMVA and the RMV governing AAMVA granting the RMV access to CDLIS.

17.     In addition to CDLIS, AAMVA operates other critical programs that the RMV uses. For example, AAMVA operates the Problem Driver Pointer System (PDPS). PDPS allows states to search the National Driver Registry (NDR), which contains information on problem drivers. By carrying out a PDPS search, the RMV obtains information that directs it to the jurisdiction that has a full record of a driver's history.  Based on this information, the RMV can determine whether an applicant for a driver's license is eligible.

18.     Like CDLIS, PDPS was created by statute and is a function of the National Highway Transportation Safety Administration (NHTSA).

19.     The RMV also uses additional systems administered by AAMVA including but not limited to: The Commercial Skills Test Information Management System (CSTIMS) provides jurisdictions with a consistent way to track and schedule CDL Skills Test results for commercial driving.  The State-to-State (S2S) Verification Service allows a state to check whether an applicant holds a driver's license or identification card in another state.

20.     The RMV queries at least one AAMVA system every time an individual applies for a driver's license.

**FMCSA's Demand for CDLIS Data**

21.     On July 27, 2026, the RMV received a Memorandum from AAMVA President & CEO Ian M. Grossman reporting that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Massachusetts' records.

22.     On August 7, 2026, the RMV received an email from AAMVA President and CEO Ian M. Grossman with a letter AAMVA sent to FMCSA attached. The letter disclosed that the Department

4

DECLARATION OF STEVEN VASQUEZI

of Homeland Security (DHS) sent AAMVA a subpoena on July 28, 2026 titled "Immigration Enforcement Subpoena" for the same CDLIS data requested by FMCSA, but they were withdrawing the subpoena due to AAMVA's cooperation with FMCSA.

23.    I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

24.    I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, the RMV already carries out those functions, as is typical for state agencies, in accordance with federal and state laws and regulations.

25.    I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions.  I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

### Irreparable Harm of Disclosure to FMCSA

26. FMCSA's demand seeks Massachusetts' proprietary and confidential records and data on its residents.

27. Once Massachusetts' data is in FMCSA's hands, Massachusetts would lose control and oversight of its confidential records.  To my knowledge, FMCSA has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency.  And even if FMCSA made promises to AAMVA regarding the security and/or privacy of this data, Massachusetts would not be in a position to enforce those promises. These new records, which would be federal and not state records, could be used for purposes that violate our state law and regulations regarding the confidentiality of information.

28. In particular, the RMV understands itself to be bound by Massachusetts laws limiting the release of any RMV customer information beyond the customer except through court order or subpoena, or to permissible users for permissible uses as outlined under the federal Driver's Privacy Protection Act (DPPA), but only after the RMV receives a mandatory signed certification from the requestor confirming they will limit the use and dissemination in accordance with state law and

DECLARATION OF STEVEN VASQUEZI

regulations.   Handing over Massachusetts proprietary and confidential information to FMCSA is incompatible with those obligations.

29. Moreover, if the data were turned over to FMCSA, Massachusetts would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to Massachusetts could form the basis or justification for federal action.

30. Finally, residents of Massachusetts entrust us with their personal data when they apply for a license, either CDL, Class D or Class M license.  That trust would be destroyed if the data is turned over to FMCSA without controls and without verification of FMCSA's purpose in seeking it.

31. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs or personal licenses from Massachusetts. This means Massachusetts will lose revenue, as each applicant must pay testing fees and licensing fees.

**Massachusetts would be Harmed if AAMVA's Programs were Impaired**

32.    I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

33.    Massachusetts would be seriously harmed if FMCSA carried out those threats. As stated above, the RMV heavily relies on CDLIS, the PDPS, and other resources and services operated by AAMVA. The RMV relies on AAMVA's programs, Boards, and committees to facilitate consistency and reciprocity between states, not just on licensing practices, but on legislative goals to improve roadway safety, engage in new technologies and make them available across jurisdictions to maximize uniformity, and bring states together who may be grappling with safety or other sensitive issues alone but benefit from collaboration and coordination.

34.    In particular, without an effective, functioning, and up-to-date CDLIS, the RMV would not be able to issue new CDLs or renew existing ones in compliance with federal law and regulations. This would result in a shortage of critical services including, but not limited to, emergency management responses, school bus and public transit drivers, hazardous material transport (oil, gas, etc.), and mail and package delivery. Additionally, we expect a shortage of necessary goods such as groceries, hospital and pharmacy supplies, and critical infrastructure project supplies and equipment.

DECLARATION OF STEVEN VASQUEZI

This doesn't even address the economic impact on CDL drivers and their families who can no longer continue with their employment without a valid, active CDL.

35.    Even if those laws and regulations did not apply, Massachusetts would be harmed by losing access to an important public safety resource that keeps unsafe drivers off of Massachusetts' roads.

**The RMV Participated in CDLIS on the Understanding that its Records would be Kept Secure**

36.    I understand that Massachusetts' participation in the CDLIS system is a condition to receive certain federal highway funds.

37.    It has never been Massachusetts' understanding that FMCSA or any other federal agency has requested or received the full contents of CDLIS or any other AAMVA system, nor that granting FMCSA the right to obtain and redisclose Massachusetts' records was a condition of participation in CDLIS.

38.    Massachusetts has relied on the security and confidentiality of CDLIS records in designing its own information systems, in establishing practices relating to the maintenance of such records, and in notifying applicants for CDLs about how their information would be used and shared.

39.    If FMCSA is able to obtain and redisclose Massachusetts' records whenever it wishes, the RMV will need to alter its practices.  Among other things, the RMV will need to revise the assurances of confidentiality it provides to CDL applicants, which will require the expenditure of substantial state resources. The RMV will need to obtain the required certification from FMCSA under Massachusetts law, and if FMCSA is unwilling to provide such certifications, the RMV would be unable to enter information related to Massachusetts applicants or drivers into the system.

40.    If the RMV had been aware that those funds were conditioned on having to hand over driver data en masse as FMCSA is currently demanding, it would not have agreed to participate as robustly in CDLIS, if at all, trusting the security and confidentiality of the system with the sensitive personal information of Massachusetts residents.

* * *

7

DECLARATION OF STEVEN VASQUEZI

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 9, 2026, in Hudson, Massachusetts.

Steven Vasquezi

Digitally signed by Steven Vasquezi
Date: 2026.08.09 12:03:18 -04'00'

Steven Vasquezi
Assistant Registrar of Credentialing
Massachusetts Department of Transportation,
Registry of Motor Vehicles Division

DECLARATION OF STEVEN VASQUEZI

# Exhibit A



ASSIGNMENT OF AAMVAnet, INC. SUBSCRIPTION AGREEMENT

BETWEEN

STATE OF NEBRASKA DEPARTMENT OF MOTOR VEHICLES

AND

AAMVAnet, INC.

AND

COMMONWEALTH OF MASSACHUSETTS,
REGISTRY OF MOTOR VEHICLES

For value received, the State of Nebraska, Department of Motor Vehicles, assigns, transfers, and sets over to AAMVAnet, Inc., a Virginia nonstock corporation, the assignee herein, all rights, titles, interests, and obligations in the AAMVAnet, Inc. Subscription Agreement between the State of Nebraska Department of Motor Vehicles, AAMVAnet, Inc., and the Commonwealth of Massachusetts, Registry of Motor Vehicles, made on the 12th day of March, 1990.

The effective date of this Assignment Of AAMVAnet, Inc. Subscription Agreement shall be November 1, 1990.

In witness whereof, the undersigned has executed this assignment as a fully authorized official on _____ 18 , 19 90.

Margaret L. Higgins
Director, Department of Motor Vehicles

### ACCEPTANCE OF ASSIGNMENT

AAMVAnet, Inc., a Virginia nonstock corporation, hereby accepts the foregoing instrument, subject to all the terms and conditions thereof, and in addition indemnifies and holds harmless the State of Nebraska, Department of Motor Vehicles, for any cause of action, loss, claim, and expenses (including reasonable attorney's fees), that arises directly or indirectly under the assigned AAMVAnet, Inc. Subscription Agreement after the date of this assignment.

AAMVAnet, Inc.

Dated _____ Oct. 19 , 1990.

## AAMVAnet, INC.
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** is made this _12th_ day of _March_, 19_90_, by and among AAMVAnet, INC., a Virginia nonstock corporation (the "Operator"), the STATE OF NEBRASKA, DEPARTMENT OF MOTOR VEHICLES (the "Nebraska DMV") and the undersigned subscriber (the "Subscriber") in the State of _Massachusetts_ (the "State").

### RECITALS

A.   Section 12007 of the Commercial Motor Vehicle Safety Act of 1986, 49 U.S.C. app. 2701 et seq. (the "Act") mandated the establishment of an information system which will serve as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial vehicles (hereinafter, the "Commercial Drivers License Information System" or "CDLIS").

B.   The operator is working in cooperation with the Nebraska DMV, representatives of the States (as such term is used in the Act) and the Federal Highway Administration with respect to the creation of a nationwide telecommunications network ("AAMVAnet") to support the operation of CDLIS.

C.   The Federal Highway Administration, Acting for the U.S. Secretary of Transportation, pursuant to the Act, has designated the Operator as the operator of CDLIS.

D.   The Nebraska DMV has entered into certain third party contractual obligations relating to the development and operation of AAMVAnet.

E.   The Nebraska DMV therefore desires to enter into this contract between AAMVAnet and the Subscriber to clarify its right to recover

1

RECEIVED

MAR 0 9 1990

NE DEPT MOTOR VEHICLES

subscription fees directly from the Subscriber for services rendered by the Operator and the third party contractor (the "Third Party Obligations") until such time as Nebraska DMV assigns its rights and obligations under this Agreement.

F.    The Subscriber desires to contract for the use of AAMVAnet for the purpose of obtaining access to CDLIS and other telecommunication services which may be available over AAMVAnet and which it may desire to utilize from time to time (the "Services"), all as set forth herein.

## AGREEMENTS

NOW THEREFORE, the parties hereby agree as follows:

1.    Use of AAMVAnet.  Operator and Nebraska DMV hereby grant to Subscriber the right to utilize AAMVAnet for the purpose of obtaining access to CDLIS and such other Services as Subscriber shall elect from time to time.

2.    Fees.  Subscriber agrees to pay for use of AAMVAnet and the Services on the basis of Subscriber's actual utilization of network services and/or applications in accordance with the charges set forth in Attachment A.  All fees, less credits approved, are exclusive of any applicable state or local sales, use or other taxes of a similar nature and are subject to change upon at least thirty (30) days written notice from Operator to Subscriber.

3.    Billing and Payment.  Following the end of each calendar month, Nebraska DMV will cause to be sent to Subscriber an invoice setting forth charges incurred during such month by the Subscriber.  Upon receipt of the invoice, the Subscriber shall pay the full amount due. Amounts remaining due for more than sixty (60) days shall accrue interest at the rate per annum of fourteen percent (14%).  Amounts remaining due for more than ninety (90) days shall result in termination of services to the Subscriber as provided in Paragraph 8

2

of the Agreements. Remittances shall be made payable to "Nebraska Department of Motor Vehicles" and shall be mailed to Nebraska Department of Motor Vehicles, CDL Division, P.O. Box 94789, Lincoln, Nebraska 68509 or such other payee and/or address as shall be designated by the Nebraska DMV.

4. **Equipment.** The Subscriber will be connected to AAMVAnet through equipment provided by the Subscriber as delineated in Attachment B of this Agreement. The Operator, the Nebraska DMV or their designee shall have the right to inspect and test such equipment to confirm the compatibility of such equipment with AAMVAnet.

5. **Compliance with Certain Policies and procedures.** The Subscriber agrees that it will, unless prohibited by state law, comply fully with the Operator's policies and procedures, set forth in Attachment C, in effect from time to time regarding the disclosure to and access of State agencies and other third parties of information transmitted over AAMVAnet, including, policies with regard to the structure and coding of transactions and billing policies and procedures.

6. **Compliance with Nebraska DMV Billing and Payment Procedures.** The Subscriber agrees that payment is due upon receipt of invoice. The Subscriber further agrees and acknowledges the authority of the Nebraska DMV to seek recovery of any financial obligations incurred by the Subscriber for services provided under this agreement.

7. **Term.** This Subscription Agreement is effective as of the date set forth above and shall continue in force until terminated by the Subscriber, Operator or Nebraska DMV, except as stated in Agreements paragraphs number three (3) and number nine (9), upon at least thirty (30) days written notice.

8. **Termination; Suspension of Services; Other Remedies.** If Subscriber fails to fulfill any obligations under this Subscription Agreement,

3

then in addition to any other remedies which Operator and/or the Nebraska DMV may seek, the Operator and/or Nebraska DMV may suspend access to AAMVAnet on ten (10) days written notice.  In addition to the foregoing, if the Subscriber fails to fulfill any obligations under this Subscription Agreement, the Operator and the Nebraska DMV may take whatever action at law or in equity which may appear necessary or desirable to enforce such obligations.  No remedy set forth herein is intended to be exclusive of any other remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Subscription Agreement or now or hereafter existing at law or in equity or by statute.

The Subscriber shall not be relieved of its liability to Nebraska DMV for any damages sustained by the Nebraska DMV as a result of any breach of this Subscription Agreement unless Nebraska DMV so releases the Subscriber and has determined for the purpose of set-off the exact amount of damage due the Nebraska DMV.

9.    Limitation on Liability of Nebraska DMV.  The Nebraska DMV enters into this Agreement to provide specified network services based upon the Federal Highway Administration Supplemental Grant CDLIS-FY 88-002 dated August 23, 1988, and as amended on March 17, 1989, to provide the amount of $2,600,000 as the funding source for this project.  If at any time the funding source fails to appropriate monies to the Nebraska DMV, the obligation of the Nebraska DMV shall cease immediately and performance of work under the Subscription Agreement by Nebraska DMV shall terminate effective as of the date specified in the notice without penalty.

In addition, when the funding from Federal Grants has been expended, then the Nebraska DMV shall not commit to the expenditure of State funds.  At no time shall the Nebraska DMV commit to the expenditure of State funds.

4

Prior to the expenditure of all federal grants funds the Director of the Nebraska DMV at any time may assign the Nebraska DMV's rights and obligations under this Agreement to:  a federal government agency, another state participating in AAMVAnet, or another agency of the State of Nebraska.  Upon expenditure of all federal grants funds, Nebraska DMV may assign this Subscription Agreement to the Operator.

10.   Force Majeure.  Neither the Operator, nor the Nebraska DMV, nor the Subscriber shall have any liability to any party by reason of any delay or failure to perform any obligation or event occasioned by any act of God, force majeure, storm, fire, casualty, work stoppage, strike, lockout, labor dispute, civil disturbance, equipment failure, riot, national emergency, act of government, act of public enemy, mechanical or technical failure or other causes of similar or dissimilar nature beyond its or their control.

11.   Choice of Law.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Nebraska.

12.   The Subscriber may not reassign any rights or obligations under this Agreement without the express written approval of the Operator and Nebraska DMV.  Upon the expenditure of all federal grant funds the Nebraska DMV may assign its rights hereunder to the Operator without the further consent of the Subscriber.

13.   Notices.  All notices required or permitted to be given under the terms of this Subscription Agreement, except as stated in Agreements paragraph number nine (9), shall be deemed given when delivered in person or on the third business day after being deposited in the United States mail, first class postage prepaid, addresses as follows:

5

**If to the Operator:**          Barry Goleman, Manager
                                 AAMVAnet, Inc.
                                 4200 Wilson Blvd., Ste. 600
                                 Arlington, VA   22203


**If to the Nebraska DMV:**      Paul N. Potadle, Attorney-Deputy
                                                     Director
                                 CDL Coordinator
                                 P.O. Box 94789.
                                 Lincoln, NE   68509


**If to the Subscriber:**        David Lewis, Deputy Registrar, MIS
                                 Registry of Motor Vehicles
                                 100 Nashua Street
                                 Boston, MA   02114

or to such other person or address which any party shall furnish to the others in writing.

14. **Headings.** The headings in this subscription Agreement are for convenience and reference purposes only and do not constitute part of the Agreement.

15. **Entire Agreement.** This Subscription Agreement constitutes the entire agreement among the parties and merges any and all prior agreements and representations respecting the matters contemplated in this Subscription Agreement, whether oral or written, by and among the parties hereto.

16. **Counterparts.** This Subscription Agreement may be executed in two or more fully executed counterparts, each of which shall be deemed an original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same

6

instrument.

17. **Severability; Nonwaiver.** Should any provisions of the Subscription Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected thereby. Failure of any party to enforce any provision of this Subscription Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

IN WITNESS WHEREOF, the undersigned have caused the Agreement to be executed by their fully authorized officials as of the date first written above.

Subscriber

By: _William T. Hutch_____

    William T. Hutch_____(name)

    Chief Deputy Registrar_____(title)

AAMVAnet, Inc.

By: _____

Barry Goleman
Manager - AAMVAnet, Inc.

Nebraska Department of Motor Vehicles

By: _____

Margaret L. Higgins
Director - Department of Motor Vehicles

7

## ATTACHMENT A

### AAMVAnet, Inc. Fee Schedule
### June 29, 1989

## CDLIS Fee Schedule

This fee schedule covers the equipment and services required for the CDLIS application.

| | |
|---|---|
| Enrollment Fee for each new CDL Holder to CDLIS | $4.00 |

Traffic Usage Charges (per 1000 Characters)
Prime Time                                     .015
Non-Prime Time                                 .008

Monthly Fee per Invoiced Account               40.00

CDLIS Transaction Charges

| Adds and Changes | 1989 | .05883 |
|---|---|---|
| | 1990 | .05425 |
| | 1991 | .05046 |
| | 1992 | .04692 |
| Inquiries | 1989 | .04445 |
| | 1990 | .04099 |
| | 1991 | .03812 |
| | 1992 | .03534 |

The above fees cover all fees and charges to the extent required for CDLIS operations.  Only one "PROFS" user ID is included in the above fees.

Federal grant funds and CDLIS enrollment fees will cover the cost of monthly host connectivity and common carrier charges for a 90 day period prior to CDLIS implementation.  Any additional costs will be at the rates covered on page 2 of Attachment A.

The fees listed on the next page apply when the service does not relate to the CDLIS application.  These rates can be used to determine the cost to connect additional host computers;  to have additional capacity;  or to use other network services.

8

Attachment A
Page 2

## Current AAMVAnet Rates
### Effective June 29, 1989

|  | Current AAMVAnet |
|---|---|
| **INSTALLATION:** | |
| Host administration (per host) | $1,328 |
| Enhanced Connectivity Service* | |
| - 9.6 Kbps line (per line) | 900 |
| - 14.4 Kbps line (per line) | 1,125 |
| - 56.6 Kbps line (per line) | 1,175 |
| Protocol conversion (non-LU6.2 States) | 4,000 |
| | |
| **HOST CONNECTIVITY (Monthly)** | |
| Host administration (per host) | 340 |
| Enhanced Connectivity Service* | |
| - 9.6 Kbps line (per line) | 778 |
| - 14.4 Kbps line (per line) | 1,237 |
| - 56.6 Kbps line (per line) | 3,111 |

\* IBM will provide the modems, IBM Information Network
communications port and management of the line.

Common Carrier charges are charged as received from the Common Carrier.
They are not included in the above charges. Prime time is from 8:00am to
8:00pm (Eastern time) Monday-Friday.

| TRAFFIC USAGE CHARGES | |
|---|---|
| Prime time per 1,000 Characters | .015 |
| Non-Prime time per 1,000 Characters | .008 |

| LOCAL DIAL ACCESS CHARGES (Per hour) | |
|---|---|
| Class A city Prime time | 4.34 |
| Class A city Non-Prime time | 2.16 |
| Class B city Prime time | 6.37 |
| Class B city Non-Prime time | 3.18 |
| 800 Number surcharge to local class A city: | 15.90 |

| INFORMATION EXCHANGE (IE) USAGE | |
|---|---|
| Information Exchange message Prime time | .255 |
| Information Exchange message Non-prime time | .128 |
| IE Traffic, per 1,000 Characters Prime time | .060 |
| IE Traffic, per 1,000 Characters Non-Prime time | .030 |
| Storage, per Million Characters per day | 3.79 |

| GENERAL CHARGES | |
|---|---|
| Enrollment Charge per invoiced account (One item) | 150 |
| Attached network resources registration (per device) | 35 |
| PROFS USER ID (w/1 MB of Storage) per month | Variable 100 |
| Monthly fee per Invoiced Account | 40 |

| SOFTWARE | |
|---|---|
| IBM expEDIte/CICS (per month) | 95 |
| IE SNA Host Interface (per month) | 32 |
| IBM expEDIte/PC (per Copy) | 150 |
| INPCS-Entry (Dial support per copy) | 150 |

9

## ATTACHMENT B

### AAMVAnet Equipment
### June 29, 1989

One pair of modems, one for each end of a leased line, are included in the AAMVAnet fee structure for CDLIS operations.  The modems are the property of the Network.

The modems provided will be sufficient to process CDLIS Transactions and related management requirements such as E-Mail.  If the subscriber requires modems with a greater capacity due to other network traffic, the subscriber will be charged for the difference in cost.

A protocol converter is included in the current AAMVAnet fee structure if required by the subscriber.  If the subscriber desires a backup Protocol Converter it can be provided at additional cost.

All equipment required for telecommunications, to the point of the subscriber's side of the modem or protocol converter, is the subscriber's responsibility and cost.

10

<u>**Attachment C**</u>

**AAMVAnet Policies and Procedures**
**June 12, 1989**

## <u>Network Management and Support</u>

1.   The subscriber agrees to allow network and application vendors to provide statistics, management information and financial information to AAMVAnet, Inc.

2.   An IBM software package "NOTIFY", which is available to all network users, will be used to manage and track Network and application problems.  The subscriber agrees to allow the network provider to provide AAMVAnet related network and application problem information to AAMVAnet Inc.

3.   The subscriber agrees to have one AAMVAnet "PROFS" User ID for Electronic Mail and Bulletin Board purposes.

## <u>CDLIS Management and Support</u>

1.   The subscriber is responsible for required changes and/or updates to pointer information relative to the subscriber.

## <u>Billing Services</u>

1.   The subscriber agrees that network charges related to the CDLIS control site, Network Control Software (NCS) and NDR Traffic will be prorated back to the subscriber based on percentage of CDLIS Traffic.

2.   The rebilling process utilized by AAMVAnet, Inc. will supply detailed network and CDLIS charges to the state as a part of the billing process.  In those cases where charges are being paid by federal grant funds, the rebilling system will first provide the detailed charges and then credit the item back to the subscriber.  This process will allow states to review the usage of the network and CDLIS in detail on an ongoing basis.

## <u>Privacy and Disclosure</u>

1.   The subscriber is responsible for any record keeping or tracking of

11 .

## SUBSCRIPTION AGREEMENT AMENDMENT

The Subscription Agreement ("Agreement") by and among the Commonwealth of Massachusetts (the "Commonwealth"); Registry of Motor Vehicles (the "Subscriber"), the State of Nebraska, Department of Motor Vehicles (the "Nebraska DMV") and AAMVAnet, Inc. (the "Operator"), BITA File No. 8283, which was executed by the parties on _____, is hereby amended. The following amendments shall be effective between the Subscriber and the Operator upon the assignment by the Nebraska DMV of its rights under this Agreement to the Operator. This Subscription Agreement Amendment shall control over any inconsistencies and/or omissions in the Agreement.

The following sections are appended to the Agreement:

1.   CONDITIONS OF PAYMENT

   (a)   Approvals. No payment obligation shall accrue under this Agreement, nor shall the Operator be obligated to commence performance under this Agreement, nor will the Subscriber process invoices for any equipment, software or services delivered by the Operator under this Agreement, unless and until this Agreement (including any supplements which identify deliverable items) and the related Form AF29 have been approved by the Bureau of Information Technology Acquisitions (BITA) and accepted for filing by the Office of the Comptroller of the Commonwealth.

   (b)   Signed Agreement. The Comptroller's Office will withhold all payments otherwise due until it has received from BITA a fully executed copy of this Agreement. For the purposes of this section, the word "Agreement" shall also refer to any amendment to this Agreement.

   (c)   Completed Delivery. Any item of equipment, software, maintenance, training or other property or services deliverable by the Operator under this Agreement must be delivered before any charges can accrue on that item. All equipment, software and services due or deliverable on or by a specified date must be delivered before charges on any of them will accrue or be paid.

   (d)   Notification. The Subscriber shall notify the Operator, in writing, once all of the preceding conditions have been fully

complied with. The Operator shall have sixty (60) days from receipt of such notification to initiate service to Subscriber in accordance with the terms of this Agreement.

2.    FISCAL YEAR APPROPRIATION

(a)    Appropriations for expenditures by agencies of the Commonwealth, and authorizations to spend for particular purposes, are made on a fiscal year basis. The fiscal year of the Commonwealth is the twelve-month period ending June 30 of each year. The obligations of the Commonwealth under this Agreement, or under any amendment to this Agreement, for any fiscal year, are subject to the appropriation to the Agency of funds sufficient to discharge the Agency obligations which accrue in that fiscal year, and authorization to spend such funds for the purposes of this Agreement.

(b)    If, for any fiscal year during the term of this Agreement, funds for this Agreement are not appropriated and authorized, or funds so appropriated and authorized, or funds so appropriated and authorized are insufficient for that purpose, then this Agreement shall terminate as of the last day of the preceding fiscal year, or when such appropriated and authorized funds are exhausted, whichever is later, without liability to the Commonwealth for damages, penalties or other charges on account of such termination.

(c)    The Subscriber agrees to make reasonable efforts to obtain funding and all necessary authorizations and to notify the Operator promptly when they have been obtained or when it appears certain they will not be obtained. If partial funding sufficient for a clearly segregatable task or tasks should be made available, the parties may agree to perform their respective obligations relative to such tasks and this Agreement shall be amended accordingly.

(d)    In the event the Subscriber has knowledge that the appropriate funds for the continuation of this Agreement will not be appropriated, the Subscriber shall provide the Operator with at least ten (10) days written notice prior to the beginning of the fiscal year for which the appropriate funds have not been appropriated. Based upon such notice, the Operator may terminate service effective on the first day of the fiscal year for which such notice was given. Obligations of the Subscriber shall cease immediately without penalty or further payment being required.

3.    TERMINATION FOR CHANGE IN CIRCUMSTANCES

(a)    This Agreement may be terminated by the Subscriber upon thirty (30) days written notice, without liability or charge for any of the following reasons:

(1)    A statue or regulation which governs either party's performance of this Agreement is enacted, amended or interpreted by a competent authority so as to increase substantially the burdens of performance;

(2)    A change in the Subscriber's requirements or funding has eliminated its need for the services;

(3)    The performance of Operator personnel is, in the sole judgement of the Subscriber's Agreement Office, inadequate and will adversely affect the quality of the expected results or unreasonably delay completion of the services or the project of which they are a part.

(b)    Termination under this section shall not relieve the Operator of any liability to the Subscriber which it has under this Agreement, for damages sustained by reason of any breach of this Agreement.    The Subscriber may withhold any payments to the Operator for the purpose of set off until such time as the exact amount of damages due the Subscriber from the Operator is determined.

4.    CONFLICTS OF INTEREST

The Operator agrees that it will not engage in any conduct which violates, or induces others to violate, the provisions of Chapter 268A of the Massachusetts General Laws regarding the conduct of public employees.

No officer, member or employee of the Subscriber and no public official of the Commonwealth or any political subdivision thereof who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of this Agreement shall (a) participate in any decision relating to this Agreement which affects his personal interest or the interest of any corporation, partnership or association in which he is directly or indirectly interested or (b) have any interest, direct or indirect, in this Agreement or the proceeds thereof.

The Operator represents and agrees that it presently does not have and will not acquire any interest, direct or indirect, which would conflict in any manner or degree with the services to be performed under this Agreement or give rise to an appearance of conflict of interest.

The Operator further represents and agrees that should future work by the Operator for any other agency,institution, company or individual during the term of this Agreement give rise to an interest, direct or indirect, which would conflict with the services to be performed under this Agreement, the Operator will give immediate notice of the matter to the Agreement Office. Should counsel for the Subscriber determine that a conflict of interest does exist, the Subscriber shall have the right to terminate this Agreement forthwith without liability for premature termination.

## 5.    MAINTENANCE AND INSPECTION OF RECORDS

(a)    The Operator shall prepare and maintain such financial records and records of services performed as are necessary to substantiate claims for payment under this Agreement. The Operator shall permit the persons named in paragraph (b) to make copies of them at the Subscriber's expense.

(b)    Pursuant to Executive Order No. 195, the Governor or his designee, the Secretary of Administration and Finance, the State Auditor or his designee and their duly authorized representatives shall have the right at reasonable times and upon reasonable notice to examine the books, records and other compilations of data of the Operator which pertain to the performance of the provisions and requirements of this Agreement.

(c)    The Operator shall reserve and make available such books, records and data for a period of three years from the date of final payment under this Agreement. The Operator shall retain such documents which are pertinent to adjudicatory proceedings or appeals commenced during the three year period until such proceedings have reached final disposition.

## 6.    TAX EXEMPT STATUS

The Subscriber represents that it is exempt from Federal excise, state and local taxes and that sales to it are exempted from

Massachusetts sales and use taxes. If in the future the Subscriber becomes subject to any such taxes, the Subscriber shall reimburse the Operator for any cost or expense incurred. Any other taxes imposed on the Operator on account of this Subscriber shall be borne solely by the Operator.

7.    COVENANT AGAINST CONTINGENT FEES

The Operator represents that no persons, other than bona fide employees working solely for the Contractor, have been employed or retained to solicit or secure this Agreement upon an arrangement or understanding for a commission, percentage, brokerage fee, gift or any other consideration contingent upon the award or making of this Agreement. For breach or violation of this representation, the Subscriber shall have the right to terminate this Agrement without liability, or in its discretion to deduct from the price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage fee or other consideration.

8.    FAIR EMPLOYMENT PRACTICES

(a)    The Operator shall not discriminate against any qualified employee or applicant for employment because of race, color, national origin, ancestry, age, sex, religion or physical or mental handicap. The Operator agrees to comply with all applicable Federal and State statutes, rules and regulations prohibiting discrimination in employment including; Title VII of the Civil Rights Acts of 1964; The Age Discrimination in Employment Act of 1967; Section 504 of the Rehabilitation Act of 1973; Massachusetts General Laws Chapter 151B, Section 4 (all relevant subsections) and all relevant Administrative Orders and Executive Orders (including Executive Order No. 227).

(b)    If a complaint or claim alleging violation by the Operator of such statutes, rules or regulations is presented to the Massachusetts Commission Against Discrimination (MCAD), the Operator agrees to cooperate with the MCAD in the investigation and disposition of such complaint or claim.

(c)    In the event of Operator's non-compliance with the provisions of this section, the Subscriber shall impose such sanctions as it deems appropriate, including, but not limited to:

(1)    Withholding of payments due Operator under this Agreement until Operator complies; and

(2)    Termination of suspension of this Agreement.

## 9.    ANTI-BOYCOTT COVENANT

The Operator warrants, represents and agrees that during the time this Agreement is in effect, neither it nor any affiliated company, as hereafter defined, participates in or cooperates with an international boycott, as defined in Section 999 (b) (3) and (4) of the Internal Revenue Code of 1954, as amended, or engages in conduct declared to be unlawful by Section 2 of Chapter 151E of the Massachusetts General Laws. If there shall be a breach in the warranty, representation and agreement contained in this paragraph, then without limiting such other rights as it may have, the Commonwealth shall be entitled to rescind this Agreement. As used herein, an affiliated company shall be any business entity of which at least 51% of the ownership interests are directly or indirectly owned by the Operator or by a person or persons or business entity or entities directly or indirectly owning at least 51% of the ownership interests of the Operator or which directly or indirectly owns at least 51% of the ownership interest of the Operator.

## 10.    CHOICE OF LAW

This Agreement shall be construed and governed by the laws of the Commonwealth of Massachusetts.

## 11.    INCLUSION OF PROVISIONS OF LAW

Every provision of law required to be in this Agreement is deemed to be inserted herein. If through mistake or otherwise, any such provision has been omitted, or is not in correct form, then forthwith upon the application of either party this Agreement shall be appropriately amended.

## 12.    CONDITIONS OF REINSTATEMENT

Any Subscriber who terminates or otherwise discontinues service under this Agreement shall as a condition of being reinstated as a Subscriber pay all outstanding charges in accordance with Paragraph 3 - Termination For Change In Circumstances.

## 13.    OPERATOR'S CERTIFICATIONS

The Operator warrants the truth, accuracy and completeness of the following documents filed (if required) with the Commonwealth in connection with this Agreement and appended hereto:

Affidavit of Compliance with corporate filing requirements (Form AF4A);

Certificate of Vote; and

Certificate of Tax Compliance.

All other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Subscriber and the Operator have caused this Subscription Agreement Amendment to be executed by their respective authorized officers.

COMMONWEALTH OF MASSACHUSETTS,
REGISTRY OF MOTOR VEHICLES          AAMVAnet, INC.

By: _William T. Hutch_              By: _Barry Goleman_

Name:  William T. Hutch             Name:  Barry Goleman

Title:  Chief Deputy Registrar      Title:  Manager

Date: ___FEB 2 6 1990___            Date: ___March 8, 1990___

## AASHTO MEMBER DEPARTMENT AMENDMENT

RECEIVED
JUL 12 1993

THIS AMENDMENT TO THE AAMVANET SUBSCRIPTION AGREEMENT is made as of the _____ day of _____, 19_____, by and among AAMVAnet, Inc., a Virginia nonstock corporation (the "Operator") and Massachusetts Highway Department (the "Subscriber").

WHEREAS, the the member departments of the American Association of State Highway Transportation Officials ("Association") wish to avail themselves of the services of a single Value Added Network ("Network") service provider for the purposes of exchanging data and information within, between or among the member departments and the Association, and such other entities as the Association may designate; and

WHEREAS, the Association wishes to provide certain exclusive services to its member departments and other designated entities including an electronic mail system (e-mail), bulletin board services, access to data bases maintained by one or more of these participants and other databases and services; and

WHEREAS, the Association conducted a competitive procurement for the purpose of obtaining the services heretofore described, and to that end prepared a request for proposal ("RFP"), dated October 12, 1990; and

WHEREAS, after due deliberation by the Association the Operator was selected as the most appropriate provider of the services desired for AASHTO and its members and others as designated by AASHTO from time to time; and

WHEREAS, the Subscriber is an AASHTO member department and desires use of the network services of the Operator, the following section is hereby added:

AASHTO Administrative Charge. At AASHTO's request, AAMVAnet has agreed to include an administrative charge established by AASHTO, expressed as a percentage of the total AAMVAnet charges. The charge will appear on the invoice sent to the Subscriber and amounts collected will be directed to AASHTO. The Subscriber acknowledges the right of AAMVAnet to collect AASHTO Administrative Charges.

SUBSCRIBER:

Massachusetts Highway Department

X By: _____



*The Commonwealth of Massachusetts*

*Registry of Motor Vehicles*

*100 · Nashua Street · Boston 02114*

JUL 12 1993

**William F. Weld**
Governor
**Thomas C. Rapone**
Secretary
**Jerold A. Gnazzo**
Registrar

April 27, 1993

Barry J. Goleman
President and CEO
AAMVAnet, Inc.
Suite 1100
4200 Wilson Boulevard
Arlington, VA  22203

Dear Mr. Goleman:

The Massachusetts Registry of Motor Vehicles acknowledges the request for the Massachusetts Highway Department to subscribe to the services available through the AASHTO VAN.

The Massachusetts Registry of Motor Vehicles agrees to the submittal of the "AASHTO Member Department Amendment", by the Massachusetts Highway Department, as an amendment to the Massachusetts Registry of Motor Vehicles AAMVAnet, Inc. Agreement filed under Master Agency Account MAMST.  The Massachusetts Registry of Motor Vehicles understands that separate billing for the AASHTO services will be established under the Master Agency Account by means of sub-accounts.

If you have any questions or need any further information, please feel free to contact me by telephone at (617) 727-8327 or fax machine at (617) 727-8710.

Sincerely,

David Lewis,
Deputy Registrar, MIS

MAMV

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF PUBLIC WORKS
BOARD OF COMMISSIONERS

## MISCELLANEOUS ITEM

RECEIVED
JUL 12 1993

DIVISION: Data Processing/ Administrative Services   PROJECT/LOCATION: Boston

Approved for Docket/Chief Engineer: _____

Action Requested: To have the Board approve and authorize the Commissioner to execute on behalf of the Massachusetts Highway Department an Agreement.

Contractor:
(if applicable)

Contract No.: _____   FA #: _____
        (if applicable)              (if applicable)

_Michael J. Anastasia_  6/24/93      _Ann Journeay_      6/29/93
Submitted by          Date          Approved by          Date

---

**EXPLANATION:**

The Data Processing Section seeks to establish an account with AAMVANET Inc. for connection to AASHTOVAN (AASHTO Value Add Network) for computer communications with the FHWA and the fifty state DOT's. Federal Highway and AASHTO have selected this communications service to provide the connection to each of the states for electronic computer communications including E-mail and information systems.

This service, which is like telephone service for computers, will be funded using state operating budget. Cost of one year's service will be $5000. This service will after testing replace the AASHTO "dial up" service currently provided by BT America which was funded in FY 93 for $5000.

A TRUE COPY -- ATTEST

For Department Secretary: _____

VOTED TO APPROVE

Item #70

Date:   JUN 3 0 1993   _Maryellen Harrington_

ADM130e (Rev.12/8

THE COMMONWEALTH OF MASSACHUSETTS
COMPTROLLER'S DIVISION

E INPUT FORM

DEPARTMENT/ORGANIZATION NAME

MASSHIGHWAY

**DOCUMENT ID**

| HANS | DEPT | R/ORG | NUMBER | PO DATE | ACCTG PRD | BUD F Y |
|------|------|-------|--------|---------|-----------|---------|
| PO | DPW | 0281 | 4185001 | 07 01 93 | | 94 |

ACTION: ENTRY (E)  MODIFY (M)  DELETE (D)   **E**

ORDER TYPE

COMMENTS:

| 49 0002 | VENDOR NAME: AAMVANET INC. |
|---------|---------------------------|

ER FUND     SELLER DEPT

DOCUMENT TOTAL: 5000.00

| NT ID | | | | | | | | | |
|-------|------|------|-----|-------|--------|-----|-----|-------|------|
| UMBER | LINE | DEPT | ORG | S/ORG | APPROP | SUB | OBJ | S/OBJ | PROG |
| | | DPW | 0281 | | 6010-0001 | EE | E08 | | |

| DESCRIPTION: COMPUTER COMMUNICATIONS SERVICE | AMOUNT 5000.00 | I/D | P/F |
|---|---|---|---|

| NT ID | | | | | | | | | |
|-------|------|------|-----|-------|--------|-----|-----|-------|------|
| UMBER | LINE | DEPT | ORG | S/ORG | APPROP | SUB | OBJ | S/OBJ | PROG |
| | | | | | | | | | |

| DESCRIPTION: | AMOUNT | I/D | P/F |
|---|---|---|---|

TITLE: _Budget_     DATE: _6/29/93_

TITLE: _Director of Data Processing_     DATE: _6/29/93_

TITLE: _____     DATE: _____