**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | No. 1:26-mc-19 |
| *Movants*, v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | |
| *Respondent*. | |

**DECLARATION OF RYAN SMITH**

I, Ryan Smith, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the State of Michigan. I am over the age of 18, competent to testify as to the facts herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Michigan Department of State (MDOS), and information I learned from MDOS personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2. I am currently employed by MDOS as Departmental Manager for the CDL Help Desk since October 2020.

3. In my current role at MDOS, I serve as the first-line supervisor of the Commercial Driver License (CDL) Help Desk Unit. This position oversees driver records processing as performed by professional and non-professionals in a complex work environment related to Commercial driver licensing and the State-to-State (S2S) processing of non-CDL driver licenses. I function as the liaison and resource for the federal CDL program, serves as the AAMVA liaison, and work with AAMVA in reporting and resolving programming issues related to CDL compliance. I also Interpret/review and propose changes to statutes relating to the CDL program. I must adhere to complex federally mandated standards for Commercial Driver Licensing, and to the requirements for S2S functionality. I represent Michigan at national CDL workshops and conventions when applicable. I analyze Michigan's CDL compliance findings for programmatic or procedural solutions and assist with investigations relating to CDL and other drivers. The CDL Help Desk is charged with maintaining all MDOS's commercial and non-CDL driving records and ensuring their accuracy and dependability for the public and MDOS. The unit also ensures that MDOS follows all state and federal laws, regulations, and best practices, as able, pertaining to CDL and non-CDL driver licenses. If errors are made, it can have a significant impact on the public (wrongful imprisonment) which can result in lawsuits for MDOS. Failure to meet the various requirements and meet the federal timelines could result in non-compliance and the subsequent loss of highway funds which would have a substantial fiscal impact on MDOS.

4. In Michigan, MDOS is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial drivers' licenses (CDLs) and non-commercial drivers' licenses. Among other things, MDOS is responsible for verifying each drivers' license

1

applicant's legal eligibility and medical fitness, identifying and disciplining problem drivers, and protecting the privacy of drivers' personal information.

## Michigan's Management of Driver Licensing

5. MDOS is responsible for issuing and renewing commercial driver's licenses (CDLs) and personal driver's licenses (PDLs) to residents of Michigan.

6. As part of Michigan's commitment to traffic safety, MDOS follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, MDOS administers driving tests, assesses applicants' medical fitness, checks to ensure that each applicant is not the holder of a driver's license from any other state, and checks each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs, MDOS also verifies the applicant's immigration status.

7. To comply with our legal obligations and ensure that each driver has a clean record, it is necessary for MDOS to have a means of checking each driver's history, not only in Michigan, but in other states where the applicant may have held a license.

8. For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS). CDLIS is a nationwide computer system that enables MDOS to ensure that each commercial driver has only one driver's license and one complete driver record. In accordance with FMCSA guidelines, States must be connected to CDLIS, and the National Driver Register in order to exchange information about CDL drivers, traffic convictions, and disqualifications.

## The Commercial Driver's License Information System (CDLIS)

9. CDLIS is a database that contains driver records owned and maintained by the states. It operates as a nationwide clearinghouse where states can assist one another in verifying the identity and history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members.

10. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's:

2

DECLARATION OF RYAN SMITH

state of record, driver license number, name, date of birth, social security number (SSN), sex, the date and time the driver was added to CDLIS, the date and time the record was last updated, and indicators showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

11.    If MDOS queries CDLIS and finds that an applicant has a Master Pointer Record, MDOS would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR) which the state of record would provide directly to the requesting state. Similarly, if another state queries CDLIS and finds a Master Pointer Record for a driver licensed in Michigan, MDOS would send that driver's record to the requesting state.

12.    To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

13.    As stated above, the data in CDLIS is owned and maintained by the states. MDOS has the power to add, delete, or change its own records maintained in CDLIS—and regularly does so, to ensure that our data remains accurate and up to date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any power to make additions, deletions, or changes to Michigan's CDLIS data.

14.    Before issuing a CDL, Michigan, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, whether his or her license has been disqualified, and whether the applicant is disqualified from operating a motor vehicle. 49 C.F.R. § 383.73(b)(ii). MDOS usually queries CDLIS about 20,000 times per day, inclusive of all driver issuance transactions, including CDLs.

15.    MDOS has participated in and relied on CDLIS to operate its CDL program since approximately 2002 with the implementation of the Motor Carrier Safety Improvement Act of 1995. Even if we were not legally required to use CDLIS, we would need CDLIS or some other system like it in order to serve our public safety mission: MDOS needs to know whether an applicant has a history of dangerous or unlawful driving in order to fulfill its public safety mission. If CDLIS were to shut

3

down, particularly on short notice, it would be a major impediment to the operation of our CDL program.

16.    MDOS also queries CDLIS before issuing a personal driver's license.  Thus, our operation of our PDL program would also be impaired by the loss of CDLIS. Without the ability to query these national systems, the MDOS would not be able to process any driver license transactions until new programing is put in place.

17.    MDOS participates in CDLIS pursuant to a contract with AAMVA.  A true and correct copy of Michigan's contract with AAMVA related to CDLIS is available at https://www.michigan.gov/dtmb/-/media/Project/Websites/dtmb/Procurement/Contracts/021/250000000943.pdf.

18.    In addition to CDLIS, AAMVA also operates other critical programs that MDOS uses or is required to use.  For example, AAMVA operates the Problem Driver Pointer System (PDPS). PDPS allows states to search the National Driver Registry (NDR), which contains information on problem drivers.  By carrying out a PDPS search, MDOS obtains information that directs them to the jurisdiction that has a full record of a driver's history.  Based on this information, MDOS can determine whether an applicant for a driver's license is eligible.  Like CDLIS, PDPS was created by statute.

19.    Another system operated by AAMVA and used by MDOS includes the State-to-State (S2S) Verification Service.  S2S is a means for a state to electronically check with all other participating states to determine if the applicant currently holds a driver license or identification card in another state.

20.    MDOS also relies on the Commercial Skills Test Information Management System (CSTIMS) hosted by AAMVA.  CSTIMS is an internet-based tool that provides jurisdictions and third-party examiners a consistent way to track the scheduling and entry of test results for commercial driving skills tests.

21.    MDOS queries at least one AAMVA system every time an individual applies for a driver's license.

4

DECLARATION OF RYAN SMITH

## Federal Demands for CDLIS Data

22.     On Monday, July 27, 2026, MDOS learned that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Michigan's records.

23.     I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

24.     I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, MDOS already carries out those functions, as is typical for state agencies, in accordance with federal and state statutes and regulations.

25.     I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

26.     On August 11, 2026, the U.S. Department of Homeland Security (DHS) issued a subpoena to AAMVA demanding the same data that FMCSA previously demanded with a return date of August 17, 2026.

## Irreparable Harm of Disclosure to FMCSA and/or DHS

27. FMCSA and DHS's demand seeks Michigan's proprietary and confidential records and data.

28. Once Michigan's data is in the federal government's hands, Michigan would lose control and oversight of its confidential records. To my knowledge, neither FMCSA nor DHS has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency. And even if FMCSA or DHS made promises to AAMVA regarding the security and/or privacy of this data, Michigan would not be in a position to enforce those promises, and these new records, which would be federal and not state records, could be used for purposes that violate our state law and regulations regarding the confidentiality of information.

DECLARATION OF RYAN SMITH

29. In particular, MDOS understands itself to be bound by Michigan laws requiring entities to have a permissible purpose to obtain personally identifiable information, including the Michigan version of the Driver Privacy Protection Act, Mich. Comp. L. § 257.208c.  Handing over Michigan's proprietary and confidential information to FMCSA or DHS is incompatible with those obligations.

30. Michigan's agreement with AAMVA includes provisions requiring AAMVA to follow Michigan's requirements in regard to data security and confidentiality, but those obligations would not run to FMCSA or DHS.

31. Moreover, if the data were turned over to FMCSA or DHS, Michigan would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to Michigan could form the basis or justification for federal action.

32. Finally, residents of Michigan entrust the state with their personal data when they apply for a commercial driver's license.  That trust would be destroyed if the data is turned over to FMCSA or DHS without controls and without a clear statement of FMCSA or DHS's purpose in seeking it.

33. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs from Michigan.  This means Michigan will lose revenue, as each applicant for a CDL must pay a $25 to $60 dollar fee (or more based on the type of CDL that is requested).

34. If individuals leave Michigan to obtain licensure elsewhere, the Michigan trucking industry will also suffer greatly due to a loss of qualified drivers.  This will impact the transfer of goods across the state and country, driving up costs and creating long delays in fulfilling requests for product.

35. There is also an acute risk that some individuals who are concerned about broadly disclosing their personal information to the federal government—such as individuals who are lawfully qualified to obtain a CDL but are part of mixed-status immigration families—may avoid the CDL process entirely and attempt to drive commercial motor vehicles without a license.  If that occurs in even a small number of cases, it would pose grave public-safety risks, as states would not be able to identify the drivers of those motor vehicles or ensure that they are properly qualified to drive commercial motor vehicles.

6

DECLARATION OF RYAN SMITH

**Michigan would be harmed if AAMVA's programs were impaired**

36.    I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

37.    Michigan would be seriously harmed if FMCSA carried out those threats.

38.    As stated above, MDOS heavily relies on CDLIS, the PDPS, and other resources and services operated by AAMVA.

39.    In particular, without an effective, functioning, and up-to-date CDLIS, MDOS would not be able to issue new CDLs or renew existing ones in compliance with federal law and regulations. This would result in many trucking businesses having to shut their doors because they would not be able hire or verify drivers to haul commerce across the state or country. Schools would not be able to provide effective transportation to their students due to a lack of qualified drivers. And even if those federal laws and regulations did not apply, Michigan would be harmed by losing access to an important public safety resource that keeps unsafe drivers off of Michigan's roads.

40.    Furthermore, if CDLIS was shut down, State Motor Carrier Officers would not be able to query CDLIS records at weigh stations or roadside stops.

**Michigan participated in CDLIS on the understanding that its records would be kept secure**

41.    I understand that Michigan's participation in the CDLIS system is a condition to receive certain federal highway funds.

42.    It has never been MDOS's understanding that FMCSA, DHS, or any other federal agency has lawful authority to obtain the contents of CDLIS, nor that granting FMCSA or DHS the right to obtain and redisclose Michigan's records was a condition of participation in CDLIS.

43.    Michigan has relied on the security and confidentiality of CDLIS records in designing its own information systems, in establishing practices relating to the maintenance of such records, and in notifying applicants for CDLs about how their information would be used and shared. MDOS relies on the parameters of the Drivers Privacy Protection Act (DPPA) to structure contracts with outside agencies for data sharing purposes, and to respond to requests for information. AAMVA's production of data to FMCSA or DHS would require MDOS to modify or inform those entities of the additional release of this information. MDOS would also have to create new methods to create and capture the

7

acknowledgement of these new requirements with our customers. And the release of Michigan's data in CDLIS to FMCSA, DHS, and to other unknown agencies creates a new burden on the MDOS in cases of a data breach. It would be almost impossible to track the extent of data breaches and notify all parties impacted.

44.    If FMCSA or DHS is able to obtain and redisclose Michigan's records whenever it wishes, Michigan will need to alter its practices. Among other things, Michigan will need to revise the assurances of confidentiality it provides to CDL applicants, which will require the expenditure of substantial state resources. In addition, Michigan would have to notify its many stakeholders, including industry leaders and driver license holders, as well as amending its various training manuals and materials.

45.    If MDOS had been aware that federal highway funds were conditioned on having to hand over driver data en masse as FMCSA is currently asking it to do, it would have needed to seriously consider its participation in CDLIS. Should Michigan remove itself from CDLIS because of the unnecessary requirement to provide copious amounts of personally identifiable information, it would require Michigan to establish its own interstate verification system, which would create an enormous financial strain on the Department as well as require a significant increase in staffing. Neither of which have been contemplated in the FY year 2026 or 2027 allocation from the Michigan legislature.


I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 11, 2026, in Lansing, Michigan.



_Ryan Smith_    08/11/26
Ryan Smith
Michigan Department of State

8

DECLARATION OF RYAN SMITH