**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | No. 1:26-mc-19 |

*Movants*,

    v.

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY,

           *Respondent*.

**DECLARATION OF LINDA BEUCKENS**

I, Linda Beuckens, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.   I am a resident of the State of Oregon. I am over the age of 18, competent to testify as to the facts herein, and I testify based on personal knowledge, records kept in the ordinary course of business at Oregon Driver and Motor Vehicle Services (DMV), and information I learned from Oregon DMV personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.   I am currently employed by the Oregon Department of Transportation (ODOT), DMV as the Program Services Group Manager and a member of the Oregon DMV executive leadership since April 2016.

3.   In my current role at Oregon DMV, I am responsible for providing enterprise leadership for DMV's programs, policy implementation, modernization efforts, and regulatory and legal processes. As the Program Services Group Manager of the Oregon DMV, I am responsible for overseeing all driver and vehicle programs, regulatory oversight of vehicle-related businesses, fraud prevention, DMV's project portfolio management, and the integration of business operations and technology. This includes the Oregon Commercial Driver Licensing program.

4.   In Oregon, DMV is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial driver licenses (CDL) and non-commercial driver licenses. *See, e.g.,* Or. Rev. Stat. (ORS) 184.615 (ODOT duties); ORS 801.020 (Statements of policy and purpose; applicability of vehicle code); ORS ch. 807 (Driving Privileges and Identification Cards). Among other things, Oregon DMV is responsible for verifying each driver license applicant's legal eligibility and medical fitness, identifying and sanctioning problem drivers, maintaining accurate driver records, and protecting the privacy of drivers' personal information.

### Oregon's Management of Driver Licensing

5.   Oregon DMV is responsible for issuing and renewing CDLs and non-commercial driver licenses (NDLs) to residents of Oregon.

6.   As part of Oregon's commitment to traffic safety, Oregon DMV follows stringent procedures to ensure that drivers do not receive a license unless they meet all state and federal requirements and can safely operate a vehicle. In pursuit of that goal, and in accordance with state and

DECLARATION OF LINDA BEUCKENS

federal laws and regulations, Oregon DMV administers driving tests, assesses applicants' medical fitness, ensures that each applicant holds only one state-issued driver credential, and checks each applicant's driving history to ensure that the applicant has valid current driving privileges and their driver license is not subject to a suspension, revocation or cancellation. For CDLs, Oregon DMV also verifies the applicant's identity and immigration status.

7. To comply with our legal obligations and ensure that each driver has a clean record, it is necessary for Oregon DMV to have a means of checking each driver's history, not only in Oregon, but in other states where the applicant may have held a license.

8. For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS).

### The Commercial Driver's License Information System (CDLIS)

9. CDLIS is a nationwide computer system that enables SDLAs to ensure that each commercial driver has only one driver license and one official driver record. States use CDLIS to assist one another in verifying the identity and history of individual CDL applicants. It is used to transmit out-of-state convictions and the withdrawal of driving privileges between a state taking an action against a driver and the state that issued the person's CDL. It is also used to transfer the driver record when a CDL holder moves to another state, and to respond to requests for driver status and history. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members. The record data in CDLIS is owned and maintained by the states.

10. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's: state of record, driver license number, name, date of birth, social security number (SSN), sex, the date and time the driver was added to CDLIS, the date and time the record was last updated, and indicators showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

DECLARATION OF LINDA BEUCKENS

11. If Oregon DMV queries CDLIS and finds that an applicant has an MPR, Oregon DMV would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR), which the state of record would provide directly to the requesting state. Similarly, if another state queries CDLIS and finds an MPR for a driver licensed in Oregon, DMV would send that driver's record to the requesting state.

12. To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

13. As stated above, the data in CDLIS is owned and maintained by the states. Oregon DMV has the power to add, delete, or change its own records maintained in CDLIS—and it regularly does so to ensure that its data remains accurate and up-to-date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any power to make additions, deletions, or changes to Oregon's CDLIS data.

14. Before issuing a CDL, Oregon, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, whether their license has been disqualified, and whether the applicant is disqualified from operating a motor vehicle. 49 C.F.R. § 383.73(b)(ii). Oregon DMV issues around 1 million driver licenses annually and queries CDLIS for every driver license transaction. Oregon DMV also maintains over 225,000 MPRs on CDLIS, which are accessible to law enforcement and other highway safety agencies nationwide for real-time decisions on the fitness and qualification of Oregon's licensed drivers.

15. Oregon DMV has participated in and relied on CDLIS to operate its CDL program since at least 1992. Even if we were not legally required to use CDLIS, we would need CDLIS or some other system like it to serve our public safety mission. That is because Oregon DMV needs to know whether an applicant has a history of dangerous or unlawful driving to fulfill its public safety mission. If CDLIS were to shut down, particularly on short notice, it would be a major impediment to the operation of our CDL program and a significant public safety concern.

DECLARATION OF LINDA BEUCKENS

16.     Oregon DMV also queries CDLIS before issuing an NDL. Oregon checks CDLIS and other systems to ensure that a driver does not hold a license or have a record in another jurisdiction. Thus, our operation of our NDL program would also be impaired by the loss of CDLIS.

17.     Oregon DMV participates in CDLIS pursuant to a contract with AAMVA. Attached as Exhibit A is a true and correct copy of Oregon's AAMVA Net agreement for the use of CDLIS.

18.     In addition to CDLIS, AAMVA also operates other critical programs that Oregon DMV uses. For example, AAMVA operates the Problem Driver Pointer System (PDPS). PDPS allows states to search the National Driver Registry (NDR), which contains information on problem drivers. By carrying out a PDPS search, Oregon DMV obtains information that directs our staff to the jurisdiction that has a full record of a driver's history. Based on this information, Oregon DMV can determine whether an applicant for a driver license is eligible. Like CDLIS, PDPS was created by statute and is a function of the National Highway Traffic Safety Administration (NHTSA).

19.     Oregon also uses the following AAMVA services:

- State-to-State (S2S) Verification Service is a means for a state to electronically check with all other participating states to determine if the applicant currently holds a driver license or identification card in another state. The platform that supports S2S, the State Pointer Exchange Services (SPEXS) also supports CDLIS. S2S participation is a requirement for REAL ID Act compliance.

- Commercial Skills Testing Information Management System (CSTIMS) is a web-based tool that provides a consistent means for tracking the scheduling and entry of test results for commercial skills tests by jurisdictions and third-party examiners.

- Driver's License Data Verification (DLDV) Service provides commercial and government entities with the real-time capability to verify driver license and identification card information against data from the issuing agency.

- The National Motor Vehicle Title Information System (NMVTIS) allows titling agencies to instantly and reliably verify the information on a paper title against the electronic data from the state that issued the title. NMVTIS protects consumers from fraud and unsafe vehicles and prevents the resale of stolen vehicles. NMVTIS also

4

DECLARATION OF LINDA BEUCKENS

assists states and law enforcement in deterring and preventing title fraud and other crimes. Consumers can use NMVTIS to access vehicle history information.

20.     Oregon DMV queries at least one AAMVA system every time an individual applies for a driver license or vehicle title.

### FMCSA's Demand for CDLIS Data

21.     On July 27, 2026, Oregon DMV learned through a memorandum from AAMVA's President and CEO to all U.S. State Driver Licensing Agency Chief Administrators that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Oregon's records.

22.     I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

23.     I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, ODOT already carries out those functions, as is typical for state agencies, in accordance with federal and state statutes and regulations. I understand that FMCSA currently has access to this data through a U.S. Department of Transportation (USDOT) CDLIS portal and regularly queries this data.

24.     I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency. Furthermore, this raises significant concerns with the principle of data minimization and purpose limitation, which require that personal information be collected, processed, and shared only for legitimate, documented purposes and only to the extent necessary to fulfill those purposes. It is unclear whether the agency's needs can be met through continued individual queries or a more limited, purpose-driven subset of records, nor is it clear how the request aligns with the stated purpose and complies with applicable federal and state privacy requirements.

### Irreparable Harm of Disclosure to FMCSA

25. FMCSA's demand seeks Oregon's proprietary and confidential records and data.

DECLARATION OF LINDA BEUCKENS

26. Once Oregon's data is in FMCSA's hands, Oregon would lose control and oversight of its confidential records. To my knowledge, FMCSA has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency. And even if FMCSA made promises to AAMVA regarding the security and/or privacy of this data, Oregon would not be in a position to enforce those promises. And these new records, which would be federal and not state records, could be used for purposes that violate our state law and regulations regarding the confidentiality of information.

27. In particular, Oregon DMV understands itself to be bound by Oregon laws regarding the use and protection of driver information. The Oregon DMV recognizes its responsibility to collect, use, and safeguard driver information in accordance with applicable federal and state laws, including the Driver's Privacy Protection Act (DPPA) and relevant state privacy statutes. Driver information maintained by Oregon DMV is used to fulfill the agency's statutory duties, such as licensing and recording sanctions. Oregon DMV is committed to protecting confidentiality, integrity, and security of driver information. Handing over proprietary and confidential information to FMCSA under these circumstances is incompatible with those obligations.

28. Due to the nature of FMCSA's data request, it appears FMCSA intends to create a duplicate national database. But CDLIS MPRs are dynamic and undergo continual updates to ensure they remain current and accurate. Sharing all state MPRs would unnecessarily include inactive or legacy data that Oregon retains under state archival standards, including records no longer within FMCSA's jurisdiction. The existence of a duplicate database outside SDLA control inherently produces multiple, unsynchronized versions of driver data, leading to compromised data integrity, erroneous reporting, and expanded access and control risks. Taken together, these factors are fundamentally inconsistent with FMCSA's stated objectives and significantly undermine the likelihood that the agency will achieve its intended outcomes under this approach. The risks are especially acute for Oregon DMV, given the sensitivity of driver information and the statutory obligations to ensure its accuracy, privacy, and security. Moreover, transferring data to FMCSA would prevent Oregon from updating or

DECLARATION OF LINDA BEUCKENS

validating it, creating a substantial risk that outdated or erroneous information attributed to the state could be used as the basis for federal action.

29. Finally, residents of Oregon entrust the state with their personal data when they apply for a commercial driver license. That trust would be destroyed if the data is turned over to FMCSA in bulk without controls and without a clear statement of FMCSA's purpose in seeking it. The agency has not established a defined, lawful, and transparent framework that articulates a specific program-compliance objective or provided a viable mechanism for achieving its stated goals.

30. There is also an acute risk that some individuals who are concerned about broadly disclosing their personal information to the federal government under these circumstances may avoid the CDL process entirely and attempt to drive commercial motor vehicles without a license. If that occurs in even a small number of cases, it would pose grave public-safety risks, as states would not be able to identify the drivers of those motor vehicles or ensure that they are properly qualified to drive commercial motor vehicles.  In addition, expanding the sharing of state CDL data beyond its intended regulatory purpose raises serious concerns that heightened privacy risks and uncertainty could deter individuals from pursuing CDLs for employment, ultimately limiting workforce availability and harming local and regional economies.

**Oregon Would be Harmed if AAMVA's Programs Were Impaired**

31.    Oregon DMV's reliance on AAMVA systems is essential to maintaining the integrity, security, and nationwide interoperability of the CDL program. Core AAMVA services, including CDLIS, State-to-State, PDPS, and identity-verification tools, ensure that Oregon DMV can verify eligibility, maintain a single accurate driver record, prevent fraud, and meet state and federal regulatory obligations.

32.    FMCSA's request for states to provide CDLIS MPRs outside the established AAMVA governance framework threatens to bypass these safeguards and undermine the coordinated national infrastructure that ensures all jurisdictions operate from synchronized, authoritative data. If Oregon's CDLIS data is extracted and used in a separate federal system that lacks AAMVA's integrity controls, Oregon faces significant risks: outdated or inaccurate information could be attributed to Oregon, exposing the state to compliance findings, renewed federal oversight, and damage to its reputation for

7

DECLARATION OF LINDA BEUCKENS

data accuracy; CDL decisions could diverge from national standards, weakening safety enforcement; and Oregon's ability to participate reliably in nationwide identity-management and driver-history exchanges could be compromised. In short, bypassing AAMVA systems destabilizes the very infrastructure Oregon depends on to ensure the safe and lawful licensing of commercial drivers across the country.

**Oregon DMV Participated in CDLIS on the Understanding That Its Records Would be Kept Secure**

33.     I understand that Oregon's participation in CDLIS is a condition for receiving certain federal highway funds.

34.     It has never been Oregon's understanding that, even though FMCSA is the federal regulatory authority for the CDL program, any federal agency may use CDLIS data for purposes outside the defined scope of CDLIS's authorized functions. CDLIS is structured as a state-governed, AAMVA-managed system with clearly delineated and limited data-use rules intended solely to support safe, uniform commercial driver licensing and to prevent individuals from holding multiple licenses across jurisdictions. Oregon's participation has always been premised on those boundaries. At no point was unrestricted or open-ended federal access to CDLIS data presented as a condition of participation, nor has Oregon ever understood CDLIS to function as a general-purpose federal data resource.

35.     Oregon has relied on the security and confidentiality of CDLIS records in designing its own information systems, in establishing practices relating to the maintenance of such records, and in notifying applicants for CDLs about how their information would be used and shared. That confidentiality is fundamental to safeguarding sensitive identifying information, maintaining the accuracy and integrity of commercial driver histories, and ensuring trust in the licensing system across jurisdictions. Oregon's operational processes, including record updates, pointer management, and verification workflows, presume that CDLIS data will be accessed only for narrow, regulated licensing and enforcement functions. Any departure from these confidentiality expectations threatens data integrity, erodes inter-jurisdictional trust, and exposes Oregon to significant operational and privacy risks.

DECLARATION OF LINDA BEUCKENS

36.    If CDLIS data were released, copied into a secondary database, or redisclosed by FMCSA outside state-authorized purposes, Oregon would be required to substantially revise its long-standing practices. This would include altering the confidentiality assurances provided to CDL applicants, investing considerable state resources to redesign public-facing notices and administrative processes, and re-evaluating compliance with Oregon's Records Privacy Law. Loss of visibility into when, with whom, or for what purpose CDLIS data is shared would prevent Oregon from ensuring that personal information is used lawfully and appropriately. Such conditions would undermine Oregon's ability to protect applicants' data, enforce misuse protections, maintain data accuracy, and hold parties accountable for how driver information is handled. They would also fundamentally place the data outside the bounds of state-authorized use.

37.    Had Oregon been informed that CDLIS participation permitted unconditional federal use or disclosure of CDLIS data, particularly for purposes beyond the established and state-authorized scope of the commercial driver licensing program, Oregon would likely have taken immediate steps to limit the categories and volume of data contributed to CDLIS. Oregon's participation has always been based on the understanding that CDLIS is a state-governed, purpose-limited system designed solely to administer commercial driver licensing and prevent multiple licenses across jurisdictions. Knowledge that federal agencies intended to use CDLIS data without defined limitations or programmatic guardrails would have required Oregon to reconsider its data-sharing obligations, implement technical and procedural restrictions on what was transmitted, and work collaboratively with other states to pursue an alternative multi-jurisdictional solution with the confidentiality and governance protections Oregon relies upon.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 8, 2026, in West Linn, Oregon.


  /s/ Linda Beuckens
LINDA BEUCKENS
Program Services Group Manager
Oregon DMV


9

DECLARATION OF LINDA BEUCKENS

# Exhibit C

ASSIGNMENT OF AAMVAnet, INC. SUBSCRIPTION AGREEMENT

BETWEEN

STATE OF NEBRASKA DEPARTMENT OF MOTOR VEHICLES

AND

AAMVAnet, INC.

AND

DEPARTMENT OF TRANSPORTATION, STATE OF OREGON

For value received, the State of Nebraska, Department of Motor Vehicles, assigns, transfers, and sets over to AAMVAnet, Inc., a Virginia nonstock corporation, the assignee herein, all rights, titles, interests, and obligations in the AAMVAnet, Inc. Subscription Agreement between the State of Nebraska Department of Motor Vehicles, AAMVAnet, Inc., and the Department of Transportation, State of Oregon, made on the 2nd day of April, 1990.

The effective date of this Assignment Of AAMVAnet, Inc. Subscription Agreement shall be November 1, 1990.

In witness whereof, the undersigned has executed this assignment as a fully authorized official on _____ *October 18* ___, 19 *90*

_____
Margaret M. Higgins
Director, Department of Motor Vehicles

ACCEPTANCE OF ASSIGNMENT

AAMVAnet, Inc., a Virginia nonstock corporation, hereby accepts the foregoing instrument, subject to all the terms and conditions thereof, and in addition indemnifies and holds harmless the State of Nebraska, Department of Motor Vehicles, for any cause of action, loss, claim, and expenses (including reasonable attorney's fees), that arises directly or indirectly under the assigned AAMVAnet, Inc. Subscription Agreement after the date of this assignment.

_____
AAMVAnet, Inc.

Dated _____ *Oct 19* ___, 19*90* .

DUPLICATES

## AAMVAnet, INC.
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** is made this _2nd_ day of
_April_____, 19_90_, by and among AAMVAnet, INC., a Virginia nonstock
corporation (the "Operator"), the STATE OF NEBRASKA, DEPARTMENT OF MOTOR
VEHICLES (the "Nebraska DMV") and the undersigned subscriber (the
"Subscriber") in the State of Oregon (the "State").

### RECITALS

A.   Section 12007 of the Commercial Motor Vehicle Safety Act of 1986, 49
     U.S.C. app. 2701 et seq. (the "Act") mandated the establishment of an
     information system which will serve as a clearinghouse and depository
     of information pertaining to the licensing and identification of
     operators of commercial motor vehicles and the disqualification of
     such operators from operating commercial vehicles (hereinafter, the
     "Commercial Drivers License Information System" or "CDLIS").

B.   The operator is working in cooperation with the Nebraska DMV,
     representatives of the States (as such term is used in the Act) and
     the Federal Highway Administration with respect to the creation of a
     nationwide telecommunications network ("AAMVAnet") to support the
     operation of CDLIS.

C.   The Federal Highway Administration, Acting for the U.S. Secretary of
     Transportation, pursuant to the Act, has designated the Operator as
     the operator of CDLIS.

D.   The Nebraska DMV has entered into certain third party contractual
     obligations relating to the development and operation of AAMVAnet.

E.   The Nebraska DMV therefore desires to enter into this contract between
     AAMVAnet and the Subscriber to clarify its right to recover

1

subscription fees directly from the Subscriber for services rendered by the Operator and the third party contractor (the "Third Party Obligations") until such time as Nebraska DMV assigns its rights and obligations under this Agreement.

F.     The Subscriber desires to contract for the use of AAMVAnet for the purpose of obtaining access to CDLIS and other telecommunication services which may be available over AAMVAnet and which it may desire to utilize from time to time (the "Services"), all as set forth herein.

**AGREEMENTS**

**NOW THEREFORE,** the parties hereby agree as follows:

1.     Use of AAMVAnet.  Operator and Nebraska DMV hereby grant to Subscriber the right to utilize AAMVAnet for the purpose of obtaining access to CDLIS and such other Services as Subscriber shall elect from time to time.

2.     Fees.

   (a)   Subscriber agrees to pay for use of AAMVAnet and the Services on the basis of Subscriber's actual utilization of network services and/or applications in accordance with the charges set forth in Attachment A.  All fees, less credits approved, are exclusive of any applicable state or local sales, use or other taxes of a similar nature and are subject to change upon at least thirty (30) days written notice from Operator to Subscriber.

   (b)   If upon receipt of such notice of a proposed fee increase, Subscriber elects to terminate this subscription agreement, Subscriber shall promptly notify Operator and Nebraska DMV in writing of this decision which shall become effective thirty (30) days after this termination notice is given.  If Subscriber provides Operator and Nebraska DMV timely written notice under this section, Operator's obligation to provide the services under

2

this agreement and Subscriber's responsibility to pay fees shall cease on the effective date of this termination notice.

(c)   Subscriber's liability to pay the fees required by this agreement shall at all times be subject to the availability to Subscriber of sufficient moneys provided by Subscriber's legislative body by appropriation, appropriation limitation or grant to continue the payment of fees under this agreement. In the event Subscriber has knowledge its state legislature has failed to appropriate funds for the continuation of this agreement, or grant monies are no longer allotted for the payment of fees under this agreement, Subscriber shall provide Operator and Nebraska DMV with at least ten (10) days written notice prior to the beginning of fiscal year for which funds have not been appropriated or grant monies made available.  Upon receipt of such written notice Operator and Nebraska DMV shall have the right to terminate any obligations they have under this agreement effective at the beginning of the next fiscal year.

(d)   Should Subscriber terminate this agreement for any reason on less than thirty (30) days written notice to Operator or Nebraska DMV, Subscriber shall pay to the full extent authorized by law reasonable termination charges based upon actual charges incurred by Subscriber from the time such termination notice is given and all services to Subscriber are terminated in accordance with contractual obligations to sub-contractors and other service providers.

3.   Billing and Payment.  Following the end of each calendar month, Nebraska DMV will cause to be sent to Subscriber an invoice setting forth charges incurred during such month by the Subscriber.  Upon receipt of the invoice, the Subscriber shall pay the full amount due. Amounts remaining due for more than sixty (60) days shall accrue interest at the rate per annum of fourteen percent (14%).  Amounts

3

remaining due for more than ninety (90) days shall result in termination of services to the Subscriber as provided in Paragraph 8 of the Agreements.  Remittances shall be made payable to "Nebraska Department of Motor Vehicles" and shall be mailed to Nebraska Department of Motor Vehicles, CDL Division, P.O. Box 94789, Lincoln, Nebraska 68509 or such other payee and/or address as shall be designated by the Nebraska DMV.

4.    Equipment.  The Subscriber will be connected to AAMVAnet through equipment provided by the Subscriber as delineated in Attachment B of this Agreement.  The Operator, the Nebraska DMV or their designee shall have the right to inspect and test such equipment to confirm the compatibility of such equipment with AAMVAnet.

5.    Compliance with Certain Policies and procedures.  The Subscriber agrees that it will, unless prohibited by state law, comply fully with the Operator's policies and procedures, set forth in Attachment C, in effect from time to time regarding the disclosure to and access of State agencies and other third parties of information transmitted over AAMVAnet, including, policies with regard to the structure and coding of transactions and billing policies and procedures.

6.    Compliance with Nebraska DMV Billing and Payment Procedures.  The Subscriber agrees that payment is due upon receipt of invoice.  The Subscriber further agrees and acknowledges the authority of the Nebraska DMV to seek recovery of any financial obligations incurred by the Subscriber for services provided under this agreement.

7.    Term.  This Subscription Agreement is effective as of the date set forth above and shall continue in force until terminated by the Subscriber, Operator or Nebraska DMV, except as stated in Agreements paragraphs number three (3) and number nine (9), upon at least thirty (30) days written notice.

4

8.  Termination; Suspension of Services; Other Remedies.  If Subscriber fails to fulfill any obligations under this Subscription Agreement, then in addition to any other remedies which Operator and/or the Nebraska DMV may seek, the Operator and/or Nebraska DMV may suspend access to AAMVAnet on ten (10) days written notice.  In addition to the foregoing, if the Subscriber fails to fulfill any obligations under this Subscription Agreement, the Operator and the Nebraska DMV may take whatever action at law or in equity which may appear necessary or desirable to enforce such obligations.  No remedy set forth herein is intended to be exclusive of any other remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Subscription Agreement or now or hereafter existing at law or in equity or by statute.

The Subscriber shall not be relieved of its liability to Nebraska DMV for any damages sustained by the Nebraska DMV as a result of any breach of this Subscription Agreement unless Nebraska DMV so releases the Subscriber and has determined for the purpose of set-off the exact amount of damage due the Nebraska DMV.

9.  Limitation on Liability of Nebraska DMV.  The Nebraska DMV enters into this Agreement to provide specified network services based upon the Federal Highway Administration Supplemental Grant CDLIS-FY 88-002 dated August 23, 1988, and as amended on March 17, 1989, to provide the amount of $2,600,000 as the funding source for this project.  If at any time the funding source fails to appropriate monies to the Nebraska DMV, the obligation of the Nebraska DMV shall cease immediately and performance of work under the Subscription Agreement by Nebraska DMV shall terminate effective as of the date specified in the notice without penalty.

In addition, when the funding from Federal Grants has been expended, then the Nebraska DMV shall not commit to the expenditure of State

5

funds.   At no time shall the Nebraska DMV commit to the expenditure of State funds.

Prior to the expenditure of all federal grants funds the Director of the Nebraska DMV at any time may assign the Nebraska DMV's rights and obligations under this Agreement to:  a federal government agency, another state participating in AAMVAnet, or another agency of the State of Nebraska.  Upon expenditure of all federal grants funds, Nebraska DMV may assign this Subscription Agreement to the Operator.

10. Force Majeure.  Neither the Operator, nor the Nebraska DMV, nor the Subscriber shall have any liability to any party by reason of any delay or failure to perform any obligation or event occasioned by any act of God, force majeure, storm, fire, casualty, work stoppage, strike, lockout, labor dispute, civil disturbance, equipment failure, riot, national emergency, act of government, act of public enemy, mechanical or technical failure or other causes of similar or dissimilar nature beyond its or their control.

11. Choice of Law.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Nebraska until such time as the State of Nebraska assigns this contract to any other party, at which time this agreement shall be construed and interpreted in accordance with the laws of the State of Oregon.

12. The Subscriber may not reassign any rights or obligations under this Agreement without the express written approval of the Operator and Nebraska DMV.  Upon the expenditure of all federal grant funds the Nebraska DMV may assign its rights hereunder to the Operator without the further consent of the Subscriber.

13. Notices.  All notices required or permitted to be given under the terms of this Subscription Agreement, except as stated in Agreements paragraph number nine (9), shall be deemed given when delivered in

6

person or on the third business day after being deposited in the United States mail, first class postage prepaid, addresses as follows:

If to the Operator:          Barry Goleman, General Manager
                             AAMVAnet, Inc.
                             4200 Wilson Blvd., Ste. 600
                             Arlington, VA  22203

If to the Nebraska DMV:      Paul N. Potadle
                             Attorney Deputy Director
                             CDL Coordinator
                             P.O. Box 94789
                             Lincoln, NE  68509

If to the Subscriber:        David Dowrie, Manager
                             Information Systems
                             Transportation Building
                             Salem, OR 97310

or to such other person or address which any party shall furnish to the others in writing.

14. Headings.  The headings in this subscription Agreement are for convenience and reference purposes only and do not constitute part of the Agreement.

15. Entire Agreement.  This Subscription Agreement constitutes the entire agreement among the parties and merges any and all prior agreements and representations respecting the matters contemplated in this Subscription Agreement, whether oral or written, by and among the parties hereto.

16. Counterparts.  This Subscription Agreement may be executed in two or more fully executed counterparts, each of which shall be deemed an

7

original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same instrument.

17.   Severability; Nonwaiver.   Should any provisions of the Subscription Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected thereby.   Failure of any party to enforce any provision of this Subscription Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

8

**IN WITNESS WHEREOF,** the undersigned have caused the Agreement to be executed by their fully authorized officials as of the date first written above.

**Subscriber**

By: _____

David Dowrie, Manager
Information Systems - Department of Transportation

**AAMVAnet, Inc.**

By: _____

Barry Goleman
Manager - AAMVAnet, Inc.

**Nebraska Department of Motor Vehicles**

By: _____

Margaret L. Higgins
Director - Department of Motor Vehicles

**Oregon Department of Transportation**

By: _____

Judith D. Gregory
Interim Deputy Director - Department of
Transportation

**Approved as to Legal Sufficiency**

By: _____

Bill Nessly
Assistant Attorney General - State of Oregon

The Oregon Department of Transportation, at its regular meeting of March 20, 1990, authorized the Interim Deputy Director of the Department of Transportation to execute this Agreement in behalf of the Department.

9

## ATTACHMENT A

### AAMVAnet, Inc. Fee Schedule
### June 29, 1989

## CDLIS Fee Schedule

This fee schedule covers the equipment and services required for the CDLIS application.

| | |
|---|---|
| Enrollment Fee for each new CDL Holder to CDLIS | $4.00 |

Traffic Usage Charges (per 1000 Characters)
Prime Time
Non-Prime Time

.015
.008

| | |
|---|---|
| Monthly Fee per Invoiced Account | 40.00 |

CDLIS Transaction Charges

| Adds and Changes | Year | Rate |
|---|---|---|
| | 1989 | .05883 |
| | 1990 | .05425 |
| | 1991 | .05046 |
| | 1992 | .04692 |
| Inquiries | 1989 | .04445 |
| | 1990 | .04099 |
| | 1991 | .03812 |
| | 1992 | .03534 |

The above fees cover all fees and charges to the extent required for CDLIS operations.  Only one "PROFS" user ID is included in the above fees.

Federal grant funds and CDLIS enrollment fees will cover the cost of monthly host connectivity and common carrier charges for a 90 day period prior to CDLIS implementation.  Any additional costs will be at the rates covered on page 2 of Attachment A.

The fees listed on the next page apply when the service does not relate to the CDLIS application.  These rates can be used to determine the cost to connect additional host computers;  to have additional capacity;  or to use other network services.

Attachment A
Page 2

## Current AAMVAnet Rates
### Effective June 29, 1989

|  | Current AAMVAnet |
|---|---|
| **INSTALLATION:** |  |
| Host administration (per host) | $1,328 |
| Enhanced Connectivity Service* |  |
|    - 9.6  Kbps line (per line) | 900 |
|    - 14.4 Kbps line (per line) | 1,125 |
|    - 56.6 Kbps line (per line) | 1,175 |
| Protocol conversion (non-LU6.2 States) | 4,000 |
| **HOST CONNECTIVITY (Monthly)** |  |
| Host administration (per host) | 340 |
| Enhanced Connectivity Service* |  |
|    - 9.6  Kbps line (per line) | 778 |
|    - 14.4 Kbps line (per line) | 1,237 |
|    - 56.6 Kbps line (per line) | 3,111 |

\*  IBM will provide the modems, IBM Information Network communications port and management of the line.

Common Carrier charges are charged as received from the Common Carrier. They are not included in the above charges.  Prime time is from 8:00am to 8:00pm (Eastern time) Monday-Friday.

| **TRAFFIC USAGE CHARGES** |  |
|---|---|
| Prime time per 1,000 Characters | .015 |
| Non-Prime time per 1,000 Characters | .008 |
| **LOCAL DIAL ACCESS CHARGES (Per hour)** |  |
| Class A city Prime time | 4.34 |
| Class A city Non-Prime time | 2.16 |
| Class B city Prime time | 6.37 |
| Class B city Non-Prime time | 3.18 |
| 800 Number surcharge to local class A city: | 15.90 |
| **INFORMATION EXCHANGE (IE) USAGE** |  |
| Information Exchange message Prime time | .255 |
| Information Exchange message Non-prime time | .128 |
| IE Traffic, per 1,000 Characters Prime time | .060 |
| IE Traffic, per 1,000 Characters Non-Prime time | .030 |
| Storage, per Million Characters per day | 3.79 |
| **GENERAL CHARGES** |  |
| Enrollment Charge per invoiced account (One item) | 150 |
| Attached network resources registration (per device) | 35 |
| PROFS USER ID (w/1 MB of Storage) per month | Variable 100 |
| Monthly fee per Invoiced Account | 40 |
| **SOFTWARE** |  |
| IBM expEDIte/CICS (per month) | 95 |
| IE SNA Host Interface (per month) | 32 |
| IBM expEDIte/PC (per Copy) | 150 |
| INPCS-Entry (Dial support per copy) | 150 |

## ATTACHMENT B

## AAMVAnet Equipment
### June 29, 1989

One pair of modems, one for each end of a leased line, are included in the AAMVAnet fee structure for CDLIS operations.  The modems are the property of the Network.

The modems provided will be sufficient to process CDLIS Transactions and related management requirements such as E-Mail.  If the subscriber requires modems with a greater capacity due to other network traffic, the subscriber will be charged for the difference in cost.

A protocol converter is included in the current AAMVAnet fee structure if required by the subscriber.  If the subscriber desires a backup Protocol Converter it can be provided at additional cost.

All equipment required for telecommunications, to the point of the subscriber's side of the modem or protocol converter, is the subscriber's responsibility and cost.

## Attachment C

### AAMVAnet Policies and Procedures
### June 12, 1989

### Network Management and Support

1.    The subscriber agrees to allow network and application vendors to provide statistics, management information and financial information to AAMVAnet, Inc.

2.    An IBM software package "NOTIFY", which is available to all network users, will be used to manage and track Network and application problems.  The subscriber agrees to allow the network provider to provide AAMVAnet related network and application problem information to AAMVAnet Inc.

3.    The subscriber agrees to have one AAMVAnet "PROFS" User ID for Electronic Mail and Bulletin Board purposes.

### CDLIS Management and Support

1.    The subscriber is responsible for required changes and/or updates to pointer information relative to the subscriber.

### Billing Services

1.    The subscriber agrees that network charges related to the CDLIS control site, Network Control Software (NCS) and NDR Traffic will be prorated back to the subscriber based on percentage of CDLIS Traffic.

2.    The rebilling process utilized by AAMVAnet, Inc. will supply detailed network and CDLIS charges to the state as a part of the billing process.  In those cases where charges are being paid by federal grant funds, the rebilling system will first provide the detailed charges and then credit the item back to the subscriber.  This process will allow states to review the usage of the network and CDLIS in detail on an ongoing basis.

### Privacy and Disclosure

1.    The subscriber is responsible for any record keeping or tracking of data that may be required due to state or federal disclosure laws.

2.    The subscriber agrees that it will not provide data from another subscriber to a commercial user. The exception to this policy is, when a driver has moved from one jurisdiction to another jurisdiction and the Driver History Data was moved related to this driver.


## Confidentiality

1.    AAMVAnet, Inc. is also establishing and maintaining information which is utilized to assist Motor Vehicle Agencies perform their official business.

In order to protect the rights of the citizens in the use of this information, it is understood and agreed by the subscriber that is requesting and/or receiving:

information from another subscriber; or

information maintained by AAMVAnet, Inc.; or

information maintained by contractors on behalf of AAMVAnet and/or the subscriber;

that such information will be for the sole purpose of:

controlling the issuance of a motor vehicle drivers license or permit; or

official subscriber business related to the transfer of a vehicle's registration or title; or

official law enforcement business; or

other official business of the subscriber's motor vehicle department or division.