**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;<br><br>    *Movants*,<br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>    *Respondent*. | No. 1:26-mc-19 |

**DECLARATION OF KRISTINA H. BOARDMAN**

I, Kristina H. Boardman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a resident of the State of Wisconsin, I am over the age of 18, competent to testify as to the facts herein, and I testify based on personal knowledge, records kept in the ordinary course of business at the Wisconsin Department of Transportation (WisDOT) – Division of Motor Vehicles (DMV), and information I learned from WisDOT – DMV personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.  I am currently employed by WisDOT as Secretary since September 2024. I have also served as WisDOT Deputy Secretary, WisDOT – DMV Administrator, WisDOT – DMV Deputy Administrator, and Director of WisDOT – DMV Bureau of Field Services.

3.  In my current role at WisDOT, I am responsible for serving as the chief executive for one of Wisconsin's largest state agencies that works to support all modes of transportation with over 3,200 employees and a biennial budget of more than $8 billion. As the Secretary of WisDOT, I am responsible for oversight of agency efforts to design, build and maintain transportation infrastructure throughout the state, work done by the Division of State Patrol that enforces laws and assists motorists throughout Wisconsin, and the services the Division of Motor Vehicles provides to the 50,000 customers it serves each week. These services encompass all Wisconsin driver licensing functions including commercial driver licensing.

4.  In Wisconsin, WisDOT - DMV is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial drivers' licenses (CDLs) and non-commercial drivers' licenses as defined in Chapter 343, Wisconsin State Statutes. Among other things, WisDOT – DMV is responsible for verifying each drivers' license applicant's legal eligibility and medical fitness, identifying and disciplining problem drivers, and protecting the privacy of drivers' personal information.

### Wisconsin's Management of Driver Licensing

5.  WisDOT - DMV is responsible for issuing and renewing commercial driver's licenses (CDLs) and non-commercial driver's licenses (DLs) to residents of Wisconsin.

DECLARATION OF KRISTINA H. BOARDMAN

6. As part of Wisconsin's commitment to traffic safety, WisDOT - DMV follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, WisDOT - DMV administers knowledge tests, driving tests, assesses applicants' medical fitness, checks to ensure that each applicant is not the holder of a driver's license from any other state, and checks each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs, DLs, and identification cards, WisDOT - DMV also verifies the applicant's legal presence in the United States and has done so since April 1st, 2007.

7. To comply with our legal obligations and ensure that each driving record does not make them ineligible for a CDL or DL, it is necessary for WisDOT – DMV to have a means of checking each driver's history, not only in Wisconsin, but in other states where the applicant may have held a license or committed a traffic violation.

8. For CDLs, this check is conducted through a number of databases, primarily the database called the Commercial Driver's License Information System (CDLIS).

### The Commercial Driver's License Information System (CDLIS)

9. CDLIS is a distributed database that contains information about commercial drivers whose driver records are owned and maintained by the states. It operates as a clearinghouse where states communicate with one another to verify the identity and history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all 50 U.S. states, the District of Columbia, 5 U.S. territories, 10 Canadian provinces, 3 Canadian territories and the agencies within those jurisdictions who administer and enforce motor vehicle laws are members.

10. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's: state of record, driver license number, name, date of birth, social security number (SSN), sex, the date and time the driver was added to CDLIS, the date and time the record was last updated, and indicators

DECLARATION OF KRISTINA H. BOARDMAN

showing whether a change in the state of record is in progress, and whether the number in the SSN field is an SSN, a substitute SSN, or a pseudo SSN.

11.   If WisDOT - DMV queries CDLIS and finds that an applicant has a Master Pointer Record, WisDOT - DMV would then send the identified state of record for that driver a request for the driver's full history, called a "driver record" or "Driver History Record" (DHR) which the state of record would provide to the requesting state. Similarly, if another state queries CDLIS and finds a Master Pointer Record for a driver licensed in Wisconsin, WisDOT – DMV would send that driver's record to the requesting state.

12.   To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

13.   As stated above, the data in CDLIS is owned and maintained by the states. WisDOT - DMV has the ability to add, delete, or change its own records maintained in CDLIS—and regularly does so, to ensure that our data remains accurate and up to date. Neither AAMVA nor the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any authority to make additions, deletions, or changes to Wisconsin's CDLIS data.

14.   Before issuing a CDL, Wisconsin, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, the status of his or her license, and whether the applicant is disqualified from operating a motor vehicle. [49 CFR 383.73(b)(ii)]. WisDOT - DMV usually queries CDLIS thousands of times per day.

15.   WisDOT - DMV has participated in and relied on CDLIS to operate its CDL program for more than 30 years. Even if we were not legally required to use CDLIS, we would need CDLIS or some other system like it in order to serve our public safety mission: WisDOT – DMV needs to know whether an applicant has a history of dangerous or unlawful driving in order to fulfill its public safety mission. If CDLIS were to shut down, particularly on short notice, it would be a major impediment to the operation of our CDL program.

3

DECLARATION OF KRISTINA H. BOARDMAN

16.     WisDOT - DMV also queries CDLIS and AAMA's State-to-State Verification System (S2S) before issuing a driver's license. Thus, our operation of our DL program would also be impaired by the loss of CDLIS.

17.     WisDOT – DMV participates in CDLIS pursuant to a contract with AAMVA. Attached as Exhibit A is a true and correct copy of Wisconsin's CDLIS contract with AAMVA.

18.     In addition to CDLIS, AAMVA also operates other critical programs that WisDOT - DMV uses or is required to use. For example, AAMVA operates the Problem Driver Pointer System ("PDPS"). PDPS allows states to search the National Driver Registry ("NDR"), which contains information on problem drivers. By carrying out a PDPS search, WisDOT – DMV obtains information that directs them to the jurisdiction that has a full record of a driver's history. Based on this information, WisDOT - DMV can determine whether an applicant for a driver's license is eligible.

19.     Like CDLIS, PDPS was created by statute and is a function of the National Highway Transportation Safety Administration ("NHTSA") and is only accessible through AAMVA's network.

20.     WisDOT – DMV uses AAMVA's State-to-State (S2S) verification service, Driver History Record (DHR), Problem Driver Pointer System (PDPS), Commercial Skills Test Information Management System (CSTIMS), Digital Image Access and Exchange (DIAE), Verification of Lawful Status (VLS), U.S. Passport Verification Service (USPVS), Social Security Online Verification (SSOLV), and SR22 and SR26 Record Filing Automation (SR22/26) for CDL, DL and identification card (ID) issuance.

21.     WisDOT - DMV queries at least one AAMVA system every time an individual applies for a CDL, DL or ID card, but typically multiple AAMVA systems are queried during every application.

**FMCSA's Demand for CDLIS Data**

22.     On July 28th, 2026, I learned that FMCSA has demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including Wisconsin's records when DMV Administrator Tommy Winkler shared that he received an email containing a letter from AAMVA Chief Executive Officer Ian Grossman, addressed to SDLA Chief Administrators, dated July 27th, 2026.

4

DECLARATION OF KRISTINA H. BOARDMAN

23.    I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other database.

24.    I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, WisDOT - DMV already carries out those functions, in accordance with federal and state statutes and regulations.

25.    I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

### Irreparable Harm of Disclosure to FMCSA

26. FMCSA's demand seeks Wisconsin's records and data.

27. Once Wisconsin's data is in FMCSA's hands, Wisconsin would lose control and oversight of these records.

28. Moreover, if the data were turned over to FMCSA, Wisconsin would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to Wisconsin could form the basis or justification for federal action.

29. Finally, residents of Wisconsin entrust the state with their personal data when they apply for a commercial driver's license. That trust would be harmed if the data is turned over to FMCSA without controls and without a clear statement of FMCSA's purpose in seeking it.

30. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs from Wisconsin. This means Wisconsin will lose revenue, as each applicant for a CDL must pay a fee to obtain a commercial learner permit (CLP) and to obtain an original CDL . The cost to obtain a (CLP) is $30. The cost to hold an original Class A, B, C commercial driver license is $74. There are additional fees to add endorsements or to upgrade classes and endorsements.

31. There is also an acute risk that some individuals who are concerned about broadly disclosing their personal information to the federal government— - such as individuals who are lawfully qualified to obtain a CDL but are part of mixed-status immigration families— - may avoid the CDL process entirely and attempt to drive commercial motor vehicles without a license. If that

DECLARATION OF KRISTINA H. BOARDMAN

occurs in even a small number of cases, it would pose grave public-safety risks due to unverified operator knowledge and skills. An unlicensed commercial motor vehicle operator may not have completed the required entry level driver training and would not have passed the knowledge and skills testing requirements to obtain a commercial driver license. Unlicensed drivers may not adhere to the federal hours-of-service limits which could lead to dangerous driver fatigue. They may bypass mandatory medical certification that screen for health conditions that could negatively impact the driver's ability to safely operate a CMV. Unlicensed drivers may also evade the drug and alcohol testing frameworks for CMV operators, increasing the risk of unsafely operating a CMV while under the influence of a controlled substance. Wisconsin would be harmed if AAMVA's programs were impaired

32.     I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

33.     Wisconsin would be seriously harmed if FMCSA carried out those threats.

34.     As stated above, WisDOT - DMV relies heavily on CDLIS, the PDPS, and other resources and services operated by AAMVA as stated in paragraph 20.

35.     Without an effective, functioning, and up-to-date CDLIS, WisDOT – DMV would not be able to issue new CDLs and DLs or renew existing ones in compliance with federal and state laws and regulations. This would result in WisDOT – DMV not being able to license drivers and notify other states of driver convictions, license withdrawals, and other driver incidents. It would negatively impact hundreds of thousands of drivers, hundreds of CDL training schools and testing companies, and have a devastating impact on freight movement and the economy. And even if those laws and regulations did not apply, Wisconsin would be harmed by losing access to an important public safety resource that keeps unsafe drivers off Wisconsin's roads.

**WisDOT - DMV participated in CDLIS on the understanding that its records would be kept secure**

36.     I understand that Wisconsin's participation in the CDLIS system is a condition to receiving certain federal highway funds.

6

DECLARATION OF KRISTINA H. BOARDMAN

37.     It has never been Wisconsin's understanding that FMCSA has the right to redisclose Wisconsin's records as a condition of participation in CDLIS.

38.     Wisconsin has relied on the security and confidentiality of CDLIS records in designing its own information systems, and in establishing practices relating to the maintenance of such records.

* * *


I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 10th, 2026, in Madison, Wisconsin.


Kristina H. Boardman
Secretary
Wisconsin Department of Transportation

7

# Exhibit C

**AAMVAnet, INC.**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT is made as of the 24ᵗʰ day of _August_, 19 _92_, by and among AAMVAnet, Inc., a Virginia nonstock corporation (the "Operator") and _State of Wisconsin_, (the "Subscriber").

**RECITALS**

A.  A nationwide telecommunications network "AAMVAnet" has been developed by Operator and is being utilized by the states to facilitate access to motor vehicle safety, registration and other governmental records.

B.  The Operator desires to make AAMVAnet available to Subscriber on the terms and subject to the conditions set forth herein.

C.  The Subscriber desires to contract for the use of AAMVAnet on the terms and subject to the conditions set forth herein.

**AGREEMENTS**

NOW THEREFORE, the parties hereby agree as follows:

1. Definitions.  As used herein, the following terms shall have the meaning ascribed to them in this Section 1.

"AAMVAnet" refers to the telecommunication network operated by AAMVAnet, Inc.

"Download" means the movement of information by electronic means from one computer or terminal to another computer.

"End User" means any party to whom the Subscriber provides a "USERID" or whom Subscriber authorized, by any other means, to access a Service.  It also means any party whom the Subscriber authorizes to access the network, programs, data or equipment through a Service.

"PROFS" is a service which provides electronic mail and bulletin board service to the Network users.

"Service" means any telecommunications or related services provided to Subscribers by the Operator.

"Modem" means a device which translates information from a computer generated form to a form required for communications.

1

"Network" means a telecommunications network designed to electronically move information or data from one computer to another.

"Prime Time" means the hours of 8:00 a.m. through 8:00 p.m. Monday through Friday Eastern Time. Prime Time hours are subject to change from time to time.

"Services" means telecommunication services available to Subscribers utilizing AAMVAnet.

"USERID" means a code which enables any party to access the network, programs, data or equipment through an Operator provided service.

2. Use of AAMVAnet. The Operator hereby grants to Subscriber the right to utilize AAMVAnet with respect to such Services as Subscriber shall elect from time to time. Subscriber acknowledges that the right to use AAMVAnet permits the Subscriber to use AAMVAnet to obtain access to such data bases and other information systems to which Subscriber has separately been provided authorized access pursuant to a written agreement with the operator of such data base or information system. A Service when provided will conform to its description, however the Operator does not warrant that Services will not be interrupted or that Services will be error free. The Operator shall have a reasonable time to correct any deficiencies in Services. Subscribers agree to permit the Operator and its contractors to take all reasonable measures to restore any deficiencies in Service.

3. Services. Subscriber is solely responsible for the selection of, use of and results obtained from the Services. Subscriber accepts all responsibility for programs, data, information or equipment provided by the Subscriber which the Subscriber or other parties access over the Network.

4. Fees. Subscriber agrees to pay for the use of AAMVAnet and the Services on the basis of Subscriber's actual utilization of AAMVAnet and the Services and/or applications in accordance with the Operator's prevailing charges. Absent manifest error, a Subscriber's actual utilization shall be as reflected on the records maintained by or under direction of Operator. All fees, less any approved credits, are exclusive of any applicable state or local sales, use or other taxes of a similar nature. Fees are subject to change upon at least thirty (30) days notice from the Operator to the Subscriber.

5. Billing and Payment. Following the end of each calendar month, the Operator will cause to be sent to the Subscriber an invoice setting forth charges incurred during such month by the Subscriber. Upon receipt of the invoice, the Subscriber promptly shall pay the full amount due. Amounts remaining due for more than sixty (60) days shall accrue interest at the rate per annum equal to the lesser of (i) fourteen percent (14%) or (ii) the maximum rate permitted by applicable law. Amounts remaining due for more than ninety (90) days shall subject Subscriber to termination of Services. Remittances shall be made payable to AAMVAnet, Inc., P.O. Box 80341, Baltimore, Maryland 21280-0341 or such other payee and/or address as shall be designated in writing by the Operator.

6. Equipment. The Subscriber will be connected to AAMVAnet through equipment provided by the Subscriber. All equipment required for telecommunications, to the point of the Operator's side of Network related modem or protocol converter, is the Subscriber's

2

responsibility and cost. Such equipment must satisfy the Operator's requirements for use with the applicable Service. The Operator or its designee shall have the right to inspect and test such equipment to confirm the compatibility of such equipment with AAMVAnet.

7. <u>Policies and Procedures</u>. The Subscriber agrees that it will comply fully with the Operator's policies and procedures, set forth in Attachment A, regarding, among other things, information transmitted over AAMVAnet, the structure and coding of transactions and billing policies and other operational procedures. These policies and procedures are subject to change from time to time upon thirty (30) days written notice to the Subscriber.

8. <u>Billing and Payment Procedures</u>. The Subscriber agrees that payment is due upon receipt of invoice.

9. <u>Term</u>. This Subscription Agreement is effective as of the date set forth above and, unless otherwise previously terminated as provided herein, shall continue in force until terminated by the Subscriber or the Operator upon at least thirty (30) days prior written notice.

10. <u>Termination; Suspension of Services; Other Remedies</u>. If Subscriber fails to fulfill any obligations under this Subscription Agreement, then in addition to any other remedies which the Operator may seek, the Operator may suspend access to AAMVAnet on ten (10) days prior written notice. In addition to the foregoing, if the Subscriber fails to fulfill any obligations under this Subscription Agreement, the Operator may take whatever action at law or in equity which is available to enforce such obligations. No remedy set forth herein is intended to be exclusive of any other remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Subscription Agreement or now or hereafter existing at law or in equity or by statute. The Subscriber shall not be relieved of its liability to the Operator for any damages sustained by the Operator as a result of any breach of this Subscription Agreement except and to the extent that Operator expressly releases the Subscriber.

11. <u>Force Majeure</u>. Neither the Operator nor the Subscriber shall have any liability to any party by reason of any delay or failure to perform any obligation or event occasioned by any act of God, force majeure, storm, fire, casualty, work stoppage, strike, lockout, labor dispute, civil disturbance, equipment failure, riot, national emergency, act of government, act of public enemy, mechanical or technical failure or other causes of similar or dissimilar nature beyond its or their control.

12. <u>Release</u>. Subscriber hereby acknowledges that neither it nor any party otherwise claiming through it, shall have any right of action of any kind against Operator with regard to any use or misuse on the part of the Subscriber of data transmitted over AAMVAnet and does hereby release Operator from any liability with respect to the same.

13. <u>Limitation of Remedies</u>. The Operator's liability for damages to the Subscriber, from any cause whatsoever, shall be limited to and in no event shall exceed the total amount invoiced for Subscriber's use of the Service to which Subscriber's claim relates for the twelve (12) month period preceding the event giving rise to Subscriber's claim. This limitation will

3

apply regardless of the form of action, whether in contract or in tort, including negligence. In no event shall the Operator be liable for any damages caused by Subscriber's failure to carry out its obligations hereunder including but not limited to compliance with rules and regulations in Attachment A relating to AAMVAnet as in effect from time to time. In no event whatsoever shall Operator be liable for any lost profits, lost savings, incidental damages, or other economic consequential damages. Operator shall not in any event be liable for any damages claimed by the Subscriber based on any third party claim.

14. Genereal Provisions.

(a) Unlawful Activity. Subscriber agrees not to use any of the Services provided under this Agreement for activities which are unlawful or objectionable as determined by the Operator in its sole discretion.

(b) Limited Rights. The Operator does not grant the Subscriber, or Subscriber's End Users, any rights to programs accessed through Services other than the right to use such programs in conjunction with the Services.

(c) Additional Approval. If Subscriber uses any Service provided under this Agreement to copy, Download, display, distribute or execute programs or perform other works, the Subscriber is responsible for obtaining all required permissions to so utilize such programs or works.

(d) Assignment or Transfer. The Operator or Subscriber may assign or transfer this Agreement with prior written notice. The Operator, in its sole discretion, may delegate its obligations (or a portion thereof) under this Agreement to other parties.

(e) Amendments. The Operator may change the terms and conditions of this Agreement upon three (3) months written notice.

(f) Directory. Unless Subscriber advises the Operator in writing to the contrary within thirty (30) days of the effectiveness of this Agreement, Subscriber authorizes the Operator to include Subscriber's name, contact information and other similar information in a directory of AAMVAnet Subscribers. The Operator reserves the right to produce and to determine the manner in which it will distribute such directory.

(g) Exhibits. If there is a conflict between this Agreement and any Attachment, the terms and conditions of the Attachment will prevail.

(h) Choice of Law. This Agreement shall be construed and interpreted in accordance with the laws of the State of Wisconsin.

4

(i) <u>Notices</u>.  All notices required or permitted to be given under the terms of this Subscription Agreement shall be deemed given when delivered in person or on the third business day after being deposited in the United States mail, first class postage prepaid, addresses as follows:

If to the Operator:     AAMVAnet, Inc.
                        Suite 1100
                        4200 Wilson Blvd.
                        Arlington, VA   22203
                        Attn: President and CEO

If to the subscriber:   *Info Tech Services*
                        *C/o Dept. of Administration*
                        *101 E. ~~Griffin~~ Wilson*
                        *Madison, WI  53708-8974*

or to such other person or address which any party shall furnish to the others in writing.

(k) <u>Headings</u>.  The headings in this Subscription Agreement are for convenience and reference purposes only and do not constitute part of the Agreement.

(l) <u>Entire Agreement</u>.  This Subscription Agreement and Attachment hereto constitute the entire agreement among the parties with respect to the subject matter covered herein and merges any and all prior agreements, oral or written, and all other communications and representations respecting the matters contemplated in this Subscription Agreement by and between the parties hereto.

(m) <u>Counterparts</u>.  This Subscription Agreement may be executed in two or more fully executed counterparts, each of which shall be deemed an original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same instrument.

(n) <u>Severability</u>.  Should any provisions of the Subscription Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected thereby.

(o) <u>No Waiver</u>.  The failure of any party to enforce any provision of this Subscription Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

5

IN WITNESS WHEREOF, the undersigned have caused the Agreement to be executed by their fully authorized officials as of the date first written above.

**SUBSCRIBER:**

BY: _P. Nicholas Hurtgen_ 8-24-02

_P. NICHOLAS HURTGEN_____(name)

_DEPUTY SECRETARY_____(title)

**OPERATOR:**

AAMVAnet, INC., a Virginia
nonstock corporation

BY: _____

Barry J. Goleman
President and CEO

6

## ATTACHMENT A

### AAMVAnet Policies and Procedures

**Network services**

1. The primary service provided by AAMVAnet is the Network connectivity. This provides the ability to move data electronically from one point of Network connection to another point of connection.

2. Electronic Mail is another service offered. It provides a means to send messages to other parties on the Network.

3. Bulletin Board services can provide information regarding the network, applications and the AAMVA organization.

4. Other services will be made available from time to time.

**Network Management and Support**

1. The Subscriber agrees to allow Network and application vendors to provide statistics, management information and financial information to the Operator.

2. An IBM software package "NOTIFY" which is available to all AAMVAnet users, will be used to manage and track Network and application problems. The Subscriber agrees to allow the Network provider to provide AAMVAnet related network and application problem information to the Operator.

3. The Subscriber will appoint a service administrator to act as a coordinator between the end users of a Service and the Operator. The service administrator's responsibilities are primarily to act as the single point of contact and coordinator in operational matters related to Operator Services.

**Privacy and Disclosure**

1. The Subscriber is responsible for any recordkeeping or tracking of data that may be required due to state or federal disclosure laws.

**Access to and Use of Services**

1. The Operator will provide to the Subscriber a USERID(s) or other means to enable access to the Services. The Subscriber is responsible for the control and distribution of Subscriber's USERID(s) to its End Users. The Operator shall have no liability for any misuse of these USERID(s) by any party not under the Operator's control. In addition, the Subscriber agrees to pay for any resulting service expense for such misuse by Subscriber's end users.

A - I

2. The Subscriber is responsible for ensuring that the Subscriber's use of a Service will not breach any laws, regulations or conventions related to, but not limited to, data privacy, international communications and exportation of technical or personal data. The Subscriber is also responsible for obtaining the necessary governmental, regulatory or statutory approvals for Subscriber's use of the Services.

3. The Operator reserves the right to temporarily withdraw access to a Service from the Subscriber when, in the Operator's opinion, Subscriber causes any part of a Service to malfunction.  The Operator may exercise such right if Subscriber fails to make changes which, in the Operator's judgment, are necessary to correct the malfunction(s).

4. If the Subscriber provides access to data, programs or other material, for use with a Service, Subscriber warrants that:

   a.   the Operator will not be violating the rights of any third parties in providing the Service; and

   b.   the disclosure or use of such material during the course of the Service will not involve a breach of any confidential or contractual relationship.

5. AAMVAnet will be available during such hours as are established from time to time by the third party vendor providing telecommunications services to Operator.  AAMVAnet may be unavailable from time to time as theresult of the need to perform system maintenance; reasonable efforts will be made to minimize inconvenience to Subscribers.


## Confidentiality/Security

1. Subscriber accepts that any data which comes into the Operator's custody under this Agreement will be protected in accordance with the applicable IBM Information Network Security Bulletin (GC34-2206).

2. The Subscriber recognizes that the Operator is not responsible for any loss of data, information or programs of any kind whatsoever.  The Subscriber is solely responsible for developing and/or maintaining procedures, external to the Service, to safeguard Subscriber's programs, information, data, and for the back up and reconstruction of loss data, information, programs or procedures.

3. Subscriber releases the Operator from all liability for the loss or alteration of Subscriber's programs or data or information or their acquisitions by another party, except for the Operator's failure to implement those aspects of the security procedures which are under the Operator's control.

4. The Operator will not be responsible for transmission errors, corruption of data or for the security of data during transmission via public telecommunications facilities.

**Current AAMVAnet Rates**
**Effective January 2, 1992**

**AAMVAnet Rate**

**INSTALLATION:    (One time charges)**
Host administration (per host)                              $1,519.00
Enhanced Connectivity Service*                              1,045.00
Protocol conversion (non-LU6.2 States)                     4,160.00

**HOST CONNECTIVITY (Monthly)**
Host administration (per host)                               376.00
Enhanced Connectivity Service*
    - 9.6 Kbps line (per line)                           858.00
    - 14.4 Kbps (per line)                             1,365.00
    - 19.2 Kbps (per line)                             1,566.00
    - 56.6 Kbps (per line)                             3,433.00

\*    Enhanced Connectivity Service means that IBM will provide the modems, IBM Information
Network communications port, and management of the line.

NOTES:
Common Carrier charges are charged as received from the Common Carrier.
They are not included in the above charges.

Prime time is from 8:00 a.m. to 8:00 p.m. (Eastern time) Monday-Friday.

**TRAFFIC USAGE CHARGES**
Prime time per 1,000 Characters                              .0154
Non-Prime time per 1,000 Characters                         .0082

**LOCAL DIAL ACCESS CHARGES (Per hour)**
Local dial access session Prime time                          6.00
Local dial access session Non-Prime time                      3.00
800 Number surcharge                                          8.75
   NOTE: Effective November 1, 1991 Traffic usage is not charged for Dial access sessions.

**INFORMATION EXCHANGE (IE) USAGE**
Information Exchange message Prime time                        .277
Information Exchange message Non-prime time                    .138
IE Traffic, per 1,000 Characters Prime time                   .065
IE Traffic, per 1,000 Characters Non-Prime time               .032
IE "A" City Local Dial Access - Prime time (1,000 char)       .025
IE "A" City Local Dial Access - Non-Prime time (1,000 char)   .012
IE "B" City Local Dial Access - Prime time (1,000 char)       .038
IE "B" City Local Dial Access - Non-Prime time (1,000 char)   .019
Short term archive charges (mil/day)                          4.07

**MAIL EXCHANGE CHARGES**
Mail Exchange-segment (domestic)                              .42
Mail Exchange-segment (international)                         .63

**GENERAL CHARGES**

| | |
|---|---|
| Enrollment Charge per invoiced account (One item) | 172.00 |
| Attached network resources registration (per device) one time | 40.00 |
| Bulletin Board USER ID (w/1 MB of Storage) per month | 114.00 |
| Bulletin Board USER ID per hour | 8.25 |
| User IDs on file (Only applies to IBM IN Remote Computing Services ID's) | 2.85 |
| Monthly fee per Invoiced Account | 40.00 |

**SOFTWARE**

| | |
|---|---|
| IBM expEDIte/CICS (per month) | 99.00 |
| IBM ExpEDIte/MVS Host (per month) | 34.00 |
| IBM expEDIte/PC (per Copy) | 180.00 |
| INPCS-HPO (Dial support, master copy) | 110.00 |