**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, et al.,<br><br>*Movants*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Respondent*. | No. 1:26-mc-19<br><br>Hon. Anthony J. Trenga |

**MOVANT STATES' REPLY IN SUPPORT OF MOTION TO QUASH SUBPOENA**


Kwame Raoul
*Attorney General of Illinois*
Cara Hendrickson*
*Executive Deputy Attorney General*
Katharine Roller†
Paul Berks*
*Complex Litigation Counsels*
Gretchen Helfrich†
*Deputy Chief, Special Litigation Bureau*
Molly Mauck†
*Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
115 South LaSalle St.
Chicago, IL 60603
312-814-3000

Counsel for the State of Illinois

* *Pro hac vice forthcoming*
† *Admitted pro hac vice*

*Additional counsel in signature block*

Jay Jones
*Attorney General of Virginia*
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
Counsel of Record
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia


August 19, 2026

# TABLE OF CONTENTS


Introduction ........ 1

Argument ........ 1

I. This Court Has Authority to Grant Movant States' Motion to Quash the Administrative Subpoena. ........ 1

A. DHS's jurisdictional argument misconstrues both the statutory text and the case law on which Movant States rely. ........ 1

B. Movant States' motion is ripe now. ........ 5

II. DHS's Issuance of a John Doe Subpoena to Conduct a Fishing Expedition Exceeds DHS's Authority. ........ 6

A. The Ninth Circuit correctly decided *Peters*, and its reasoning applies with even greater force to the facts here. ........ 7

B. DHS cannot identify any cases permitting enforcement of a subpoena as sweeping and unfocused as the one before this Court. ........ 9

C. DHS's opposition, particularly when viewed alongside DOT's briefing in a related case, further reveals that its purpose in issuing the subpoena is improper. ........ 12

D. The subpoena is procedurally invalid. ........ 13

III. The Subpoena Violates the DPPA. ........ 14

IV. The Subpoena Violates the Privacy Act. ........ 15

Conclusion ........ 17

In its opposition, the U.S. Department of Homeland Security (DHS) seeks to refashion precedent that has long restrained agency subpoena power. Holding a boundless view of that power, DHS claims it has authority to request millions of records about commercial driver's license (CDL) holders from the Commercial Driver's License Information System (CDLIS) to conduct, in its own words, a "fishing expedition." *See* ECF No. 21 at 9–10[1] (hereinafter, DHS Opp.). And it claims that the owner of these records, Movant States, have no authority to bring a motion to quash to challenge DHS's attempt to take possession of this highly sensitive personal information. In DHS's view, the States instead must hope that the American Association of Motor Vehicle Administrators (AAMVA), the subpoena target, which operates the CDLIS database, will not turn over the States' records even in the face of highly coercive threats from the federal government.

The Court should reject DHS's extraordinary claims. The Court has ample authority to grant Movant States' motion, as caselaw makes clear. And DHS's own briefing confirms that its planned fishing expedition is premised on a fundamental misunderstanding of the law governing CDLs—claiming an interest in investigating the issuance of CDLs at unspecified "driving schools," even though States and the District of Columbia, not schools, issue CDLs. *See* DHS Opp. at 8. Because DHS's subpoena is an undisputed "John Doe" subpoena that exceeds DHS's authority, violates the Privacy Act, and violates the Driver's Privacy Protection Act (DPPA), the Court should quash the subpoena.

## ARGUMENT

### I. This Court Has Authority to Grant Movant States' Motion to Quash the Administrative Subpoena.

#### A. DHS's jurisdictional argument misconstrues both the statutory text and the case law on which Movant States rely.

Two complementary sources provide this Court with authority to grant Movant States' motion to quash. First, Rule 45 provides that "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged

[1] Page numbers of filed documents cited herein are from the ECF header.

or other protected matter." Fed. R. Civ. P. 45(d)(3)(A). Rule 81 makes this rule applicable to "proceedings to compel testimony or the production of documents" through an administrative subpoena, "except as otherwise provided by statute." *Id.* R. 81(a)(5). Second, 8 U.S.C. § 1225(d)—far from "provid[ing]" "otherwise"—expressly vests "[a]ny United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer" with jurisdiction to "issue an order requiring . . . persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify" in response to an administrative subpoena. 8 U.S.C. § 1225(d)(4)(B). These provisions thus grant the Court authority to adjudicate a "motion" to "quash . . . a subpoena," Fed. R. Civ. P. 45(d)(3)(A), including an administrative subpoena, *id.* R. 81(a)(5), and vest it with jurisdiction over actions regarding the enforceability of subpoenas under section 1225(d).

Courts have repeatedly found jurisdiction over motions to quash subpoenas in similar circumstances. In *Greene v. Philadelphia Housing Authority*, the court held that it had jurisdiction to "decide whether to quash" an administrative subpoena issued by the HUD Office of the Inspector General, even absent a motion to enforce, because the Inspector General Act provided that such subpoenas are "enforceable by order of any appropriate United States district court." 789 F. Supp. 2d 582, 586 (E.D. Pa. 2011) (citing *Territorial Ct. of V.I. v. Richards*, 847 F.2d 108, 109 (3d Cir. 1988); *Amato v. United States*, 450 F.3d 46, 47 (1st Cir. 2006)). In *In re Children's National Hospital*, the court found that it had authority to adjudicate an entity's motion to quash a subpoena issued to a third party under 18 U.S.C. § 3486—even where the underlying statute did not expressly grant it that right—because Rules 45 and 81 authorized such an action and "nothing in the language of the statute *prohibits* a non-party from moving to quash a § 3486 subpoena." No. 1:25-cv-03780 (JRR), 2026 WL 160792, at *4 (D. Md. Jan. 21, 2026) (emphasis added); *see In re Admin. Subpoena*, No. 1:26-mc-0007 (MSM) (AEM), 2026 WL 1392565, at *3, 10 (D.R.I. May 14, 2026) (granting motion to quash in similar posture). And in *In re Summons Issued to Meta Platforms*, the court held that Rules 45 and 81 vested it with "authority" to grant a third-party's motion to quash an "administrative summons" under 19 U.S.C. § 1509—which likewise contains

no express authorization to file a motion to quash—outside the context of an enforcement proceeding. Dkt. No. 3 (Order) at 2, No. 25-mc-80325 (PHK) (N.D. Cal. Oct. 17, 2025) (citing *Garrett v. City & Cnty. of S.F.*, 818 F.2d 1515, 1519 (9th Cir. 1987)); *see also Amazon.com Servs. LLC v. U.S. Dep't of Justice*, 2023 WL 7651232, at *3 (W.D. Wash. Nov. 15, 2023) (finding that Rule 81 authorized petition for modification of subpoena). This motion is on all fours with this lengthy line of precedent.

Largely disregarding these and similar cases, DHS attempts to avoid this Court's jurisdiction by imposing novel restrictions on the scope of both section 1225 and Rule 81.

First, DHS claims that section 1225(d) specifies that the "sole mechanism by which the validity of [a] subpoena may come before the Court" is when DHS "'invoke[s] the aid of [the] court.'" DHS Opp. at 5–6 (quoting 8 U.S.C. § 1225(d)(4)(A)). But contrary to DHS's assertion, nothing in the statute limits this Court's jurisdiction to circumstances in which the Attorney General or an immigration officer has "invoke[d] the aid" of a court under this subsection. *Id.* Instead, in discussing which district courts have authority to issue orders relating to an administrative subpoena, the statute refers to "[a]ny United States district court within the jurisdiction of which *investigations or inquiries are being conducted* by an immigration officer," 8 U.S.C. § 1225(d)(4)(B) (emphasis added), not only district courts in which the Attorney General or an immigration officer has moved to enforce the subpoena. And the statute acknowledges a district court's jurisdiction in circumstances other than in response to a motion to enforce, such as "in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer." *Id.*

Moreover, the notion that section 1225(d) provides a complete overview of this Court's authority is inconsistent with DHS's necessary concessions about this Court's authority. DHS recognizes, of course, that this Court would have the authority to quash the subpoena after the federal government moves to enforce it. DHS Opp. at 6 ("If [DHS moves to enforce], then the validity of the subpoena may be contested."); *id.* at 7 (arguing that this Court has "no authority to issue the relief requested," "[u]nless and until the federal government enlists the Court's aid to

compel enforcement"). Yet section 1225(d) says nothing about a district court's authority to quash a subpoena or deny an agency petition to enforce. That is not because the district court has no such authority; it is because the statute prescribes DHS's "subpoena authority," *see* 8 U.S.C. § 1225(d)(4), rather than a complete canvass of the relief this Court can order when DHS issues an administrative subpoena. *See In re Children's National Hospital*, 2026 WL 160792, at *4 (concluding, in response to a similar argument, that "[t]he government erroneously reads into the statute a prohibition that does not exist, which is to say nothing in the language of the statute prohibits a non-recipient from moving to quash a § 3486 subpoena").

Second, DHS incorrectly claims that Rule 81 does not authorize pre-enforcement motions to quash because it states that the Federal Rules "'apply to *proceedings* to compel testimony or the production of documents'" through an administrative subpoena. DHS Opp. at 7 (quoting Fed. R. Civ. P. 81(a)(5)). But the term "proceedings" naturally includes proceedings initiated by a motion to quash, which Rule 45 expressly authorizes, as well as the government's proceedings to secure compliance with a subpoena. *See* Fed. R. Civ. P. 45(d)(3)(A). And, as noted above, numerous courts have found Rules 45 and 81 applicable in precisely those circumstances. DHS cites no authority for its contrary construction, which would defeat Rule 81's purpose of enabling "application of any of the rules in the proceedings whenever the district court deems them helpful." Rule 81(a)(3), advisory committee's note (1946 amend.).

Finally, in its effort to wave away the authority cited in Movant States' motion, DHS claims that all of the cases in which courts have adjudicated pre-enforcement motions to quash relied on an express grant of statutory authority in 18 U.S.C. § 3486. DHS Opp. at 7. That is doubly incorrect. Some of those cases did not involve proceedings under section 3486 at all. *See, e.g.*, *Summons Issued to Meta Platforms*, Dkt. No. 3 at 2, No. 25-mc-80325 (subpoena issued under 19 U.S.C. § 1509); *see also Greene*, 789 F. Supp. 2d at 586 (subpoena issued under Inspector General Act). And some of those cases that did involve section 3486 concerned pre-enforcement motions to quash filed by third parties who lacked any express statutory cause of action under section 3486. *See, e.g.*, *In re Children's National Hospital*, 2026 WL 160792, at *4; *In re Admin. Subpoena*,

2026 WL 1392565, at *1–3. In considering and granting those motions, the courts ruled on their "broad" and "inherent discretion and authority . . . to quash" a subpoena consistent with Rules 45 and 81. *Summons Issued to Meta Platforms*, Dkt. No. 3 at 2, No. 25-mc-80325. This Court should do the same.

**B. Movant States' motion is ripe now.**

DHS identifies a pre-enforcement ripeness problem for subpoena recipients, who are fundamentally differently situated than Movant States. Subpoenaed parties, the argument goes, are "not harmed by the absence of judicial review" prior to a motion to enforce, because they will necessarily have "an adequate opportunity to object if, and when, the agency files an action to enforce its subpoena." *Bell Atl. Cash Balance Plan v. U.S. EEOC*, 976 F. Supp. 376, 381 n.10 (E.D. Va. 1997); *see also In re Ramirez*, 905 F.2d 97, 99 (5th Cir. 1990) ("in order to challenge the enforceability of the INS subpoena in the present case, Ramirez should have refused to comply with the subpoena and awaited any enforcement action by the INS").

But Movant States' rights are not so secure, as they may well "*not* be afforded an opportunity to object" before the subpoena recipient complies with DHS's demand. *Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*, 89 F. Supp. 2d 1144, 1151 (N.D. Cal. 2000), *aff'd sub nom. Hell's Angels Motorcycle Corp. v. McKinley*, 360 F.3d 930 (9th Cir. 2004) (emphasis in original). The facts here crystallize why Movant States were not guaranteed any opportunity to participate in enforcement proceedings, absent intervention from this Court. Even if AAMVA did not wish to voluntarily comply with the subpoena DHS issued, its ability to resist compliance may well have been compromised by the federal government's threat to cancel millions of dollars in federal funding if AAMVA refused to voluntarily provide the data requested in DHS's subpoena. *See* ECF No. 3-1 at 23 ("Unless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the [DHS] subpoena, and considering terminating its contract with AAMVA."). Indeed, in the span of just over two weeks, AAMVA agreed to comply with the Federal Motor Carrier Safety Administration's (FMCSA) Data Demand, ECF No. 3-1 at

13, considered partial compliance with a State opt-in or opt-out option, *id*. at 16, and most recently could not confirm that they would not generally produce the data to the federal government, *see* Dkt. No. 3-1 ¶¶ 4–5 (Roller Decl.), *Illinois v. U.S. Dep't of Transp.*, Case No. 1:26-cv-2547 (E.D. Va). FMCSA and DHS, by contrast were unwavering and increasingly aggressive actors, firm on their coordinated demands. ECF No. 2; ECF No. 3-1 at 4, 7–8, 11, 13–14, 16, 23–24.

Extending the ripeness analysis that applies to subpoena recipients to others who lack the protections that informed that analysis would invite the very abuse of process that occurred here. Movant States' ability to protect their independent legal interests in the subpoenaed records should not turn on the willingness and fortitude of the subpoena recipient in resisting the federal government's coercive demands. Consistent with other courts' decisions when faced with similar pre-enforcement suits by third parties who possess the principal interest in the records, *see* ECF No. 3 (hereinafter, Movants' Br.) at 13 (collecting recent cases), this Court should issue relief now.[2]

## II. DHS's Issuance of a John Doe Subpoena to Conduct a Fishing Expedition Exceeds DHS's Authority.

On the merits, DHS's opposition is notable for what it lacks—citation to a single authority that supports its audacious claim that not only can it use its statutory subpoena authority to conduct a fishing expedition for potential investigative targets, but it can do so in a sea of State-collected and State-owned data reflecting the personal and sensitive information of approximately 17 million people, the vast majority of whom are U.S. citizens (and none of whom are alleged to operate driving schools). There is a reason for the lack of citation to such authority, and that is because no court has ever sanctioned the use of an administrative subpoena to conduct such a fishing expedition, let alone one of the magnitude DHS seeks to conduct here.

[2] To the extent this Court agrees with DHS that this pre-enforcement challenge is not ripe, it should dismiss this motion without prejudice to Movant States' ability to (1) move to quash the subpoena following DHS's initiation of enforcement proceedings and (2) move to quash the subpoena following AAMVA's statement that it will comply with the subpoena without a petition to enforce. DHS concedes that the validity of the subpoena may be contested if DHS moves to enforce, DHS Opp. at 5–6, and DHS does not contest Movant States' standing to contest the validity of the subpoena at that juncture.

It makes sense that no court has allowed enforcement of a subpoena like the one before this Court. Accepting DHS's position here would render meaningless the central elements of the test courts employ when examining an administrative subpoena's validity and determining whether to quash or order enforcement. As a corollary, moreover, DHS apparently sees no limits on its administrative subpoena authority. There is no precedent for this position, and no basis for believing that Congress ever intended to confer such far-reaching authority on an agency.

Notably, DHS does not bother to contest that, if *Peters v. United States,* 853 F.2d 692, 699–700 (9th Cir. 1988), was correctly decided, DHS's subpoena is an invalid fishing expedition. *Peters* reached the right result, and this Court should quash DHS's subpoena for the same reasons that persuaded the Ninth Circuit there. This Court should also quash the subpoena for the independent bases that the subpoena was issued for an improper purpose and is procedurally defective.

### A. The Ninth Circuit correctly decided *Peters*, and its reasoning applies with even greater force to the facts here.

In *Peters*, immigration authorities conducting "a general criminal investigation of a group of unnamed tenants . . . who may be undocumented aliens" sought enforcement of a subpoena to a labor camp that provided housing for approximately 150 families. *Id.* at 693. The immigration officer there attested to having arrested about 300 undocumented individuals at the camp over an 11-year period and having received "numerous complaints" of undocumented persons at the camp. *Id.* at 695. The Court nonetheless quashed the subpoena, holding that "[a]n administrative subpoena . . . may not be so broad so as to be in the nature of a 'fishing expedition,'" and, further, the INA provision allowing issuance of administrative subpoenas "does not authorize . . . a blanket John Doe subpoena where the targets of a general investigation are unknown." *Id.* at 700.

DHS's justification here is even more lacking than in *Peters*. Rather than seeking information about specific or identifiable targets among CDL holders, the subpoena seeks *17 million* individuals' records, containing sensitive and personally identifying information. This means DHS would receive the personal data of many millions of individuals with lawful

immigration status or U.S. citizenship. And this would all be done in service, not of investigating a target, but in the hope of finding one. Under *Peters*, DHS's use of the administrative subpoena power in this vague, but extreme, dragnet manner is impermissible.

The reasoning in *Peters* would foreclose DHS's hunt for even someone who may have violated a provision that DHS, in the abstract, has authority to enforce. And DHS cannot legitimately base its action on its credulity-straining claim that the subpoena is intended to serve a possible investigation of unspecified "driving schools" for issuing commercial driver licenses to purportedly "removable" or "illegal" noncitizens, DHS Opp. at 8, 11, notwithstanding that CDLs are issued by the States and the District of Columbia, *and not driving schools. See, e.g.*, 49 C.F.R. § 383.5 (a CDL "means a license issued to an individual by a State or other jurisdiction of domicile"); ECF No. 3-2 ¶¶ 5–8; ECF No. 3-3 ¶¶ 5–8; *States*, FMCSA, https://www.fmcsa.dot.gov/registration/commercial-drivers-license/states (last visited Aug. 18, 2026) ("The States and Washington, DC are the backbone of Commercial Driver's Licensing. They issue the licenses and assess the qualifications and validity of each of their drivers.").

DHS asserts that *Peters* was wrongly decided. It was not. Like the Ninth Circuit, the Fourth Circuit, too, has recognized that one purpose of "[t]he requirement that subpoenas be used only for a legitimate and authorized governmental purpose" is to "prohibit[] the government from 'engag[ing] in arbitrary fishing expeditions' and from 'select[ing] targets of investigation out of malice or an intent to harass.'" *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)); *see also United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a 'fishing expedition' through appellants' records, and where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced." (citations omitted)); *see also In re Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (describing subpoena as "the classic impermissible fishing expedition" in granting motion to quash).

DHS also misapprehends *United States v. Bisceglia*, 420 U.S. 141 (1975), *partially superseded by statute*, 26 U.S.C. § 7609, which the *Peters* Court distinguished. *Bisceglia* involved a different subpoena-authorizing statute, but importantly, did not approve a broad fishing expedition. The subpoena there sought to identify the source of two specific, suspicious bank deposits. *Id.* at 142–44. The Court approved the subpoena as narrowed by the district court for the specific facts before it, as emphasized by the concurring Justices:

> The summons, in short, was issued pursuant to a genuine investigation. The Service was not engaged in researching some general problem; its mission was not exploratory. The distinction between an investigative and a more general exploratory purpose has been stressed appropriately by federal courts, and that distinction is important to our decision here.

*Id.* at 152 (Blackmun, J., concurring) (citations omitted). *Bisceglia* in no way supports DHS. Indeed, DHS has not pointed to a single instance of a court enforcing an administrative subpoena with a purpose and scope remotely akin to DHS's subpoena here.[3] And for good reason. As *Bisceglia* recognized, and as seen here, the administrative subpoena power can easily be abused. 420 U.S. at 146, 150–51; *see supra* pp. 5–6.

**B. DHS cannot identify any cases permitting enforcement of a subpoena as sweeping and unfocused as the one before this Court.**

In the absence of authority for its position, DHS mischaracterizes Supreme Court precedent and its progeny. Neither *United States v. Morton Salt*, 338 U.S. 632 (1950), nor any of the other cases DHS cites, sanction the use of an administrative subpoena (or similar tool) to hunt for potential targets. In *Morton Salt*, the agency was following up on prior proceedings against a number of salt producers and a trade association to assess whether those entities were continuing to comply with a previously entered decree. *Id.* at 634–35. And even in that context, the Court cautioned that "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."

[3] The principle enunciated in *Peters* extends beyond subpoenas issued under the INA, *see, e.g.*, *United States v. Golden Valley Elec. Ass'n.*, 689 F.3d 1108, 1115; *F.D.I.C. v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997), and beyond the Ninth Circuit, *see, e.g.*, *E.E.O.C. v. Kmart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238 (D. Mass. 2025). Fourth Circuit precedent, as described above, further confirms as much.

*Id.* at 652. The administrative subpoena in *United States v. Oncology Servs. Corp.*, 60 F.3d 1015 (3d Cir. 1995), similarly had an identified target. There, the Nuclear Regulatory Commission's subpoena was directed to a nuclear medicine licensee in connection with the agency's investigations of the licensee, following the death of a patient at one of the licensee's treatment centers and the initial investigating team's conclusion that "weaknesses in [the licensee's] radiation program were a contributing cause of the patient's death and caused subsequent radiation exposure to employees and the general public." *Id.* at 1017.[4]

DHS's discussion of these cases—and its response to *In re Sealed Case* (*Administrative Subpoena*), which found that an agency could use subpoenas to investigate "suspicious asset transfers" but not to "uncover 'other wrongdoing, as yet unknown,'" 42 F.3d 1412, 1418 (D.C. Cir. 1994) (agency "offered no statutory authority to support this unlimited claim of investigatory power, nor have we discovered one")—evinces a fundamental misunderstanding of the distinction between authority to employ an administrative subpoena to determine if there is a basis to pursue enforcement against a clearly identified or identifiable target of the agency's investigation and authority to search for targets to investigate. An agency may use an investigative subpoena in a relatively broad but not unbounded manner to investigate a target to confirm (or negate) suspicion that the target has violated a law within the agency's jurisdiction and authority to enforce. But it must have an identifiable target *and* authority. DHS does not claim a target here. And its claim of authority to investigate involves a mix of confusion about who issues CDLs, a purported wish to aid a fellow agency in investigating matters outside DHS's authority to investigate, and the belief that, were it able to take possession of vast quantities of Americans' personal data, it just might find someone who may have violated a law that DHS as a general matter is responsible for enforcing. *See supra* p. 6; Movants' Brief at 16–17 (explaining that the subpoena failed to identify

[4] In *Oncology Services*, moreover, there was no real question that the agency's subpoena satisfied the applicable test. The licensee there challenged the agency's authority to *continue* its investigation following issuance of a Report of Investigation, but also effectively conceded the agency's authority. 60 F.3d at 1018, 1020. Against this backdrop, the court found that the licensee had not sufficiently made the case that certain information sought by the agency did not meet the test of relevance. *See id*. at 1020.

an appropriate investigative purpose within DHS's authority, is overbroad, and is out of proportion to any legitimate interest DHS could have).

DHS's proffered theory of its authority merely serves to highlight its fatal flaws. Were it the case that an agency could lawfully use an administrative subpoena to cast about for investigative targets and seek to "uncover '[] wrongdoing, as yet unknown,'" courts would not be able to test such subpoenas' validity as binding precedent requires. While the enunciation of that test varies, the central requirements are that "(1) the inquiry is within the authority of the agency and is for a proper purpose; (2) the matter requested is reasonably relevant to the inquiry; and (3) the demand is not unreasonably burdensome or broad." *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 166 (4th Cir. 1988); *see Morton Salt Co.*, 338 U.S. at 652. Without an identifiable target and some basis for investigating that target, a court cannot conclude that the inquiry at issue is within the agency's authority (or for a proper purpose); as here, it cannot judge whether the request is "reasonably relevant to *the* inquiry" (emphasis added); and, were there the authority DHS claims, the concept of overbreadth would lose all meaning.

This leads inexorably to what is most damning here. DHS seeks a subpoena power that could effectively be unlimited—and all the more so when coupled with the ability to attach threats to the recipient's ability to function if it were to be so bold as to have a court test the subpoena's validity. *See, e.g.*, Dkt. No. 46 at 8, *Illinois v. U.S. Dep't of Transp.*, Case No. 1:26-cv-2547 (E.D. Va.) ("FMCSA further told AAMVA that [DHS] would issue an administrative subpoena requiring AAMVA to produce the information in the master pointer records by August 17."). In this case, AAMVA's "[f]ailure to comply, said FMCSA, could prompt DOT to 'cancel AAMVA's grants' and 'consider terminating its contract with AAMVA." *Id.* (cleaned up)).

Support for DHS's breathtaking assertion of power cannot be found in 8 U.S.C. § 1225(d)(4), and it cannot be found in caselaw. To the contrary, DHS's position is but a reminder that "[t]he subpoena power 'is a power capable of oppressive use, especially when it may be indiscriminately delegated and the subpoena is not returnable before a judicial officer,'" *United States v. Minker*, 350 U.S. 179, 187 (1956) (quoting *Cudahy Packing Co., Ltd. v. Holland*, 315

U.S. 357, 363–64 (1942)), and thus a power that cannot be unbounded or unchecked. *Cf. Fed. Trade Comm'n v. American Tobacco Co.*, 264 U.S. 298, 305–06 (1924) ("Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to . . . direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime." (citation omitted)).

### C. DHS's opposition, particularly when viewed alongside DOT's briefing in a related case, further reveals that its purpose in issuing the subpoena is improper.

An administrative subpoena must be issued for a congressionally authorized purpose, and an agency cannot use a subpoena "to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964). The briefing and record in this case, as well as the briefing in the related case, *Illinois v. U.S. Dep't of Transp.*, Case No. 1:26-cv-2547 (E.D. Va.), further confirm that DHS's administrative subpoena was used to settle a collateral dispute between AAMVA and the U.S. Department of Transportation (DOT). *See* Movants' Brief at 18–19. Accordingly, the subpoena issued for an improper purpose and should be quashed.

DHS's briefing and the letter accompanying the subpoena each cite three purposes for DHS's demand for the records of every CDL holder. Nothing in DHS's subpoena references DOT or FMCSA, FMCSA's concurrent data demand to AAMVA, or the sharing of data with DOT or FMCSA as among the subpoena's intended purposes. But the record in this case and the briefing in the related case tell a different story.

On June 25, 2026, FMCSA issued its first request to AAMVA for the production of 17 million CDLIS pointer records. ECF No. 3-1 at 4. Following a meeting between AAMVA and FMCSA in the week of July 20, 2026, FMCSA reiterated its demand in a letter on July 24, 2026. ECF No. 3-1 at 11. On July 28, 2026, DHS served its first subpoena for the requested records from AAMVA. ECF No. 3-1 at 16. In a follow-up email, FMCSA staff indicated to AAMVA that "FMCSA and DHS had coordinated on their data demands and that the subpoena would be withdrawn due to AAMVA's efforts to cooperate with FMCSA." *Id*. When AAMVA balked at the

request to produce all of the requested data to FMCSA in light of this newly referenced connection with civil immigration efforts, ECF No. 3-1 at 16, DOT indicated that it would "take immediate action to secure the production of the requested pointer records," including the following: (1) "Today, the Department of Homeland Security will reissue the administrative subpoena it previously withdrew"; and (2) "Unless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants" and "filing an enforcement action to enforce the [DHS] subpoena," ECF No. 3-1 at 23. In litigation over FMCSA's data demand, DOT's brief further acknowledges that FMCSA "was coordinating with DHS." Dkt. No. 45 at 26–27, *Illinois v. U.S. Dep't of Transp.*, Case No. 1:26-cv-2547 (E.D. Va.).

In the related case, DOT argues that "[a] stated basis is no pretext at all." *Id.* at 27. But the same cannot be said for DHS's course of conduct. Up to and including in its briefing in this case, DHS does not describe the sharing of data with DOT or FMCSA as among the subpoena's intended purposes, nor does it reference its coordination with FMCSA or its effort to use its subpoena power to pressure AAMVA to acquiesce in FMCSA's collateral data demand. DHS's continued obfuscation of its issuance, and then *reissuance*, of its subpoena in aid of FMCSA's collateral demand confirms the subpoena's improper purpose.

**D. The subpoena is procedurally invalid.**

DHS contends here that a "properly formatted" subpoena seeking production of records (as indicated by checking Box B)—in contrast with a subpoena seeking the appearance or testimony of a witness (as indicated by checking Box A)—would not specify the title of the proceeding in Box 2. That contention is neither supported by anything in the text of 8 C.F.R. § 287.4, nor by DHS's past practice in issuing "Box B" subpoenas for production of records. *See, e.g.*, Dkt. No. 9-1 at 6, *United States v. Baass*, No. 2:25-mc-00083 (C.D. Cal.) (DHS administrative subpoena for records, issued pursuant to 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4, which does not check Box A, does check Box B, and does list a title of proceeding in Box 2).

### III. The Subpoena Violates the DPPA.

This Court should quash the subpoena for additional reasons. To start, the subpoena violates the DPPA. That statute provides that "personal information" and "highly restricted personal information" drawn from motor vehicle records "may be disclosed" only if one of fourteen exceptions applies. 18 U.S.C. § 2721(b); *see id.* § 2721(a)(1)–(2), (c). The sole exception DHS invokes here—the government use exception—permits information to be disclosed "[f]or *use* by any government agency . . . in carrying out its functions." *Id.* § 2721(b)(1) (emphasis added). As the *en banc* Seventh Circuit has explained, the plain meaning of this text permits disclosure only where each "particular piece of disclosed information is . . . *used* to effectuate" a government function. *Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) ("*Senne I*"). DHS cannot satisfy that standard: it does not contend that "each particular piece of . . . information" in 17 million records will be "used" to carry out any of DHS's functions. DHS Opp. at 13–14.

Instead of attempting to satisfy that textual standard, DHS seeks to rewrite it, claiming that it is enough that DHS's purpose in *requesting* the data is to assist "in carrying out its functions," even if DHS will not actually use each particular piece of data. DHS Opp. at 13–14. But the DPPA does not ask whether the agency had a valid motive for requesting the data in some general sense. It requires that the "personal information" at issue—all of it—will be "disclosed . . . [f]or use" in carrying out a government function. 18 U.S.C. § 2721(b)(1). In other words, "[e]ach distinct disclosure or use of personal information . . . must be permitted by the DPPA." *Maracich v. Spears*, 570 U.S. 48, 74 (2013). DHS cannot obtain any piece of "personal information" that it will not actually "use" in carrying out its functions.

The Seventh Circuit's panel decision in *Senne* is not to the contrary. That opinion—which followed the *en banc* court's remand—exhaustively detailed the unrebutted evidence the government presented as to how "'all of the disclosed information actually *was used*' in effectuating one of the permissible purposes" in the statute. *Senne v. Vill. of Palatine*, 784 F.3d 444, 446 (7th Cir. 2015) ("*Senne II*") (quoting *Senne I*, 695 F.3d at 608). In particular, the

government demonstrated that each piece of information it disclosed on a person's parking ticket—including name, date of birth, sex, height, weight, and address—had "utility to the police" because its disclosure increased the likelihood the ticket would be paid, enabled police to match the car with its owner, provided non-English speakers a source of identification during traffic stops, and more. *Id.* at 446–47. Further, the court explained that providing individuals with all of this information still served those functions even if, as the plaintiff claimed, the government did not ultimately need to use the information "on *his* parking ticket." *Id.* at 447.

DHS has not made a comparable showing here. It does not explain (or even attempt to explain) how DHS will "use" each of the data fields it has requested—unlike in *Senne II*, for instance, DHS has not explained how the agency will derive utility from taking custody of a person's name or date of birth or social security number. Nor has DHS explained how it will use all 17 million records, dating back five years, that it demands. And to the extent DHS has discussed its plans for any of these records, it asserts that it seeks the records to investigate the issuance of CDLs at "driving schools"—revealing only a deep misunderstanding about who issues CDLs, rather than a use for carrying out an actual DHS function. *See supra* p. 8. Allowing a government entity to obtain vast stores of highly restricted information on such a feeble showing would "contravene the statutory design" and "undermine in a substantial way the DPPA's purpose of protecting an individual's right to privacy in his or her motor vehicle records." *Maracich*, 570 U.S. at 60–61.

## IV. The Subpoena Violates the Privacy Act.

The subpoena also violates the Privacy Act. In seeking to amass millions of individuals' personal data, DHS ignores three of the Act's requirements: first, the Act's mandate that agencies publish a notice when creating or modifying databases, 5 U.S.C. § 552a(e)(4); second, its direction that agencies maintain only personal information that is necessary to accomplish a mandatory agency function, *id.* § 552a(e)(1); and third, its restrictions on sharing information with other agencies, *id.* § 552a(b). DHS's efforts to explain away each of these requirements is unavailing.

First, DHS claims that it has satisfied the Privacy Act's notice requirement because CDLIS master pointer records "are covered by" an existing DHS system, namely, DHS's "External Investigations System of Records" (or "EISR"), which already has a published system of records notice ("SORN"). DHS Opp. at 14; *see* Privacy Act of 1974 System of Records, 85 Fed. Reg. 74,362 (Nov. 20, 2020). DHS overreads this SORN. Under the Privacy Act, SORNs must, among other requirements, identify the "categories of records maintained in the system." 5 U.S.C. § 552a(e)(4)(C). Though the EISR SORN is broad, it does not alert the public that DHS will collect all commercial drivers' personal information, even information that has nothing to do with a law-enforcement investigation.

The EISR SORN sets forth several expansive categories of records that DHS possesses, including "subject records"; "associate, victim, and witness records"; records about "third-party record holders"; and "investigatory and evidentiary records." 85 Fed. Reg. at 74,364. Collectively, these categories cover significant ground. *Id.* But they do not address the personal data of all commercial drivers, including those with no plausible relation to unlawful activity: It is implausible that millions of law-abiding people could be the "subject" or "associate" of an investigation; these individuals are not themselves "third-party record holders"; and DHS has not identified any "investigation" for which it needs data on millions of law-abiding Americans.

Second, DHS has not shown that it has met the Privacy Act's data-minimization requirement. 5 U.S.C. § 552a(e)(1). DHS asserts without explanation that the "subpoena seeks information relevant and necessary to DHS's statutory law enforcement activities." DHS Opp. at 15. But as explained above, DHS's law-enforcement authority does not empower it to collect millions of records in the hope they may reveal unlawful activity, and DHS nowhere explains why all of those records, which include personal data of millions of American citizens, could be "relevant and necessary" to an investigation into "fatal crashes . . . by illegal aliens." *Id.* at 3. And again, the records DHS seeks—sensitive personal data about drivers—has no relevance to the investigative purpose that DHS has described—the claimed interest in investigating the issuance of CDLs at driving schools. *See id.* at 8.

Third, DHS's effort to circumvent the Privacy Act's prohibition against data disclosure is similarly unavailing. DHS argues that it can share the CDLIS database with FMCSA under the Privacy Act's routine-use exception, *see* 5 U.S.C. § 552a(b)(3), under a routine use in the EISR SORN that allows DHS to disclose records to agencies charged with "enforcing or implementing a law" where a "record, either on its face or in conjunction with other information, indicates a violation or potential violation of law." DHS Opp. at 15; *see* 85 Fed. Reg. at 74,365. Even assuming CDLIS data could fall within the EISR SORN, this routine use would not justify sharing CDLIS data because it allows DHS to share records only where *the individual record* "indicates a violation or potential violation of law." 85 Fed. Reg. at 74,365; *see Doe v. DiGenova*, 779 F.2d 74, 86 (D.C. Cir. 1985) (construing similar routine use in SORN and concluding that "[i]t is clear from the language" that "this routine use deals with referral of records to law enforcement officials only when the records themselves indicate a violation of law"). Nothing in DHS's brief suggests that *all* CDLIS master pointer records, whether on their face or in conjunction with other data, evidence violations of law.

## CONCLUSION

For the foregoing reasons, Movant States respectfully request that this Court quash DHS's administrative subpoena to AAMVA.

Dated: August 19, 2026

Respectfully Submitted,

**KWAME RAOUL**
Attorney General of Illinois

/s/ Katharine Roller
Cara Hendrickson*
*Executive Deputy Attorney General*
Katharine Roller†
Paul Berks*
*Complex Litigation Counsel*
Gretchen Helfrich†
*Deputy Chief, Special Litigation Bureau*
Molly Mauck†
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.,
Chicago, IL 60603

**JAY JONES**
Attorney General of Virginia

/s/ Megan C. Keenan
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
*Counsel of Record*
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us

312-814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
Paul.Berks@ilag.gov
Gretchen.Helfrich@ilag.gov
Molly.Mauck@ilag.gov
*Counsel for State of Illinois*

mphillips@oag.state.va.us
*Counsel for Commonwealth of Virginia*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Mitchell P. Reich*
Mitchell P. Reich†
*Senior Counsel to the Attorney General*
Karthik Reddy†
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov
*Counsel for District of Columbia*

**ROB BONTA**
Attorney General of California

*/s/ David Green*
Thomas S. Patterson*
Michael L. Newman*
*Senior Assistant Attorneys General*
Seth E. Goldstein*
Robin L. Goldfaden*
*Supervising Deputy Attorneys General*
David Green*
Maria Buxton*
Chase Goldstein*
Ezra Kautz*
Emilia P. E. Morris*
*Deputy Attorneys General*
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov
*Counsel for State of California*

**KRISTIN MAYES**
Attorney General of Arizona

*/s/ Mary M. Curtin*
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov
ACL@azag.gov
*Counsel for State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

*/s/ Gabe Podesta*
Gabe Podesta*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
Gabe.Podesta@coag.gov
Sarah.Weiss@coag.gov
*Counsel for State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Vianca Malick*
Vianca Malick*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Vianca.Malick@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

*/s/ Ian R. Liston*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Anuradha Sivaram*
*Assistant Attorney General*

*Counsel for State of Connecticut*

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Counsel for State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

/s/ *Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for State of Hawaiʻi*

**AARON M. FREY**
Attorney General of Maine

/s/ *Halliday Moncure*
Halliday Moncure*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Halliday.Moncure@maine.gov
*Counsel for State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ *Yasmin Dagne*
Yasmin Dagne*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ *Gerard J. Cedrone*
Gerard J. Cedrone*
*Deputy State Solicitor*
Michelle Pascucci*
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2282
Gerard.Cedrone@mass.gov
*Counsel for Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ *Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov
*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ *Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
*Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us
*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

/s/ *K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General

**JENNIFER DAVENPORT**
Attorney General of New Jersey

/s/ *Amanda McElfresh*
Amanda McElfresh*
*Deputy Attorney General*
New Jersey Office of the Attorney General

1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Counsel for the State of Nevada*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samanti*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Counsel for State of New Mexico*

124 Halsey Street
Newark, NJ 07101
609-696-5363
Amanda.McElfresh@law.njoag.gov
*Counsel for State of New Jersey*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
Matthew Conrad*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
212-416-8333
Rabia.Muqaddam@ag.ny.gov
Matthew.Conrad@ag.ny.gov
*Counsel for State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
*Counsel for State of Oregon*

**JOSH SHAPIRO**
Governor for Commonwealth of Pennsylvania

*/s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov
*Counsel for State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Lauryn K. Fraas*
Lauryn K. Fraas*
*Assistant Attorney General*
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov
*Counsel for State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Brian Keenan*
Brian Keenan*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857

Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov
*Counsel for State of Wisconsin*