IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Movants,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:26-mc-19 (AJT-IDD) |

**ORDER**

On August 11, 2026, Respondent, the United States Department of Homeland Security (DHS), served on the American Association of Motor Vehicle Administrators ("AAMVA") an Administrative Subpoena No. HSI-DC-2026-081167-001 (the "Administrative Subpoena"), [Doc. No. 2], for the production to it of highly sensitive information on over 17 million persons who have been issued Commercial Driver's Licenses ("CDL"). Pending are Movant States' Motion to Quash the Administrative Subpoena ("Motion to Quash"), [Doc. No. 1], and Respondents' Expedited Motion to Lift Order of Abeyance and Request for a Determination of Movants' Motion to Quash ("Motion to Lift"), [Doc. No. 82], (collectively, "the Motions'). Having considered the Administrative Subpoena, the Motions, the memoranda in support thereof, [Doc. Nos. 3, 23], and in opposition thereto, [Doc. No. 21], and the supporting exhibits and declarations before the Court, and for the reasons stated herein, this Court finds that: (1) this Court has jurisdiction over the Motion to Quash and venue is proper in this Court; (2) the Movant States have standing to move to quash the Administrative Subpoena; and (3) the Administrative Subpoena exceeds DHS' authority, compliance with which would violate the Driver's Privacy Protection Act ("DPPA")

and the Privacy Act, and is otherwise deficient and improper; and the Motion to Quash, for good cause shown, is **GRANTED,** the Administrative Subpoena **QUASHED**, and the Motion to Lift is **DENIED** as moot.

## I. BACKGROUND

Pursuant to federal legislation and regulations, the AAMVA was created to serve as the exclusive clearinghouse and depository of certain information supplied by the states with respect to their residents who have applied for or received CDLs. *See* 49 U.S.C. §§ 31309(a), (d) (requiring the Secretary of Transportation to maintain and operate "an information system," known as the Commercial Driver's License Information System ("CDLIS"), either directly or through an "authorized operator"); Commercial Driver's License Information System State Procedures Manual, Release 5.2.0, 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011) ("In 1988, the Federal Highway Administration (FHWA) entered into a designation agreement with AAMVA's affiliate AAMVA.net, Inc. to create and operate CDLIS. Under that agreement, CDLIS had to contain all the information required in 49 U.S.C. 31309(b). . . . [A] 1988 agreement automatically transferred to FMCSA upon the Agency's establishment and remained in effect until FMCSA and AAMVA, . . . entered into a superseding agreement in 2008."). This information, known as "master pointer records" ("MPR"), includes that person's name, date of birth, state of record, license number, and social security number, and is intended to be shared among the states in connection with their issuance of CDLs. *See* [Doc. No. 3-1] at 4, 5, 17, 21 (AAMVA's letters); *see also* § 31309(b) (listing the minimum information that the "system" should contain regarding each commercial motor vehicle operator).[1]

[1] "'[P]ointer records,' although built in large part from information in 'driver records,' are separate from driver records." [Doc. No. 3-1] at 5. Driver records "are maintained by originating jurisdictions," i.e., the States, "and merely accessed via the [CDLIS]." *Id.* at 6.

By statute and implementing policies and regulations, access to the information in the MPRs is highly restricted. In that regard, under 49 U.S.C. § 31106(e)(2), direct access may be granted only to "appropriate personnel of a State agency or instrumentality authorized to carry out State commercial motor vehicle safety activities and commercial driver's license laws, or appropriate personnel of a local law enforcement agency . . . ."[2] Additionally, "[t]he Secretary may require a State, as a condition of an award of grant money under this section, to provide the Secretary access to all State licensing status and driver history records via an electronic information system, subject to [the DPPA, 18 U.S.C. § 2721]." § 31106(c)(2); *cf.* § 31106(a)(2) (requiring coordination of CDLIS "in cooperation with the States"). And the Commercial Motor Vehicle Safety Act ("CMVSA") directs the Secretary to develop an information policy and ensure that information in CDLIS "shall be made available and subject to review and correction in accordance" with that policy. 49 U.S.C. § 31309(c). As this Court summarized in *Illinois, et al. v. DOT et al.*, 1:26-cv-2547-AJT-IDD, (hereinafter referred to as the "Related Case"):

> DOT has developed such a policy, issued on January 13, 2005, which explicitly states that that "the records in CDLIS are not controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005). A subsequent policy statement issued on May 18, 2026, states that the MPR records belong to the states, not the federal government. 91 Fed. Reg. 28514, 28517 (May 18, 2026) (describing the MPRs as "owned by each state."). The January 13, 2005 policy also reiterates that there are only four entities authorized to access information from CDLIS: "the Secretary of Transportation, the States, an employer or prospective employer of a person who operates a commercial motor vehicle (CMV), and a person who operates a CMV for an employer that owns or leases a CMV or assigns employees to operate a CMV." 70 Fed. Reg. at 2455. Reflecting the highly sensitive and protected nature of the CDLIS, under the Policy, other federal agencies may "request access to information" only upon a required showing in accordance with a designated procedure within the FMCSA and upon executing a "Memorandum of Understanding" with either DOT or FMCSA. *Id.*

---

[2] "Notwithstanding any prohibition on disclosure of information in" the Privacy Act, the Secretary "may" disclose information contained in the CDLIS to these designated persons "in accordance with standards, conditions, and procedures as determined by the Secretary," 49 U.S.C. § 31106(e)(2), and the policy developed by the Secretary on making CDLIS information available "shall be consistent with existing Federal information laws, including regulations . . . ." § 31106(e)(1).

Order, *Id.*, Doc. No. 54 (E.D. Va. Aug. 20, 2026).

By letter dated June 25, 2026, the Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation (DOT) demanded that AAMVA turn over the MPRs for every driver in the entire Commercial Driver's License Information System ("CDLIS") database going back five years, comprising approximately 17 million MPRs. An exchange of letters ensued, in which AAMVA raised concerns that complying with the Data Demand would violate federal and state laws and regulations, including the DPPA and the Privacy Act, as well as its contracts with the states, which administer CDLs. *See* [Doc. No. 3-1] (letters).

On July 28, 2026, an administrative subpoena, ostensibly issued by DHS, was served on AAMVA (the "First Subpoena"), titled "Immigration Enforcement Subpoena," which called for production of the same data demanded by FMCSA. The stated purpose was to obtain files needed "in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws." *See* [Doc. No. 3-1] at 16. Thereafter, FMCSA informed AAMVA by email that "FMCSA and DHS had coordinated on their data demands and that the subpoena would be withdrawn due to AAMVA's efforts to cooperate with FMCSA." *Id.* Accordingly, the First Subpoena was withdrawn. [Doc. No. 3] at 5.

By letter dated August 7, 2026, AAMVA informed FMCSA that it would convene its Board of Directors to consider an "opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." [Doc. No. 3-1] at 16 (emphasizing that, "[a]t bottom, this is state data that does not belong to AAMVA").

In response, by letter dated August 11, 2026, to AAMVA, DOT and FMCSA, acting through their General Counsel, stated that AAMVA's "opt-in or opt-out choice by the states" is "unacceptable" and that "[g]iven your shift in position, DOT has no choice but to take immediate

action to secure the production of the requested pointer records," referencing, as implementation of that decision, that "[t]oday, the Department of Homeland Security will reissue the administrative subpoena it previously withdrew[]" and that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* at 23–24.

That same day, the Administrative Subpoena at issue in this matter was again issued to AAMVA, titled "IMMIGRATION ENFORCEMENT SUBPOENA," which was identical to the First Subpoena. The Administrative Subpoena demanded a response by 8:00 a.m. Eastern Time on August 17, 2026, six days after service. [Doc. No. 2]. The reason for the Administrative Subpoena, as stated in the cover letter, is "investigating illegal practices in commercial driver's license (CDL) schools, identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens, and conducting civil immigration enforcement." [Doc. No. 2] (citing 8 U.S.C. § 1225(d) as legal authority for DHS's demand).

On August 13, 2026, several States and the District of Columbia (collectively, the "Movant States" or "Movants") brought this Motion to Quash the Administrative Subpoena. [Doc. No. 1].

On August 14, 2026, the Court, finding it would benefit from additional briefing on the Motion to Quash, entered an administrative stay "until further order of this Court, during which, the time for AAMVA to produce documents pursuant to the Subpoena is continued to a date to be determined." [Doc. No. 19].

On August 20, 2026, after further briefing and oral arguments on the Motion to Quash and the then pending motion for a temporary restraining order in the Related Case, the Court ordered that the administrative stay be vacated and the Motion to Quash be held in abeyance pending the

further consideration and disposition of issues raised in the Related Case challenging the DOT's Data Demand, with the time for AAMVA to respond to the Administrative Subpoena continued, pending further court order. [Doc. No. 25].

On September 17, 2026, this Court issued a preliminary injunction in the Related Case, enjoining "AAMVA, its officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them . . . from transferring to the Federal Defendants or any other agency the Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand," and enjoining

> DOT, FMCSA, Secretary of Transportation, and the Administrator of FMCSA, their officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them . . . from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the information requested in the Data Demand, including, without limitation, terminating or threatening to terminate AAMVA's federal contracts or funding, terminating or threatening to terminate Plaintiff States' federal contracts or funding, or taking any other action that could impair the operation of CDLIS or Plaintiff States' ability to issue commercial driver's licenses . . . .

Order, *Illinois et al.*, 1:26-cv-2547-AJT-IDD, Doc. No. 113 at 16 (Sept. 17, 2026).[3]

By order dated September 21, 2026, the Court granted in the Related Case the request of the American Federation of Teachers ("AFT") to intervene. Order, *Id.*, Doc. No. 114 (Sept. 21, 2026).[4]

## II. LEGAL STANDARD

Rule 45(d)(3) of the Federal Rules of Civil Procedure, titled "Quashing or Modifying a Subpoena," provides that "[o]n timely motion, the court for the district where compliance is

---

[3] In the Related Case, the Plaintiff States and the Federal Defendants raised similar arguments related to the DPPA and Privacy Act. The Court accordingly incorporates into its analysis here the relevant facts and applicable law contained in the preliminary injunction order entered in that case. *See* Order, *Id.*, Doc. No. 113 (Sept. 17, 2026).

[4] The basis for the intervention was that certain AFT members, principally 13,500 workers in the U.S. transportation industry—including school bus drivers, maintenance drivers, civil engineers and inspectors—hold CDLs, and their personal identifying information is included within the CDLIS. Mot. To Intervene, *Id.*, Doc. Nos. 91, 91-2 (Sept. 1, 2026).

required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter . . . ." Fed. R. Civ. P. 45(d)(3)(A), (A)(iii). Rule 81, which discusses the applicability of the Rules generally, states, with regard to proceedings involving a subpoena, that "[t]hese rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5).

Separately, 8 U.S.C. § 1225(d) provides:

> Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

*Id.* § 1225(d)(4)(B).

## III. DISCUSSION

The Plaintiff States seek to quash the Administrative Subpoena on the following grounds: (1) the Administrative Subpoena is defective on its face under 8 C.F.R. § 287.4 in that it fails to state the "title of the proceeding" for which the information is sought; (2) it exceeds DHS's statutory authority under 8 U.S.C. § 1225(d) in that it constitutes an unlawful, sweeping, unfocused "John Doe" subpoena and seeks documents based on stated purposes that are not reasonably related to the scope of the subpoena; (3) compliance with it would violate the DPPA, including the government-use exception, which requires that a requesting agency demonstrate that all of the information obtained is actually used in effectuating a legitimate government function; (4) compliance with it would violate the Privacy Act's "core privacy protections," including the Act's (i) notice requirements for creating or modifying a "system of records," which the Plaintiff States

allege the Administrative Subpoena effectively does by creating a new database of CDLIS information, (ii) requirement that an agency maintain only such information about individuals as is "relevant" and "necessary" to a purpose which the agency is required by law to accomplish, and (iii) consent requirement for disclosure of personal information to another federal agency, the exceptions to which Plaintiffs argue have not been satisfied here; and (5) it was issued in bad faith in that its purpose was not solely to enforce immigration laws but to strong-arm AAMVA into compliance with FMCSA's improper Data Demand. [Doc. No. 3] at 10–21.

In turn, DHS argues that this Court lacks jurisdiction to quash a pre-enforcement administrative subpoena, and that Federal Rules of Civil Procedure 45(d)(3)(A) and 81(a)(5), relied upon by the Plaintiffs, are inapplicable here, where DHS has not initiated a relevant enforcement "proceeding." [Doc. No. 21] at 3–5. DHS also contends that the Administrative Subpoena is lawful because (1) DHS was not required to specify the title of a proceeding because it was not seeking the appearance of a person as part of such a "proceeding"; (2) DHS possesses broad statutory authority to issue such subpoenas without the particularity which Plaintiffs claim is needed; (3) the stated purposes for the Administrative Subpoena fall within § 1225(d)(4)(a) and are adequately connected to the information requested; and (4) DHS's interest in the same information as FMCSA does not support bad faith because the Administrative Subpoena would not be necessary if FMCSA obtained and was able to provide to DHS the requested information. [Doc. No. 21] at 8–11. Finally, DHS contends that it is permitted to obtain the information it seeks in the Administrative Subpoena under both (1) the DPPA, given its government-use exception applies; and (2) the Privacy Act, given that (i) its notice requirements are inapplicable here, where DHS' request is covered by an existing system of records, (ii) the DPPA's maintenance requirements are met, and (iii) the routine use exception to its disclosure and consent requirements

applies. *Id.* at 13–15.

A. This Court has jurisdiction.

Given the nature of the information sought, DHS understandably does not contend that the Plaintiff States lack standing to object to and quash the subpoena.[5] *See Thomas v. Marina Assocs.*, 202 F.R.D. 433, 434 (E.D. Pa. 2001) ("Generally speaking, a party does not have standing to quash a subpoena served on a third party. An exception is made, however, where, as here, the party seeks to quash based on claims of privilege relating to the documents being sought."). Rather, it contends that the Court lacks jurisdiction to determine the enforceability *vel non* of the Administrative Subpoena since the time for AAMVA to respond has not yet passed, DHS has not yet moved to enforce the Administrative Subpoena, and the issue of enforceability is therefore not yet "ripe."

Rule 45 of the Federal Rules of Civil Procedure specifically authorizes the Court to quash a subpoena that "requires disclosure of privileged or other protected matter," as the Administrative Subpoena does here, "if no exception or waiver applies . . . ." Fed. R. Civ. P. 45(d)(3)(A)(iii). Rule 81 makes Rule 45 applicable to subpoenas issued by a "United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5). Nor does § 1225(d), relied upon by DHS, deprive the Court of the jurisdiction clearly conferred under Rules 45 and 81. Rather, § 1225(d) simply expands the Court's jurisdiction "in the event of neglect or refusal to respond to a subpoena" for documents

[5] As confirmed in connection with the preliminary injunction issued in the Related Case, the Movant States have standing to challenge the Administrative Subpoena, as they do with respect to FMCSA's and DOT's Data demand, given that (1) the States, not AAMVA, own the records stored in the CDLIS, (2) transfer of such records to DHS pursuant to the Administrative Subpoena would "profoundly alter the nature of the CDLIS database and deprive the States of control over their data," (3) disclosure of such State-owned records would "impose significant compliance burdens on the States," and (4) residents' loss of trust in their States resulting from the transfer of their personal data would lead to a chilling effect on the pool of legally present and qualified CDL applicants accompanied by a decline in revenue from application fees, as well as a potential public safety risk in the event that "residents who would otherwise become qualified operators of commercial motor vehicles . . . attempt to drive commercial motor vehicles without a license . . . ." [Doc. No. 3] at 7–9.

demanded by an immigration officer. *See* § 1225(d)(4) (authorizing "[a]ny United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer" to order compliance). Based on these provisions, the Court concludes that it has jurisdiction to consider the Motion to Quash, just as other courts have held in similar cases involving motions to quash administrative subpoenas. *See, e.g.*, *Greene v. Philadelphia Housing Authority*, 789 F. Supp. 2d 582, 586 (E.D. Pa. 2011) ("The HUD subpoena is an administrative subpoena issued by the HUD Office of the Inspector General, pursuant to the Inspector General Act, 5 U.S.C.App. 3 § 6(a)(4). The Inspector General Act specifically provides that subpoenas issued pursuant to the Act are [in the case of refusal to obey,] 'enforceable by order of any appropriate United States district court.'"). This conclusion is underscored by the current posture of the case, where AAMVA has now been enjoined from turning over the subpoenaed information to DHS and can be deemed to have constructively refused to do so. *See* Order, *Illinois et al.*, 1:26-cv-2547-AJT-IDD, Doc. No. 113 at 16 (Sept. 17, 2026).

B. DHS is not authorized to obtain the subpoenaed documents from AAMVA.

As an initial matter, DHS is not authorized by statute, regulation, or DOT policy to receive—by administrative subpoena or otherwise—the subpoenaed records directly from AAMVA. As stated above, direct access to MPRs contained within the CDLIS are restricted to a specific universe of potential recipients, none of which include DHS. *See supra* Section I.

C. The Administrative Subpoena is defective on its face.

The issuance of the Administrative Subpoena did not follow the "proper administrative steps" required by applicable law, as clear from the face of the subpoena. *See Spell v. United States*, 907 F.2d 36, 39 (4th Cir. 1990). Specifically, 8 C.F.R. § 287.4(b) requires that all subpoenas be issued on Form I-138 and that the title of the proceeding for which the documents are demanded

be stated. Here, the Administrative Subpoena left blank the space for "the title of the proceeding" for which the subpoenaed documents were being requested.

DHS argues that the "title of the proceeding" requirement applies only to subpoenas seeking a person's appearance or testimony (which DHS would indicate by checking Box A of the Form I-138) and that 8 C.F.R. § 287.4(b) therefore does not require DHS to name a specific "proceeding" in Box 2 of the Form I-138 when seeking production by checking Box B. But that contention flies in the face of the clear text of the applicable regulation,[6] and DHS's own past practice in issuing subpoenas pursuant to 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4. *See* [Doc. No. 21] at 13; *United States v. Baass*, No. 2:25-mc-00083-JLS-SSC (C.D. Cal.), Doc. No. 9-1 at 6 (DHS administrative subpoena does not check Box A, checks Box B, and lists title of proceeding in Box 2).

D. The Administrative Subpoena exceeds DHS's authority.

Despite DHS's "concededly broad subpoena and investigatory authority," *see Peters v. United States*, 853 F.2d 692, 695–96 (9th Cir. 1988) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)) (discussing Immigration and Naturalization Services' subpoena and investigative authority), "[t]he authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute." *Peters*, 853 F.2d at 696. Subpoenas may "be

---

[6] 8 C.F.R. § 287.4(b) states in full:

> ***Form of subpoena.*** All subpoenas shall be issued on Form I-138.
>
> (1) ***Criminal or civil investigations.*** The subpoena shall command the person or entity to which it is addressed to attend and to give testimony at a time or place specified. A subpoena shall also command the person or entity to which it is addressed to produce the books, papers, or documents specified in the subpoena. A subpoena may direct the taking of a deposition before an immigration officer of the Department.
>
> (2) ***Proceedings other than naturalization proceedings.*** *Every subpoena issued under the provisions of this section shall state the title of the proceeding* and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. A subpoena shall also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena. A subpoena may direct the taking of a deposition before an immigration officer of the Department.

(emphasis added).

used only for a legitimate and authorized governmental purpose," and thus the government is prohibited "from 'engaging in arbitrary fishing expeditions' and from 'selecting targets of investigation out of malice or an intent to harass.'" *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (cleaned up) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)).

Here, the Administrative Subpoena, directing AAMVA to produce the personal identifying information of 17 million individuals, represents a textbook example of an improper "John Doe" subpoena with no clear purpose or need other than to place a massive amount of personal identifying information directly into an unauthorized administrative agency.[7] *See, e.g.*, *Peters*, 853 F.2d at 695 n.3, 698–99 (identifying a subpoena as an improper "John Doe" subpoena because it requests "information concern[ing] individuals whose identity is currently unknown to [the agency]," without specific statutory authorization to do so); *see also Gen. Ins. Co. of Am. v. EEOC*, 491 F.2d 133, 136 (9th Cir. 1974) (upholding denial of enforcement of EEOC's demand for information from employer because it was "unduly broad" in that it "reached back in time nearly eight years . . ." and "demanded evidence going to forms of discrimination not even charged or alleged . . ."); *In re Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792, at *4–9 (D. Md. Jan. 21, 2026) (describing as "the classic impermissible fishing expedition" DOJ's subpoena for hospital's production of adolescent patient records, including patient names, social security numbers, and other personal information, which the Government asserted "was issued in furtherance of ferreting out violations of the FDCA" without articulating any particular hospital

[7] The Administrative Subpoena's cover letter states that Homeland Security Investigations is "investigating illegal practices in commercial driver's license (CDL) schools, identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens, and conducting civil immigration enforcement." [Doc. No. 2] at 3. The subpoenaed records have no information pertaining to CDL schools or an understandable connection to Respondent's unparticularized investigatory or enforcement needs. *See infra* Section III.E (discussing government use exception under the DPPA).

violations). In that regard, "[a]gencies are . . . not afforded 'unfettered authority to cast about for potential wrongdoing . . . .'" *CFPB v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017) (quoting *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994)). And even in cases in which the subjects of investigation are identified, the Supreme Court has warned that an investigation "may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to" exceed the government's power. *Morton Salt Co.*, 338 U.S. at 652 ("But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.") (upholding Commission's order requiring entities' additional reports to assess their compliance with prior proceedings). And "where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced." *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (quoting *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir. 1968) ("This judicial protection against the sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the [individual subject of the investigation] but to a third-party who may have had some dealing with the person under investigation.")).

E. Compliance with the Administrative Subpoena would violate the DPPA and Privacy Act

The information sought under the Administrative Subpoena contains both "personal information" and "highly restricted personal information," as defined by statute, drawn from the States' "motor vehicle records." *See* 18 U.S.C. § 2725(3) (defining "personal information" as information that identifies an individual," including their driver identification number, name, address and telephone number); § 2725(4) (defining "highly restricted personal information" as "an individual's photograph or image, social security number, medical or disability information"). The DPPA prohibits "any person" from "obtain[ing] or disclos[ing] any personal information[]

from a motor vehicle record" unless one of fourteen exceptions applies. 18 U.S.C. § 2722(a); *see* 18 U.S.C. § 2721(a)(1), (c). Four of those exceptions enable disclosure of the "highly restricted personal information" sought in the Administrative Subpoena. § 2721(a)(2), only one of which DHS relies on, *viz.*, the "government use exception." *See* § 2721(b)(1).

Section 2721(b)(1) permits disclosure "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." § 2721(b)(1). DHS contends this exception applies to the subpoenaed documents because the personal and highly restricted personal information will assist the agency "in carrying out its functions." *See* [Doc. No. 21] at 13.

The purpose of the DPPA is to safeguard information for security and safety reasons. *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 607 (7th Cir. 2012) (en banc) ("*Senne I*") ("[From the legislative history,] it is clear that safety and security concerns associated with excessive disclosures of personal information held by the State in motor vehicle records were the primary issue to be remedied by the legislation." (citing, for example, 140 Cong. Rec. H2526 (daily ed. Apr. 20, 1994) (statement of Rep. Porter Goss))). Moreover, "[t]he default rule of the statute is that the DMV, and any person or entity authorized to view its records, is *prohibited* from sharing the information." *Id.* at 603. Given this overriding purpose, courts have recognized that while an agency's "use" for personal information need not be "immediate or certain" to come within the government use exception, *Senne v. Vill. of Palatine*, 784 F.3d 444, 446 (7th Cir. 2015), the use must be particularized and narrowly defined such as would maintain "[t]he balance between law enforcement and privacy," which "favors allowing discreet disclosure of limited information of credible value to law enforcement, since the potential harm of such disclosure is negligible but the

benefits nonnegligible." *Id.* at 447–48.

Here, even under the Administrative Subpoena's broadly stated statutory purposes for requesting the data, DHS cannot conceivably "use"—nor does it attempt to specify how it can use—each particular piece of protected personal information contained in the 17 million sought-after records, dating back five years, to effectuate "its functions." *See Senne I*, 695 F.3d at 605 (rejecting the government's view that, "as long as it can identify a subsection of the law under which *some* disclosure is permitted, *any* disclosure of information otherwise protected by the statute is exempt, whether it serves an identified purpose or not . . ."); *see also Maracich v. Spears*, 570 U.S. 48, 74 (2013) ("Each distinct disclosure or use of personal information acquired from a state DMV must be permitted by the DPPA. *See* § 2724(a) ("A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains"); *see also* § 2721(c).").[8]

Compliance with the Administrative Subpoena would also violate the Privacy Act for three main reasons. First, the Privacy Act requires agencies to publish a notice when creating or modifying a system of records. 5 U.S.C. § 552a(a)(5) (defining "system of records"); § 552a(e)(4) (requiring publication "in the Federal Register upon establishment or revision a notice of the existence and character of the system of records," and enumerating details required to be in such notice); §§ 552a(e)(11), (r). Section 552a(e)(11) states:

> [A]t least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use

---

[8] DHS has so far has identified one particular plan for the requested data: to investigate "driving schools for the issuance of CDLs [sic] to illegal aliens . . . ." *See* [Doc. No. 21] at 8. But how the limited yet highly sensitive information for 17 million CDL holders relates to that effort is unclear, particularly since the MPRs have no information pertaining to driving schools and the States and the District of Columbia, not driving schools, issue CDLs. *See, e.g.*, 49 C.F.R. § 383.5 (defining "CDL" as "a license issued to an individual by a State or other jurisdiction of domicile").

> of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency . . . .

Section 552a(r) states:

> Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.

DHS contends that the requested records are "covered by DHS's existing system of records," namely, DHS's "External Investigations System of Records" ("EISR"), which already has a published system of records notice ("SORN") that adequately notifies commercial motor vehicle operators it contains personal information required for the Agency's investigative activities. *See* [Doc. No. 21] at 14 (citing System of Records, 85 Fed. Reg. 74362, 74362, 74634 (Nov. 20, 2020)). But the broad EISR SORN does not sufficiently alert the public to the "categories of records maintained in the system" which DHS intends to collect, including commercial drivers' personal information that is unrelated to a law-enforcement investigation, particularly because many individuals swept up in the records request cannot plausibly be the subject of or involved in in an investigation and because DHS has not identified any such investigation necessitating these millions of records. *See* § 552a(e)(4)(C); 85 Fed. Reg. at 74364 (setting forth several expansive categories of records that Respondent possesses, including "subject records"; "associate, victim, and witness records"; records about "third-party record holders"; and "investigatory and evidentiary records").

Second, the Privacy Act directs agencies to maintain "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required . . . by statute or by executive order . . . ." § 552a(e)(1). With respect to this data-minimization

requirement, DHS offers simply that "the subpoena seeks information relevant and necessary to DHS's statutory law enforcement activities." [Doc. No. 21] at 15. This empty explanation is unpersuasive for reasons similar to those stated above, namely, that the Administrative Subpoena does not sufficiently explain the need for the sweeping, unfocused request for millions of records pertinent to DHS's law-enforcement authority such that the Court can ascertain how all those records could be "relevant and necessary" to the claimed investigative purpose involving driving schools or some other, permissible purpose.

Third, the Privacy Act restricts the information-sharing between agencies that purportedly would occur here. Specifically, § 552a(b) provides:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be [made in accordance with the enumerated exceptions below].

One of the exceptions to this data disclosure prohibition, is the routine-use exception under § 552a(b)(3), which DHS invokes. That exception permits disclosure pursuant to a "routine use," provided that such routine use is "compatible with the purpose for which [the information] was collected," § 552a(a)(7), and is noticed in the Federal Register, "including the categories of users and the purpose of such use." *See id.* § 552a(e)(4)(D).[9]

---

[9] As an initial matter, DHS's intended use of the MPRs is certainly not "compatible with the purpose for which [the information] was collected" by AAMVA. *See* § 552a(a)(7). But whether AAMVA's purpose in collecting the subpoenaed information controls for the purposes of the routine use exception is not clear. In that regard, DHS, a federal agency, issued the Administrative Subpoena on AAMVA, which is not a federal agency but rather a private non-profit organization not subject to the Privacy Act. *See* AAMVA, Applications & Services Privacy Principles (last visited: Oct. 16, 2026 at 12:20 EST), Applications & Services Privacy Principles - American Association of Motor Vehicle Administrators - AAMVA. Nevertheless, Movants contend based on § 552(b) that "the subpoena, which DHS has plainly issued in part for the purpose of obtaining information on behalf of FMCSA, violates the Privacy Act's basic prohibition against disclosing personal information without consent." [Doc. No. 3] at 22. And given DHS's statements concerning how it intends to use that information, DHS's possession of the subpoenaed documents for the stated law enforcement purposes can reasonably portend the transfer of information in those documents to other law enforcement agencies. Compliance with the Privacy Act by DHS' expected transfer of information to other agencies is therefore a relevant consideration in determining whether to quash the Administrative subpoena.

Signaling its intention to share the subpoenaed information with other agencies, DHS argues that the CDLIS database can be shared pursuant to this routine-use exception based on its already in place EISR SORN, which allows DHS to disclose records to another agency "charged with investigating or prosecuting a violation or enforcing or implementing a law, rule, regulation, or order, where a record, . . . indicates a violation or potential violation of law . . . ." [Doc. No. 21] at 15 (quoting 85 Fed. Reg. at 74365). But the routine-use exception requires agencies to publish a detailed notice consistent with § 552a(e)(4)(D), and in line with the rulings of other courts, including the D.C. Circuit in a case construing similar routine use language in SORN, DHS's claimed routine use requires that each individual record must "indicate[] a violation or potential violation of law." *See Cooper v. F.A.A.*, 816 F. Supp. 2d 778, 787 (N.D. Cal. 2008), *rev'd*, 622 F.3d 1016 (9th Cir. 2010), *rev'd*, 566 U.S. 284 (2012), and *aff'd*, 696 F.3d 1265 (9th Cir. 2012) (addressing a routine use that "allows sharing with an appropriate federal agency only when a system of DOT records 'indicates a violation or potential violation of the law . . .") ("When DOT–OIG sent the name, social security number, date of birth and gender of approximately 45,000 pilots to SSA–OIG, it was not because those records indicated a violation or potential violation of the law. Rather, the records were sent to *discover* violations or potential violations."); *Doe v. DiGenova*, 779 F.2d 74, 84, 86 (D.C. Cir. 1985) (addressing a routine use provision that allows disclosure of relevant records to an appropriate agency in the event that the system of records "indicates a violation or potential violation of law") ("It is clear from the language of the provision that this routine use deals with referral of records to law enforcement officials only when the records themselves indicate a violation of law.").

Here, DHS has not identified, nor does it contend, that the individual records evidence violations or potential violations of law, and to allow it to obtain these records so that it can share

them with other law enforcement agencies would run afoul of the "delicate balance between limiting disclosure of records, and not unduly hampering government operations" reflected in the specific exemptions Congress established. *DiGenova*, 779 F.2d at 84 ("The memorandum describing the compromise bill states that this provision was 'intended to discourage the unnecessary exchange of information to other persons or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material.' 120 Cong.Rec. 40,881 (introduced by Congressman Moorhead), *reprinted in Legislative History* at 859–60.").

F. The Administrative Subpoena appears to have been issued for an improper purpose.

The Court may inquire into the underlying reasons for the Administrative Subpoena to prevent abuse of the Court's process. *See United States v. Powell*, 379 U.S. 48, 58 (1964). "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* Here, one of DOT's stated purposes for the Data Demand was to share that information with DHS; and the record indicates that the Administrative Subpoena was issued to assist DOT in its efforts to pressure AAMVA into acceding to FMCSA's and DOT's improper Data Demand. In short, DHS's Administrative Subpoena, whose issuance and threatened enforcement appears to have been under the supervision, if not actual control, of DOT, was used to settle a collateral dispute between AAMVA and DOT. *See* [Doc. No. [Doc. No. 3-1] at 16 (August 7 letter) (referencing FMCSA's indication "that FMCSA and DHS had coordinated on their data demands and that the subpoena would be withdrawn due to AAMVA's efforts to cooperate with FMCSA"); *id.* at 23–24 (August 11 letter) ("Given your shift in position, DOT has no choice but to take immediate action to secure the production of the requested pointer records," including that "[t]oday, [DHS] will reissue the administrative subpoena

it previously withdrew[]" and that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including . . . filing an enforcement action to enforce the subpoena . . . .").

## IV. CONCLUSION

For the above reasons, it is hereby

**ORDERED** that the Motion to Quash, [Doc. No. 1], be, and the same hereby is, **GRANTED** and the Administrative Subpoena **QUASHED;** and it is further

**ORDERED** that the Motion to Lift, [Doc. No. 82], be and the same hereby is, **DENIED** as moot.

The Clerk is directed to forward copies of this Order to all counsel of record.

October 20, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge